UNITED  STATES  DISTRICT  COURT

FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA

| | |
|---|---|
| UNIVERSAL ELECTRONICS, INC., ) | CASE NO. SACV 12-00329 AG (JPRx) |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | CLAIM CONSTRUCTION ORDER |
| v. ) | |
| ) | |
| ) | |
| UNIVERSAL REMOTE CONTROL ) | |
| INC. ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

1   **BACKGROUND**

2

3       Plaintiff Universal Electronics, Inc. ("Plaintiff") alleges that Defendant Universal Remote
4   Control, Inc. ("Defendant") has infringed the following U.S. Patents:
5   •       5,414,426 (the "'426 Patent"), titled "Favorite Key Macro Command and Chained Macro
6           Command in a Remote Control"
7   •       5,568,367 (the "'367 Patent"), titled "Remote Control with Key Lighting"
8   •       5,614,906 (the "'906 Patent"), titled "Method for Selecting a Remote Control Command
9           Set"
10  •       6,587,067 (the "067 Patent"), titled "Universal Remote Control with Macro Command
11          Capabilities"
12      The parties dispute the meaning of twelve claim terms, and have agreed to the meaning of
13  twenty-four claim terms.  (Joint Claim Construction Chart.)  The parties presented extensive
14  arguments in their papers and at the hearing.  In this Order, the Court determines the proper
15  claim constructions of each disputed term.

16

17  **LEGAL STANDARD**

18

19      Claim construction is an issue of law "exclusively within the province of the court."
20  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).  Such construction begins
21  with an analysis of the claim language itself, *Interactive Gift Express, Inc. v. Compuserve, Inc.*,
22  256 F.3d 1323, 1331 (Fed. Cir. 2001), since the claims define the scope of the claimed invention.
23  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005).  In construing the claim language,
24  the Court begins with the principle that "the words of a claim are generally given their ordinary
25  and customary meaning."  *Id*. at 1312 (internal quotation marks omitted).
26      The ordinary and customary meaning is the meaning that the [claim] term would have to a
27  person of ordinary skill in the art in question at the time of the invention."  *Id*. at 1313.  "[T]he
28  person of ordinary skill in the art is deemed to read the claim term not only in the context of the

1    particular claim in which the disputed term appears, but in the context of the entire patent.

2    Where the patent itself does not make clear the meaning of a claim term, courts may look to

3    "those sources available to the public that show what a person of skill in the art would have

4    understood the disputed claim language to mean," including the prosecution history and

5    "extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and

6    the state of the art." *Id*. at 1314.

7           "In some cases, the ordinary meaning of claim language as understood by a person of

8    skill in the art may be readily apparent even to lay judges, and claim construction in such cases

9    involves little more than the application of the widely accepted meaning of commonly

10   understood words." *Id*.  "In such circumstances general purpose dictionaries may be helpful."

11   *Id*. at 1314.  In other cases, claim terms will not be given their ordinary meaning because the

12   specification defines the term to mean something else. *Novartis Pharms. Corp. v. Abbott Labs.*,

13   375 F. 3d. 1328, 1334 (Fed. Cir. 2004); *Kumar v. Ovonic Battery Co., Inc.*, 351 F.3d 1364, 1368

14   (Fed. Cir. 2003).  For the specification to define a term to mean something other than its

15   ordinary meaning, it must set out its definition in a manner sufficient to provide notice of that

16   meaning to a person of ordinary skill in the art. *In re Paulson*, 30 F.3d 1475, 1480 (Fed. Cir.

17   1994).

18         Under 35 U.S.C. § 112, ¶ 6, a patentee may express a claim limitation as "a means or step

19   for performing a specified function without the recital of structure, material, or acts in support

20   thereof." *Inventio AG v. ThyssenKrupp Elevator Americas Corp.*, 649 F.3d 1350, 1356 (Fed.

21   Cir. 2011).  Such limitations, often referred to as "means plus function" claims, "shall be

22   construed to cover the corresponding structure, material, or acts described in the specification

23   and equivalents thereof." *Id*.  Section 112, ¶ 6 applies "only to purely functional limitations that

24   do not provide the structure that performs the recited function." *DuPuy Spine, Inc. v. Medtronic*

25   *Sofamor Danek, Inc.*, 469 F.3d 1005, 1023 (Fed. Cir. 2006).

26

27

28

**ANALYSIS**

**1.      '426 PATENT**

The parties dispute the construction of three limitations in claim 10 of the '426 Patent. (Joint Claim Construction Chart 4-6.)  Because they appear next to each other in the claim and are closely related, the Court will consider their construction as a group.  Claim 10, with the disputed limitations in bold and designated A, B, and C, reads as follows:

10. A remote control comprising:

a microprocessor including a CPU and memory means;

a keyboard coupled to said microprocessor and including a set of keys including
        number keys and at least one MACRO key;

IR lamp driver circuitry coupled to said microprocessor;

light emitting means for generating and emitting IR signals coupled to said IR
        lamp driver circuitry;

code data stored in said memory means for creating the IR signals, which are sent
        by said light emitting means to a controlled device to cause the controlled
        device to perform specific command functions;

a macro entry/definition program stored in said memory means;

**[A] means for determining if a predetermined keystroke sequence entered on
        the keyboard is, according to said macro entry/definition program, a
        command to establish a select channel macro;**

**[B] means for determining, after a select channel macro command is sensed, if
        one or more of said number keys have been depressed followed by
        depression of the at least one MACRO key; and,**

**[C] means for storing the number(s) of the depressed number key or keys in
        association with the at least one MACRO key in said memory means.**

4

### 1.1.    Limitations A, B, and C Are All Means Plus Function Limitations

The parties agree that limitations A and B are means plus function terms governed by 35 U.S.C. § 112, ¶6 and that the identified structure in the specification includes a microprocessor. Plaintiff argues that limitation C is not a means plus function term.  (Pl.'s Opening Claim Construction Br. 11.)  Because resolution of that dispute will determine whether means plus function analysis will apply to all three limitations, the Court addresses it first.

To decide whether a limitation is subject to means plus function treatment, the Court must first look to the claim terms.  "The use of the term 'means' triggers a rebuttable presumption that § 112 ¶ 6 governs the construction of the claim term."  *Inventio*, 649 F.3d at 1356 (citing *TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259 (Fed. Cir. 2008)).

Plaintiff argues that "means for storing the number(s) of the depressed number key or keys in association with the at least one MACRO key in said memory means" is not governed by 35 U.S.C. § 112, ¶6 because it "recites the structure (i.e. memory) necessary to perform the recited function."  (Pl.'s Opening Claim Construction Br. 11.)  Plaintiff acknowledges that use of the word "means" creates a presumption that 35 U.S.C. § 112, ¶6 applies, but argues that "[i]f, in addition to the word 'means' and the functional language, the claim recites sufficient structure for performing the described functions in their entirety, the presumption of § 112 ¶6 is overcome."  (*Id.* (quoting *TriMed, Inc. v. Stryker Corp.*, 514 F. 3d 1256, 1259 (Fed. Cir. 2008).)  Plaintiff argues that the recitation of "said memory means" (referencing the structure recited earlier in the claim) is sufficient structure because the parties have agreed that "memory means" needs no construction and is not a means plus function term.  (*Id.*)  Plaintiff also cites a few cases holding, in the circumstances of those cases, that "memory means" was not a means plus function term.  (*Id.*)

But whether "memory means" is a means plus function term is not the question.  The limitation is "**means for storing** the number(s) of the depressed number key or keys in association with the at least one MACRO key **in** said memory means" (emphasis added).  The memory means, standing alone, cannot be the "means for storing the number . . . in the memory

means." While not an absolute rule, all claim terms are presumed to have meaning in a claim. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004). Thus, the "means for storing the number . . . in the memory means" invokes structure beyond the memory means itself. The fact that the claim states that the function is to act on a clearly defined structure does not convert the term into something other than a means plus function term. The Court holds that limitation C is a means plus function term governed by 35 U.S.C. § 112, ¶6.

### 1.2.    The Claimed Functions for Limitations A, B, and C

The construction of a means plus function limitation includes two steps: (1) determine the claimed function; (2) identify the corresponding structure in the written description that performs that function. *JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir. 2005) (citing *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1321 (Fed. Cir. 2003)).

As to limitations A and B, the parties agree on the claimed functions: they are the simply the portions of the limitation after the "means for" language. (Joint Claim Construction Chart 4-5.) The Court agrees. As to limitation C, only Defendant proposed a function. (*Id.* at 6.) As for the other limitations, it is simply the function recited in the claim. (*Id.*) The Court agrees that the Defendant has correctly identified the function. Therefore, the Court holds that the claimed functions are as follows:

A.    "determining if a predetermined keystroke sequence entered on the keyboard is, according to said macro entry/definition program, a command to establish a select channel macro";

B.    "determining, after a select channel macro command is sensed, if one or more of said number keys have been depressed followed by depression of the at least one MACRO key";

C.    "storing the number(s) of the depressed number key or keys in association with the at least one MACRO key in said memory means."

6

### 1.3.   What Structure Does the '426 Patent's Specification Link to the Claimed Functions, and Is It Sufficient?

The parties agree that the structure corresponding to limitations A and B includes a microprocessor.  (Joint Claim Construction Chart 4-5.)  The parties dispute whether the specification sufficiently discloses an algorithm performed by the microprocessor for those limitations.  (*Id*. at 4-6.)  Defendant argues that limitation C also includes a microprocessor, and that the disclosed "algorithm" is insufficient.  (*Id*. at 6.)  Plaintiff does not propose a structure for limitation C, because as discussed in Section 1.1., Plaintiff argued that limitation C was not a means plus function claim.  (*Id*.)  Plaintiff therefore does not directly respond to Defendant's "insufficient algorithm" argument as to limitation C, instead relying on its argument that the limitation does not invoke 35 U.S.C. § 112, ¶6.  (Pl.'s Reply Claim Construction Br. 11-13.)

35 U.S.C. § 112, ¶6 "requires disclosure of corresponding structure in the specification, and that disclosure must clearly link the disclosed structure to the claimed function with which it is associated."  *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1220 (Fed. Cir. 2003).  "The point of the requirement that the patentee disclose particular structure in the specification and that the scope of the patent claims be limited to that structure and its equivalents is to avoid pure functional claiming."  *Aristocrat Technologies Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

Thus, "in a means-plus-function claim 'in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm.'"  *Id*. (quoting *WMS Gaming, Inc. v. Int'l Game Tech*, 184 F.3d 1339, 1349 (Fed. Cir. 1999)).  That is because "to claim a means for performing a particular function and then to disclose only a general purpose computer as the structure designed to perform that function amounts to pure functional claiming."  *Id*.

"The preferred definition of 'algorithm' in the computer art is: 'A fixed step-by-step procedure for accomplishing a given result; usually a simplified procedure for solving a complex

1  problem, also a full statement of a finite number of steps.'" *Id.* (quoting *In re Freeman*, 573

2  F.2d 1237, 1246 (CCPA 1978)).  To sufficiently disclose an algorithm, a patent need not include

3  the actual computer code.  *Typhoon Touch Technologies, Inc. v. Dell, Inc.*, 659 F.3d 1376, 1385

4  (Fed. Cir. 2011).  Rather, "[a] description of the function in words may 'disclose, at least to the

5  satisfaction of one of ordinary skill in the art, enough of an algorithm to provide the necessary

6  structure under § 112, ¶ 6.'"  *Id.* (quoting *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323,

7  1340 (Fed. Cir. 2008)).

8      Using this standard, Plaintiff asserts that the disputed limitations can be construed and

9  that the specification discloses adequate structure.  (Pl.'s Opening Claim Construction Br. 5-11.)

10  Defendant argues that the specification discloses insufficient structure, such that the claim is an

11  invalid attempt at pure functional claiming.  (Def.'s Opening Claim Construction Br. 7-12.)  The

12  Court will address each limitation in turn.

13

14      1.3.1.  Structure Corresponding to the Function Recited by Limitation A:

15          "determining if a predetermined keystroke sequence entered on the

16          keyboard is, according to said macro entry/definition program, a

17          command to establish a select channel macro"

18

19      Plaintiff argues that the corresponding structure for limitation A is a "microprocessor

20  executing instructions described at Col. 2:64-67."  (Pl.'s Opening Claim Construction Br. 5.)

21  Defendant argues that the term is invalid because specification fails to disclose adequate

22  structure, and instead only discloses "that the program determines if the first keystroke is I and

23  the second keystroke is III and is followed by the Macro key (Column 4, lines 16-19 and

24  Column 5, lines 22-30)."  (Def.'s Opening Claim Construction Br. 8.)

25      Plaintiff's cited "instructions" for the microprocessor are "determining if the

26  predetermined keystroke sequence is, according to the macro entry/definition program, a

27  command to establish a select channel macro."  ('426 Patent 2:64-67.)  Those "instructions" are

28  nothing but the function recited by the limitation.  If the Court were to adopt Plaintiff's

construction, it would be hard to imagine a clearer case of purely functional claiming, and the claim would be invalid, as Defendant urges. "[T]he language 'describes an outcome, not a means for achieving that outcome.'" *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1384 (Fed. Cir. 2009) (invaliding computer-implemented means plus function claim as indefinite, quoting *Aristocrat*, 521 F.3d at 1334); *see also Aristocrat*, 521 F.3d at 1334 (rejecting patentee's contention that the function recited by the claim **was** the algorithm); *Finisar*, 523 F.3d at 1340 (rejecting patentee's contention that a passage merely restating the function recited in the claim could be the corresponding structure).

Additionally, Plaintiff cites to the wrong part of the specification. Claim 10 is an apparatus claim ("A remote control comprising"), in contrast to claim 5, which is a method claim ("A method for entering a channel select macro . . . ."). The Summary of the Invention to which Plaintiff cites has one paragraph describing "a remote control" and another describing "a method for entering a channel select macro . . . ."). ('426 Patent 2:22-23, 47-49.) Plaintiff cites to the method paragraph, but because claim 10 is directed to an apparatus, it should have cited to the apparatus paragraph. Had Plaintiff done so, it would have cited "circuitry and program instructions for determining if the predetermined keystroke is, according to the macro entry/definition program, a command to establish a select channel macro." ('426 Patent 2:36-39.) By citing to the method paragraph, Plaintiff presumably sought to avoid the additional "circuitry and program instructions" language recited in the apparatus paragraph. That language refutes Plaintiff's contention that the mere recitation of the function is sufficient structure: even the Summary of the Invention stated that circuitry and programming instructions—**unspecified** circuitry and programming instructions—were necessary to carry out that function.

While Defendant contends that there is no corresponding structure whatsoever described in the specification, it previously identified column 4, lines 16-19 and column 5, lines 22-30, although it claimed that the structure disclosed there was "insufficient." (Pl.'s Reply Claim Construction Br. 7.) Those portions of the specification do in fact identify structure that constitutes the means—the "circuitry and program instructions"—for the claimed function.

1    As to circuitry, column 4, lines 16-19, referencing Figure 3, provide that "[t]he keypad 20

2  is coupled to the microprocessor 38 by an interrupt line 46 and a bus 48 to the CPU 44."  A

3  relevant portion of Figure 3 is reproduced below:



17  Given that the claimed function is "determining if a predetermined keystroke sequence **entered**

18  **on the keyboard**" is a macro command, the structures that couple the keypad to the

19  microprocessor—the interrupt line and bus—are part of the structure that performs the function.

20  *See* Herbert Taub, *Digital Circuits and Microprocessors* 126, 365, 472-74 (1982) (a bus

21  transfers information from a number of signal sources, and an interrupt allows a request to the

22  CPU to be handled immediately even if the CPU is engaged in executing another function).

23    And column 5, lines 22-30 does provide an algorithm—a "fixed step-by-step procedure

24  for accomplishing a given result"—for the microprocessor to perform:

25    As apparent from a study of FIG. 4, the program first determines whether a

26    depressed key or keystroke is the "I" key. If not, the program performs other

27    functions as required and exits to the idle state. If yes, the program then determines

28    if the next keystroke is the "III" key. If not, the program performs other functions

10

1    as required and exits to an idle state. Then the program determines if the third
2    keystroke is a MACRO key.
3    ('426 Patent 5:22-30.)  Figure 4 "is a flow chart of the steps performed by the macro entry
4    definition program stored in the remote control."  ('426 Patent 3:15-18.)  The following excerpt
5    from Figure 4 illustrates those instructions in graphical form:



17   Plaintiff dislikes the specificity of the identified structure, and argues that the "disclosure
18   was included to teach a person of skill how to practice the invention—not to limit the claim."
19   (Pl.'s Opening Claim Construction Br. 9 (citing *Rexnord Corp. v. Laitram*, 274 F.3d 1336, 1344
20   (Fed. Cir. 2001) ("Specifications teach. Claims claim.").))  But *Rexnord* was not discussing
21   means plus function terms.  Disclosure of the structure is the *quid pro quo* of means plus
22   function claiming.  *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1381 (Fed. Cir.
23   1999).  Such claims "shall be construed to cover the corresponding structure, material, or acts
24   described in the specification and equivalents thereof."  35 U.S.C. § 112, ¶ 6.
25       Thus, the Court construes "means for determining if a predetermined keystroke sequence
26   entered on the keyboard is, according to said macro entry/definition program, a command to
27   establish a select channel macro" as the following structure and equivalents thereof: an interrupt

line, bus, and microprocessor.  The microprocessor is programmed with the following algorithm: if a depressed key or keystroke is the "I" key, and the next keystroke is the "III" key, and the third keystroke is a MACRO key, then a command to establish a select channel macro has been entered.  If the sequence is interrupted by other keystrokes, then the program performs other functions as required and exits to an idle state.

> ### 1.3.2.  Structure Corresponding to the Function Recited by Limitation B: "determining, after a select channel macro command is sensed, if one or more of said number keys have been depressed followed by depression of the at least one MACRO key"

The parties again disagree about whether the specification sufficiently discloses an algorithm for the microprocessor to carry out the claimed function.  Plaintiff's "algorithm" is a "microprocessor executing instructions described at Col. 2:67 – Col. 3:1."  (Pl.'s Opening Claim Construction Br. 9.)  But that portion of the specification merely recites the function: it says "determining, after a select channel macro command is sensed, if one or more of said number keys have been depressed followed by depression of the at least one MACRO key."  Again, if the Court were to adopt that construction, the claim would be purely functional and invalid under *Aristocrat*.  Plaintiff also again cites to the Summary of Invention paragraph describing the method, rather than the apparatus, and therefore again omits "circuitry and program instructions" from the corresponding structure.  (Pl.'s Opening Claim Construction Br. 9., '426 Patent 2:39-43.)

Defendant argues that "the specification includes no structure for determining whether a MACRO key has been depressed after the number keys have been pressed as also required by the claimed function, let alone any algorithm for making this determination."  (Def.'s Opening Claim Construction Br. 10.)

The Court holds that the hardware component of the structure is the same as for the previous phrase, limitation A.  The structure includes "a microprocessor including a CPU and

1   memory; a keyboard coupled to the microprocessor and including the keypad which comprises a

2   set of keys including number keys and at least one MACRO key . . . and, a macro

3   entry/definition program stored in the memory . . . ." ('426 Patent 2:47-3:1 (quoted but partially

4   ignored by Plaintiff's Opening Br. 10).)  The hardware structure is therefore again a keyboard,

5   interrupt line, bus, and microprocessor.

6        As to the algorithm/program instructions, Plaintiff admits that there is no flow chart

7   describing how the remote control performs this function, and instead provides an "exemplary

8   flow chart" that the inventors **could have** submitted.  (Pl.'s Opening Claim Construction Br. 11.)

9   Plaintiff argues that the prose description is sufficient.  (*Id.*)  The problem with Plaintiff's

10  position is that other than the bare recitation of the function, the specification does not **anywhere**

11  describe "determining, after a select channel macro command is sensed, if one or more of said

12  number keys have been depressed followed by depression of the at least one MACRO key."

13  None of the four flow charts in the specification show steps for carrying out that function, nor

14  are such steps described in prose anywhere in the specification other than in the mere recitation

15  of the function.

16       In an attempt to bolster the adequacy of the corresponding "structure," Plaintiff submitted

17  the declaration of Shawn Burke, Ph.D. with its rebuttal briefing.  (Pl.'s Rebuttal Claim

18  Construction Br., Ex. N.)  Defendant objects to the late submission of the declaration, arguing

19  that (1) no unexpected issues were raised in Defendant's opening brief, (2) the parties never

20  indicated any intent to rely on expert witnesses, (3) the declaration goes beyond responding to

21  Defendant's arguments, and instead raises new theories that Plaintiff should have presented in its

22  opening brief, and (4) the declaration should have been filed with Plaintiff's opening brief.

23  (Defendants' Evidentiary Objections to the Declaration of Shawn Burke 1-4.)  The Court

24  sustains Defendant's objections to the declaration.  Due to the scheduled established by the

25  Court, including the exchange of proposed claim constructions, and as shown by the negotiations

26  between the parties that reduced the number of claim terms in dispute, Plaintiff was well aware

27  of Defendants' position on these claim terms.  Plaintiff could have submitted Dr. Burke's

28  declaration along with its opening brief, if not earlier.  Plaintiff has no sufficient excuse for

1  waiting until the reply to introduce extrinsic evidence for the first time.  *See In re Katz*

2  *Interactive Call Processing Patent Litig.*, 712 F. Supp. 2d 1080, 1097 (C.D. Cal. 2010) aff'd in

3  part, vacated in part, remanded, 639 F.3d 1303 (Fed. Cir. 2011) ("This Court does not address

4  the two new arguments Charter raised in its reply brief because Katz did not have an opportunity

5  to brief these issues.")

6        The Court notes that the Burke declaration implicitly confirms the Court's analysis that

7  the corresponding structure cannot be found in the specification.  Referring to limitation B, Dr.

8  Burke notes that "[t]he disputed claim element and corresponding structure at Col. 2:67 – Col.

9  3:1 **merely re-arranges the logic tests** to have the MACRO key test follow the number key or

10  keys test."  (Burke Decl. ¶ 22 (emphasis added).)  So Burke admits that the specification

11  nowhere **actually** describes the series of steps that correspond, in order, to the function of

12  limitation B.  Thus, even if the Court had not sustained Defendant's objection to the Burke

13  declaration, it would **support** the conclusion that the specification fails to disclose structure

14  corresponding to the recited function.

15        Likewise, Plaintiff's rebuttal brief confirms that the specification only contains

16  "alternative sequence[s] of keystrokes," and "alternative embodiment[s]," that is, the

17  specification describes other functions, **but not the function that is in the claim**.  (Pl.'s

18  Rebuttal Claim Construction Br. 10.)  That it would be easy to re-arrange the structure described

19  in the specification is irrelevant.  "The question before us is whether the specification contains a

20  sufficiently precise description of the 'corresponding structure' to satisfy section 112, paragraph

21  6, not whether a person of skill in the art could devise some means to carry out the recited

22  function.  *Blackboard*, 574 F.3d at 1385.

1.3.3.  Structure Corresponding to the Function Recited by Limitation C:
"storing the number(s) of the depressed number key or keys in association
with the at least one MACRO key in said memory means"

As discussed in Section 1.1, Plaintiff argues, contrary to the Court's holding, that "means for storing the number(s) of the depressed number key or keys in association with the at least one MACRO key in said memory means" is not a means plus function term.  (Pl.'s Opening Claim Construction Br. 12.)  Plaintiff therefore declined to identify corresponding structure in the specification.  Defendant argues that the function is implemented by the device's microprocessor, and thus: (1) an algorithm must be disclosed, and (2) the absence of a disclosed algorithm means that the limitation is invalid.

The Court has conducted an independent review of the specification, and is unable to locate the structure corresponding to the recited function.  While it is possible that guidance from the Plaintiff could have lead the Court to a different conclusion, the Court is left with only Defendant's argument and the Court's own analysis.  The Court therefore finds the limitation invalid as indefinite.  *See HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1283 (Fed. Cir. 2012) (finding waiver of means plus function indefiniteness argument).

## 2.   '367 PATENT

The parties dispute the construction of two terms in the '367 Patent.  Both are found in claim 4, reproduced with the disputed terms in bold here:

A hand held, battery operated remote control for controlling an appliance from a
remote location, said remote control comprising: a housing having openings
through an upper wall thereof; a plurality of transparent or translucent
push-buttons each extending upwardly through one of said openings; one of said
push-buttons being a light actuation button; a plurality of switch means each
associated with one of said push-buttons; and a light emitting circuit located inside

said housing and including at least one light emitting element **positioned in said housing at a location not under a push button**, light dispersing means for illuminating one or more of said push-buttons with light from said at least one light emitting element, and **circuit means for maintaining 10 said light emitting circuit activated for a short period of time after depression of said light actuation button**.

The Court will analyze the two limitations in turn.

### 2.1.   "positioned in said housing at a location not under a pushbutton"

Plaintiff argues that no construction is necessary, but in the alternative, proposes "positioned within the housing and spaced from the pushbutton far enough such that the light emitting element is not under a push button."  (Pl.'s Opening Claim Construction Br. 13.) Defendant's proposed construction is "positioned within the housing and spaced from the pushbutton far enough such that the light emitting element does not directly light the push button."  (Def.'s Opening Claim Construction Br. 13.)

Defendant acknowledges that its construction is not the plain meaning, but argues that "[t]he plain meaning of the claim term 'not under a push button' is unsupported by the specification," and thus, if construed according to its ordinary meaning, the claim would be invalid for failure to meet the written description requirement of U.S.C. § 112, ¶ 1.  (*Id.* at 13-14.)  Defendant cites to Figures 5 and 6 of the '367 Patent, relevant portions of which are reproduced below, with the lighting elements (21) and buttons (52 and 24) emphasized:



(*Id.*)  The lighting elements are not directly under the buttons, so from these figures, it becomes clear that Defendant uses a peculiar definition of the word "under."  For Defendant, a lighting element is "under" a push button if the lighting element is lower on the y-axis then than the button, regardless of whether the lighting element is aligned with the button on the x-axis. Defendant thus attempts to convert a term that, in the context of the specification, denotes information about both axes, into one that only describes the y-axis.  Defendant should have brought its scuba gear to the *Markman* hearing, because using its definition, the Court is under the waters of Lake Titicaca, elevation 12,507 feet.

Defendant points to nothing in the specification that provides affirmative supports for its construction of the term—the applicant nowhere set out a special meaning for the term.  But Defendant contends that the prosecution history supports its special meaning.  (*Id*. at 14.) Defendant cites to a December 27, 1995 amendment, where the applicant changed the claim to specify the "not under a push button" limitation to overcome prior art that disclosed a lighting element under a push button.  (Brookley Decl., Ex. D 37, 39.)  But as Defendant acknowledges,

1    the applicant also added a light dispersing means to the claims, and the argument that Defendant

2    identifies says that what distinguishes the applicant's remote control is the light dispersing

3    means.  (*Id.*)  It does not argue the uniqueness of the lighting element.  (*Id.*)

4         Defendant cites to the following passage in the prosecution history: "Loheac teaches

5    diodes 14 and 14' that are preferably position under keys on a keyboard . . . . Further Loheac

6    teaches that the diodes 14 and 14' can even be positioned **between** two keys."  (*Id.*, emphasis

7    added.)  Because the applicant disclosed that Loheac taught placing LEDs **between** pushbuttons

8    as an alternative to **under** them, the applicant does not seem to have argued that the relative

9    elevation of the lighting element distinguished the invention over the Loheac reference.

10   Defendant has pointed to nothing in the prosecution history suggesting that the applicant ever

11   represented or understood that its claims required the light emitting element to be at the same

12   elevation as, or at a greater elevation than, the buttons.  Nor does Defendant identify any portion

13   of the prosecution history in which the applicant argued that its LEDs provided no direct

14   illumination to the pushbutton.

15        The Court adopts Plaintiff's proposed construction with the modification in bold for

16   clarity: "positioned within the housing and spaced from the pushbutton far enough such that the

17   light emitting element is not **directly** under a push button."

18

19                    2.1.1.  "circuit means for maintaining said light emitting circuit activated

20                            for a short period of time after depression of said light actuation

21                            button"

22

23        The parties agree that this is a means plus function element governed by 35 U.S.C. § 112,

24   ¶ 6.  (Joint Claim Construction Chart 6-7.)  The parties agree that the recited function is

25   "maintaining said light emitting circuit activated for a short period of time after depression of

26   said light actuation button."  (*Id.*)  Plaintiff argues that the corresponding structure is the lighting

27   circuit disclosed at '367 Patent 3:48-52.  (*Id.*)  That portion of the specification states: "The light

28   emitting elements 21 are connected with a lighting circuit on the circuit board 20. The lighting

18

1  circuit is constructed and arranged to cause the light emitting elements 21 to emit light for

2  several seconds upon pushing a light actuation push-button 24 . . . ."

3       Once again, the structure Plaintiff identifies is merely a recitation of the function.

4  Plaintiff notes that the lighting circuit itself performs the recited function, but the function

5  requires action on the lighting circuit, specifically, **maintaining** the circuit activated for a short

6  period of time after the button is pressed.  Nothing in the specification that Plaintiff identifies is

7  structure for performing that particular function.  Plaintiff's construction would cover **any**

8  structure that maintains the lighting circuit activated for a few seconds, whether or not any such

9  structure appears in the specification.  That violates the *quid pro quo* of means plus function

10 claiming.  *Atmel,* 198 F.3d at 1381 (Fed. Cir. 1999).  We must keep in mind that means plus

11 function claiming is not an exception to the rule that "a patentee may not broaden his product

12 claims by describing the product in terms of function."  *General Elec. Co. v. Wabash Appliance.*

13 *Corp.*, 304 U.S. 364, 371 (1938).  Instead, 35 U.S.C. § 112, ¶ 6 provides for a particular type of

14 claim drafting that sounds functional but is made structural through claim construction:

15      An element in a claim for a combination may be expressed as a means or step for

16      performing a specified function without the recital of structure, material, or acts in

17      support thereof, and such claim shall be construed to cover the corresponding

18      structure, material, or acts described in the specification and equivalents thereof.

19 Courts "construing means-plus-function language in a claim must look to the specification and

20 interpret that language in light of the corresponding structure, material, or acts described therein,

21 and equivalents thereof, **to the extent that the specification provides such disclosure**."  *In re*

22 *Donaldson Co., Inc.*, 16 F.3d 1189, 1193 (Fed. Cir. 1994) (emphasis added).  Where "the

23 specification discloses no structure that corresponds to the claimed function[,] [t]his renders the

24 claim, and the claims depending from it, invalid for indefiniteness.  *Cardiac Pacemakers, Inc. v.*

25 *St. Jude Med., Inc.*, 296 F.3d 1106, 1114 (Fed. Cir. 2002).

26      Plaintiff's rebuttal cites to caselaw holding that the term "circuit" can convey structural

27 meaning.  (Pl.'s Claim Construction Rebuttal Br. 15.)  But that is not the question.  "Circuit" is

28 structural, but the function recited is "maintaining the circuit activated."  The question is what

structure the specification teaches for maintaining the circuit in the activated state.  Plaintiff also cites a number of other patents that use the phrase "lighting circuit" in an attempt to argue that a "lighting circuit" is a term that denotes structure.  (Pl.'s Claim Construction Rebuttal Br. 15-16.)  But again, that is not the question before the Court.  As Defendant argues in rebuttal, "[a]pparently, some type of timing  device was contemplated by the patent applicant for performing the 'maintaining' function, but such a device is nowhere disclosed in the '367 specification."  (Def.'s Claim Construction Rebuttal Br. 15.)  Indeed, in the unrelated patents Plaintiff discusses, there were disclosed means for controlling the lighting circuit that are absent here.

Because the Court cannot identify structure that corresponds to the **claimed** function, claim 4 of the '367 Patent is invalid for indefiniteness.

### 3.      '906 PATENT

The parties dispute four terms in '906 Patent claim 16.  The parties agree that all four are means plus function terms, and do not dispute the recited functions.  (Joint Claim Construction Chart 7-14.)  As in Sections 1 and 2 above, the parties dispute whether the specification recites structure corresponding to the recited function.  (*Id*.)  Plaintiff argues that it does, while Defendant argues that the limitations are indefinite, and that the claim is therefore invalid.  (*Id*.) The Court will address each limitation in turn.

#### 3.1.     "means for assigning an effects observable command from each of the plurality of command sets to one of said plurality of assignable user actuated switches or keys"

Plaintiff contends that the corresponding structure in the specification is a microprocessor executing the specific instructions shown in Figs. 3A & 3C as highlighted in Plaintiff's Exhibit I, reproduced here:



(Pl.'s Opening Claim Construction Br. 16-18.)  As described in the specification, "Fig. 3A shows the starting point of the instructions to be executed by the microprocessor 42 in controlling the remote control 10."  ('906 Patent 4:44-47.)  At the Markman hearing, Plaintiff noted that it had highlighted one of the wrong steps on the flow chart: instead of the "is it a mode key" step, it meant to highlight the "is it an enter setup command?" step.  Plaintiff did not explain where the specification links using only the four highlighted steps to the claimed function.

Defendant argues that because the corresponding structure includes a microprocessor, the algorithm must be disclosed, and that the identified structure just repeats the functional language

"assign an effects observable command from each of the searchable command sets to one of the assignable keys."  (Def.'s Opening Claim Construction Br. 16-19.)

Plaintiff is correct that a patentee may express an "algorithm in any understandable terms including as a mathematical formula, in prose . . . or as a flow chart, or in any other manner that provides sufficient structure." *Finisar*, 523 F.3d at 1340 (citation omitted).  But the flow chart Plaintiff identifies does not provide the algorithm for the recited function.  It merely describes the conditions under which the remote control would "assign an effects observable command from each of the searchable command sets to one of the assignable keys."  When it comes to the critical step—the "assigning" function **actually recited** in the claim term—the flow chart merely recites the functional language from the claim.  As discussed in more detail in earlier sections above, the claim term is thus indefinite.  Plaintiff's cited flow charts "fail[] to describe, even at a high level, how a computer could be programmed to produce the structure that provides the results described in the boxes."  *In re Aoyama*, 656 F.3d 1293, 1298 (Fed. Cir. 2011) ("Figure 8 only presents several results to be obtained, without describing how to achieve those results, and certainly not how to generate transfer data." (internal quotation marks omitted)).  The claim is thus invalid.

> **3.2.**   **"means for transmitting said effects observable command when the corresponding one of said plurality of assignable user actuated switches or keys is actuated"**

Plaintiff argues that the corresponding structure is "LED driver circuit and infrared LED." (Pl.'s Opening Claim Construction Br. 18-19.)  Plaintiff cites the specification:

> The LED driver circuit 40 is coupled to the control circuit 30 and incorporates the visual LED 24 and the infra-red LED (not shown) located at the front 26 of the remote control 10 and provides the LEDs with driving power in response to signals received from the control circuit 30. . . . **The infra-red LED provides the**

1   **signaling capability for sending the remote control signals to the devices to be**

2   **controlled.**

3   ('906 Patent 4:29-37 (emphasis added).)

4   Defendant argues that the specification does not disclose how the elements operate to

5   perform the function, and "[i]ndeed, the infra-red LED is admittedly 'not shown' in the

6   specification . . . . Given this lack of disclosure, the specification plainly fails to provide the

7   corresponding structure . . . ." (Def.'s Opening Claim Construction Br. 18.)  In its rebuttal brief,

8   Defendant again relies on the fact that "the infra-red LED is 'not shown' at all in the

9   specification."  (Def.'s Rebuttal Claim Construction Br. 18.)

10   The Court rejects Defendant's argument.  The fact that the specification notes that the

11   infra-red LED is not shown in a figure does not mean that it is not described in the specification.

12   It is described perfectly clearly in the portion of the specification quoted above, and Defendant

13   has produced no evidence suggesting that the disclosure of an infra-red LED is at all unclear to a

14   person having ordinary skill in the art.  "The test for definiteness is whether one skilled in the art

15   would understand the bounds of the claim when read in light of the specification." *Miles*

16   *Laboratories, Inc. v. Shandon Inc.*, 997 F.2d 870, 875 (Fed. Cir. 1993).  The disclosure here

17   meets that test.

18   Defendant also suggests that the control circuit is a necessary part of the corresponding

19   structure, because it links the keypad circuit and the LED circuit.  (Def.'s Opening Claim

20   Construction. Br. 17.)  However, precedent requires the Court to carefully examine the recited

21   function and not identify "corresponding" structure that is not strictly necessary for that function.

22   "The corresponding structure to a function set forth in a means-plus-function limitation must

23   actually perform the recited function, not merely enable the pertinent structure to operate as

24   intended."  *Asyst Technologies, Inc. v. Empak, Inc.*, 268 F.3d 1364, 1371 (Fed. Cir. 2001).  In

25   *Asyst*, the district court identified a communication line as part of the structure corresponding to

26   "means for receiving and processing."  *Id*. at 1369.  The Federal Circuit reversed, noting that the

27   line communicated the information, but did not receive or process it.  *Id*. at 1370.  Here, the

28   claimed means are for "transmitting" the signal when certain keys are activated.  Like in *Asyst*,

23

the control circuit conveys information, but it does not itself perform the claimed transmitting function.  It is therefore not part of the corresponding structure.

The Court holds that the corresponding structure is an "LED driver circuit and infrared LED," and equivalents thereof.

### 3.3.    "means for indicating the halting of the actuation of the plurality of assignable user actuated switches or key"

Plaintiff argues that the corresponding structure is a microprocessor executing the specific instructions from Figure 3D highlighted as follows:



1    (Pl.'s Opening Claim Construction Br. 20-21.)  Thus, Plaintiff contends that a microprocessor

2    programed with the steps "key pressed?" and "is it an exit setup key?" constitute structure

3    corresponding to the function of "indicating the halting of the actuation of the plurality of

4    assignable user actuated switches or key."  Plaintiff also cites to the specification:

5            If the key pressed is an exit setup key (i.e. a magic key 20), then the remote control

6            10 sets the current command set for the currently selected mode to the command

7            set corresponding to the effects observable command assigned to the last pressed

8            assigned key. Typically the user exits the setup procedure when the user observes

9            the desired effect on the device to be controlled by the remote control 10,

10           indicating that a compatible command set has been located.

11   ('906 Patent 6:51-58.)

12           Defendant contends that the specification provides no specific algorithm whatsoever to

13   perform the indicating function, and thus, the claim limitation is fatally indefinite.  (Def.'s

14   Opening Claim Construction Br. 18-19.)

15           "[S]tructure disclosed in the specification is "corresponding" structure only if the

16   specification or prosecution history clearly links or associates that structure to the function

17   recited in the claim.  This duty to link or associate structure to function is the quid pro quo for

18   the convenience of employing § 112, ¶ 6."  *B. Braun Med., Inc. v. Abbott Laboratories*, 124 F.3d

19   1419, 1424 (Fed. Cir. 1997).

20           Here, the specification does not clearly link or associate any structure with the claimed

21   function.  The word "halting" (or "halt") only appears in the claim, and nowhere else in the

22   specification.  Nor are synonyms such as "stop" or "stopping" found in the specification.  The

23   word "ending" occurs once, but only in an unrelated context, in the phrase "starting with the

24   'one' key and ending with the "zero" key."  ('906 Patent 6:35.)  Thus, it is not at all clear what

25   the function "indicating the halting" means, much less what structure is linked to it.  It could

26   mean that the remote control's user indicates the halting, or that the circuitry or programming

27   indicates the halting. The cited flow chart provides some support for the former function, but

28

none for the latter.  And, if the claim term were user-focused, the corresponding structure would need to include the relevant exit key, and Plaintiff does not propose that it does.

The Court cannot find any structure that is clearly linked to the claimed function.  The claim thus violates the "quid pro quo for the convenience of employing § 112, ¶ 6," and is indefinite.

### 3.4.   "means for setting the remote control to transmit future remote control commands from the command set containing the last transmitted effects observable command"

Plaintiff argues that the algorithm is a flow chart box that says "set the current command set to the command set corresponding to the effects observable command assigned to the last pressed assigned key." (Pl.'s Op. Br. 21-22.)  That is a mere restatement of the claimed function, with no algorithm disclosed.  The claim term is indefinite for the reasons stated above concerning purely functional claiming.  The flow chart box identified by Plaintiff "describes an outcome, not a means for achieving that outcome."  *Aristocrat,* 521 F.3d at 1334 (Fed. Cir. 2008).

### 4.   '067 PATENT

The parties dispute three terms from the '067 Patent, one each from claims 1, 3, and 6.  Claim 1 is an apparatus claim.  Claim 3 is a "readable medium having instructions for having steps" claim, that is, a "Beauregard claim," named after *In re Beauregard*, 53 F.3d 1583 (Fed. Cir. 1995), which the Federal Circuit has held "should be treated as method claims to avoid 'exalt[ing] form over substance.'"  *Digital-Vending Services Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1276 (Fed. Cir. 2012) (quoting *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1374 (Fed. Cir. 2011)).  Claim 6 is a method claim.

Although the terms are worded differently, Defendant argues that they should be construed identically, while Plaintiff offers similar but nonidentical constructions for each.  The Court will analyze them as a group.  The disputed terms and the parties' proposed constructions are:

| Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "pushbuttons of the keyboard being activated to directly identify each of the plurality of different home appliances of different manufactures to which the universal remote control is to be matched" (claim 1) | Pushbuttons are pressed to enter codes that directly identify each particular home appliance to which the universal remote control is to be matched | The pushbuttons of the keyboard are activated to generate a blink code for a particular home appliance to identify a particular make and model. The blink code is recorded, e.g., written down, and then matched to a special features chart or table which identifies the functions assigned to special extended function or macro buttons located on the universal remote control for the particular home appliance of the particular make and model |
| "instructions further perform the step of using activation of one or more of the pushbuttons of the keyboard to directly identify each of the plurality of different | Wherein the instructions further perform the step of determining if pushbutton are pressed to enter codes that directly identify each particular home appliance to | Same as above |

| | | |
|---|---|---|
| home appliances of different manufacturers to which the universal remote control is to be matched" (claim 3) | which the universal control is to be matched | |
| "using activation of one or more pushbuttons of the keyboard to directly identify each of the plurality of different home appliances of different manufacturers to which the universal remote control is to be matched" (claim 6) | determining if pushbuttons are pressed to enter codes that directly identify each particular home appliance to which the universal remote control is to be matched | Same as above |

(Joint Claim Construction Chart 15-16.)   For context, claim 1 is as follows, with the disputed phrase in bold:

1. In a universal remote control comprising a keyboard having a plurality of pushbuttons including a macro pushbutton and a library of codes and data for use in transmitting operating commands to a plurality of different home appliances of different manufacturers, a readable medium having instructions for performing steps comprising:

matching the universal remote control to a plurality of different home appliances of different manufacturers such that selected codes and data from the library are used to transmit operating commands to the matched home appliances in response to activation of selected pushbuttons of the keyboard, the **pushbuttons of the keyboard being activated to directly identify each of the plurality of different home appliances of different manufacturers to which the universal remote control is to be matched**; and

assigning to the macro pushbutton a subset of the selected codes and data from the
library whereafter activation of the macro pushbutton causes the universal
remote control to use the subset of selected codes and data from the library
to transmit a plurality of operating commands to one or more of the
matched home appliances.

### 4.1.    The Language of the Claims Unambiguously State that the Disputed Claim Limitations Concern "Matching"

Defendant "disagrees that the claim limitation relates at all to the step of matching the remote control to a particular component." (Def.'s Opening Claim Construction Br. 23.)  But claim construction "begins and ends" with the actual words of the claims.  *Renishaw PLC v. Marposs Societa'per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998).  Defendant's argument is in direct conflict with the plain language and structure of the claim.  The disputed term appears as part of the limitation "**matching** the universal remote control . . . ."  And the disputed claim language itself ends with "to which the universal remote control **is to be matched**."  "[T]he context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms."  *Phillips*, 415 F.3d at 1314 (Fed. Cir. 2005) (quoting *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003)).  Defendant's denial of the clear textual context ant content runs directly afoul of the controlling caselaw.

### 4.2.    The Specification Describes Two Ways to Match: Direct/Quick and Step-and-Set, and Describes Two Ways to Obtain Codes for Direct/Quick Matching

"[C]laims must be construed so as to be consistent with the specification, of which they are a part. *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003).  "[T]he specification may reveal a special definition given to a claim term by the

1   patentee that differs from the meaning it would otherwise possess.  In such cases, the inventor's

2   lexicography governs."  *Phillips*, 415 F.3d at 1316.  Here, the disputed term contains a

3   phrase—"directly identify"—that is not used in the specification.  Instead, the specification uses

4   the terms "direct" in the portions that Plaintiff cites for support (e.g., '067 Patent 10:44-47), and

5   uses "identify" in the portion that Defendant cites for support.  ('067 Patent 14:23-38.)  The

6   sections cited by both parties are in fact relevant to the phrase "directly identify" as used in the

7   disputed term "to directly identify each of the plurality of different home appliances of different

8   manufacturers to which the universal remote control is to be matched."

9       The specification teaches two principal ways to match equipment to the remote control:

10  the "step-and-set" method illustrated in Figure 16, and the "direct-entry/quick set" procedure

11  illustrated in Figure 17.  Figures 18A, 18B, 19A, and 19B, are also relevant to an understanding

12  of the various matching procedures, as are the descriptions of those figures in the specification

13  provided at 10:39-14:36.  The specification also provides a verbatim recitation at 14:39-19:20 of

14  the instructions that intended to be supplied to users along with the remote control, which is also

15  relevant to the disputed limitation.

16      In the step-and-set procedure illustrated in Figure 16, the user need not know any codes in

17  advance.  Rather, the users select the type of equipment to which they would like to match the

18  remote (e.g., VCR, cable box, TV), and then simply "try various function buttons to see if the

19  equipment responds correctly."  ('067 Patent 14:57-59.)  If the device does not respond correctly

20  or at all, users then press a key to set the remote to send a different set of codes, and then the

21  user again tries various function buttons to see if the equipment responds correctly.  (*Id*. at

22  14:65-15:2.)  If the device again does not respond correctly or at all, the user repeats the process

23  until the device is matched.  (*Id*. at 15:8-12.)  Because step-and-set (1) is pure trial and error,

24  with the correct device being identified only indirectly by observing that the various functions

25  work as desired, and (2) because the user never has to know what code corresponds to which

26  device or to enter such a code, the Court finds that it does not involve "direct identification" of

27  the device.

28

By contrast, in the direct-entry/quick-set/quick-matching procedure, the user first determines the code that corresponds to the device of interest, and then enters that device-specific code into the remote.  "Quick-Matching is a way to set the device 10 **directly** to match any controlled equipment in its library."  (*Id*. at 18:34-37 (emphasis added).)  The specification provides two ways to obtain that code.  First, the user can look up the make and model of the device in a booklet that lists the codes.  (*Id*. at Fig. 17, 10:48-50.)  If the device is not listed in the booklet, the user can first match the device using the step-and-set method, and then have the remote provide the code once set through trial and error.  (*Id*. at Fig. 17, 19A, 19B, 18:33-44.)

Of course, if the user employs the step-and-set method, the device will be matched without being directly identified.  But the user may want to perform a direct-entry/quick-match **after** a device is set through step-and-set in order to configure the remote to switch back and forth between controlled devices using a "DO command."  (*Id*. at 18:58-19:20, Fig. 18.)  "The device 10 can easily be taught to control a whole houseful of infrared remote controlled equipment—just teach the device 10 a DO command to QUICK-MATCH each additional piece of equipment."  (*Id*. 19:17-20.)

Thus, Figure 19A describes one of the two disclosed ways to obtain a device-specific code that can be entered on the keyboard "to directly identify each of the plurality of different home appliances of different manufacturers to which the universal remote control is to be matched."  "Fig. 19A sets forth the steps initiated by a user to determine the blink codes which identify what equipment or apparatus the remote control device 10 is set for."  (*Id*. at 14:22.)  While Defendant argues that Figure 19A only relates to determining which code used by the controlled device (Def.'s Opening Claim Construction Br. 23-24), the specification makes clear that one purpose for doing so is to perform further quick matching of the device and the remote, in which the device is directly identified by the entered code.  Defendant is thus wrong to look at Figure 19A in isolation or only in conjunction with the specification at 16:17-63; it in fact plays a role in the quick matching function illustrated in Figure 17 and discussed in the specification at 18:33-19:20.

1    The specification therefore teaches that once a user has determined the code, either

2  through looking it up or through the process illustrated in Figure 19A, the quick matching

3  function can be used via the "pushbuttons of the keyboard being activated to directly identify

4  each of the plurality of different home appliances of different manufacturers to which the

5  universal remote control is to be matched."  The proper construction should therefore reflect that

6  the direct identification is by push-button code entry.

7    Contrary to that conclusion, Defendant proposes a construction that relates to the other

8  reason that a user would employ the process of Figure 19A to determine the code used by a

9  controlled device.  Defendant's proposed construction is:

10        The pushbuttons of the keyboard are activated to generate a blink code for a

11        particular home appliance to identify a particular make and model. The blink code

12        is recorded, e.g., written down, and then matched to a special features chart or

13        table which identifies the functions assigned to special extended function or macro

14        buttons located on the universal remote control for the particular home appliance

15        of the particular make and model.

16  (Def.'s Opening Claim Construction Br. 21.)  As the specification teaches, that procedure relates

17  to figuring out what non-standard features the universal remote controls on a particular device:

18        Since the device 10 can control such a wide range of equipment, there is not

19        enough room on it for buttons for every possible feature of every remote control.

20        Instead, there are eight extended function buttons at the bottom labeled A through

21        H. To find out what these eight buttons control for your particular TV, VCR, cable

22        converter and CD player: [perform a series of steps, including those identified by

23        Defendant in its construction]

24  ('067 Patent 16:22-27.)  The specification makes it clear that this process for determining the

25  function for the multifunction buttons A through H is not part of the matching process.  Instead,

26  it is something that the user may optionally do after matching.  Even if its cited portion of the

27  specification were relevant, Defendant's construction would import limitations from the

28  specification into the claims, a practice that the Court must avoid.  *Phillips*, 415 F.3d at 1323.

1   Defendant essentially treats the claims as means plus function claims, discussed extensively in

2   Sections 1-3, and seeks to have the Court to construe the claim to include all of the

3   corresponding structure (misidentified by Defendant) in the specification.  But the claims at

4   issue are not means plus function claims, and Defendant's approach is wholly at odds with basic

5   claim construction principles.  *Id*.

6

7   **4.3     Plaintiff's Construction is Consistent with the Prosecution History**

8

9   As Defendant notes, the limitations at issue were important to the allowance of the

10  application.  The examiner's reasons for allowance stated that the prior art did not teach or

11  suggest "a method and a computer medium with instruction[s] for performing the step of directly

12  identifying a plurality of different home appliances to a universal remote control for matching

13  codes in combination with the assignment of the codes for a macro pushbutton."  (Pl.'s

14  Submission of Extrinsic Evidence, Ex. 4 at UEI000429.)  Thus, the examiner believed that the

15  specific limitations at issue were directed to multiple-device quick-matching through direct entry

16  of the device codes.  That is consistent with the Court's reading of the specification.

17  Also, Plaintiff correctly notes that in course of the reexamination—which resulted in a

18  confirmation that the claims of the '067 Patent were valid—Plaintiff was required to identify the

19  specific portions of the specification that supported various claim terms, and Plaintiff identified

20  the same portions of the specification that it identifies now to support the claim phrase.  (Pl.'s

21  Rebuttal Claim Construction Br. 23) (citing Reexamination BPAI Appeal Brief, Ex. 5 to Pl.'s

22  Submission of Extrinsic Evidence).)  Further, Plaintiff notes that in the reexamination, it

23  submitted two declaration from experts, ostensibly persons of skill in the art, who understood the

24  claim limitations to relate to the matching step, not some other purpose.  This prosecution history

25  evidence is consistent with the Court's reading of the claims themselves and of the specification.

26

27

28

### 4.4     The Court's Constructions

While the Court largely agrees with Plaintiff's constructions, the Court uses slightly different phrasing in some instances to accurately reflect the above analysis:

| Term | Plaintiff's Construction | Court's Construction |
| --- | --- | --- |
| "pushbuttons of the keyboard being activated to directly identify each of the plurality of different home appliances of different manufactures to which the universal remote control is to be matched" (claim 1) | Pushbuttons are pressed to enter codes that directly identify each particular home appliance to which the universal remote control is to be matched | Same as Plaintiff's construction |
| "instructions further perform the step of using activation of one or more of the pushbuttons of the keyboard to directly identify each of the plurality of different home appliances of different manufacturers to which the universal remote control is to be matched" (claim 3) | Wherein the instructions further perform the step of determining if pushbutton are pressed to enter codes that directly identify each particular home appliance to which the universal control is to be matched | instructions further perform the step of using codes entered through pushbuttons that directly identify each particular home appliance to which the universal control is to be matched |
| "using activation of one or more pushbuttons of the keyboard to directly identify each of the plurality of different home appliances of | determining if pushbuttons are pressed to enter codes that directly identify each particular home appliance to which the universal remote | using codes entered through pushbuttons that directly identify each particular home appliance to which the universal remote control is to |

| different manufacturers to which the universal remote control is to be matched" (claim 6) | control is to be matched | be matched |
|---|---|---|

### 4.5.    Defendant Has Not Established Indefiniteness

Defendant also requests that the Court invalidate the claim as indefinite.  Whether a claim is indefinite under 35 U.S.C. § 112, ¶ 2 is a question of law.  *Personalized Media Communications, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 702 (Fed. Cir. 1998).  35 U.S.C. § 112, ¶ 2's "distinctly claiming" requirement means that the claims must have a clear and definite meaning when construed in the light of the complete patent document.  *Miles Laboratories, Inc. v. Shandon Inc.*, 997 F.2d 870, 874-75 (Fed. Cir. 1993).  "The test for definiteness is whether one skilled in the art would understand the bounds of the claim when read in light of the specification."  *Id.* at 875.  "Because a claim is presumed valid, a claim is indefinite only if the 'claim is insolubly ambiguous,' and no narrowing construction can properly be adopted."  *Id.  Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1338-39 (Fed. Cir. 2003) (quoting *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001).  As shown from the discussion in of claims and specification in Sections 4.1-4.3, the bounds of the claim are understandable, and are not "insolubly ambiguous."

Defendant argues that the inconsistency between Plaintiff's infringement contentions and its proposed constructions support a finding of indefiniteness.  (Def.'s Opening Claim Construction Br. 23.)  Despite Plaintiff's protestations to the contrary, it appears that its infringement contentions do accuse Defendant's products of infringing the limitation because they blink the code of the device "to which it has been matched," rather than infringing because buttons are pressed to enter a code.  That is, the infringement contention treats the claim limitation as corresponding to Figure 19A, as opposed to the entry of the device-specific code

1   under the quick-match method.  (Pl.'s Rebuttal Claim Construction Br. Ex. S at 9 (disputed

2   limitation in claim 1 infringed by remote identifying "the devices to which it **has been**

3   **matched**"), 22 (disputed limitation in claim 3 infringed for same reason), 29 (disputed limitation

4   in claim 6 infringed for same reason).)

5        While that mistaken infringement contention does indicate that Plaintiff might have

6   wavered on the construction it wished to advance in this case, Defendant cites no authority

7   stating that such an inconsistency is proof of indefiniteness.  The Court notes that the tests for

8   indefiniteness focus on how someone of ordinary skill would understand the claims in view of

9   the specification.  The Court performed that analysis above, and was able to construe the claims.

10  The Court holds that they are not indefinite.

11

12       **5.      AGREED TERMS**

13

14       The parties agreed to the construction of 24 terms.  Even where the parties agree on the

15  construction of claim terms, the Court has an independent obligation in connection with claim

16  construction. *See Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1555 (Fed. Cir.

17  1995) ("In the exercise of that duty, the trial judge has an independent obligation to determine

18  the meaning of the claims, notwithstanding the views asserted by the adversary parties.")  Here,

19  the Court lacks the context necessary to evaluate the agreed constructions, and so cannot

20  definitively adopt them as the Court's ruling.  However, recognizing the benefits of resolving

21  disputes and providing clarity as the litigation advances, the agreed constructions shall be

22  binding on the parties, who are on notice that the Court may revise them if the Court determines

23  sua sponte that it is necessary.

24        The Court notes that had the parties been unable to reach agreement on the 24 agreed

25  terms, the Court would not have construed them all.  Some of them appear to be the kind that

26  give patent lawyers a bad name.  It seems unlikely that it is necessary to construe "positioned

27  beneath" as "positioned below," as the parties have agreed (recognizing that the parties could not

28  agree on what "under" means, as discussed in Section 2.1).  Claim construction is "not an

1  obligatory exercise in redundancy." *United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d

2  1554, 1568 (Fed. Cir. 1997).  "[M]erely rephrasing or paraphrasing the plain language of a claim

3  by substituting synonyms does not represent genuine claim construction." *C.R. Bard, Inc. v.*

4  *U.S. Surgical Corp.*, 388 F.3d 858, 863 (Fed. Cir. 2004).  It is possible that specifying that

5  "beneath" means "below" is a helpful clarification in context.  But again, because the Court

6  lacks that context, it takes no action on the parties' agreed constructions other than to hold that

7  the parties will be bound by them.  Before the Court will be able to employ any of the parties'

8  agreed constructions substantively, the parties will need to explain their context to the Court.

9  The Court suspects that it will not be necessary to employ all 24 constructions.

10

11  **<u>DISPOSITION</u>**

12

13        These claim constructions shall govern this case.

14

15  IT IS SO ORDERED.

16  DATED: February 1, 2013

17

18  _____

19                  Andrew J. Guilford
20                United States District Judge

21

22

23

24

25

26

27

28