Peter H. Kang, SBN 158101
pkang@sidley.com
SIDLEY AUSTIN LLP
1001 Page Mill Road, Building 1
Palo Alto, California 94304
Tel: (650) 565-7000
Fax: (650) 565-7100

ADDITIONAL COUNSEL LISTED
ON SIGNATURE PAGE

Attorneys for Defendant
UNIVERSAL REMOTE CONTROL, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| UNIVERSAL ELECTRONICS, INC., <br><br> Plaintiff and Counterclaim-Defendant, <br><br> v. <br><br> UNIVERSAL REMOTE CONTROL, INC., <br><br> Defendant and Counterclaimant. | Case No. 8:12-CV-00329 AG (JPRx) <br><br> Assigned to: Hon. Andrew J. Guilford <br><br> **DEFENDANT UNIVERSAL REMOTE CONTROL, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OMNIBUS MOTION FOR SUMMARY JUDGMENT** <br><br> Date: March 24, 2014 <br> Time: 10:00 a.m. <br> Place: Courtroom 10D |

## TABLE OF CONTENTS

Page

I.   INTRODUCTION ............................................................................................1

II.  APPLICABLE LEGAL STANDARDS.............................................................2

III. ISSUE #1:  LACHES, ESTOPPEL, AND IMPLIED LICENSE .....................3

    A.   Factual Background ...............................................................................4

        1.   History Between the Parties Related to the '426 Patent................4

        2.   History Between the Parties Related to the '067 Patent................5

        3.   Activity Preceding This Action .....................................................6

    B.   Laches Prevents the Award of Any Pre-Suit Damages ........................7

        1.   UEI Has Long Had Actual and Constructive Knowledge of the Allegedly Infringing Activities............................................7

            a.   UEI Had Actual Notice .......................................................7

            b.   UEI Had Constructive Notice..............................................8

            c.   UEI's Withdrawal of Certain Infringement Claims in This Action Cannot "Unring the Bell"............................9

        2.   The Length of UEI's Delay Triggers a Presumption of Laches ............................................................................................9

            a.   UEI Cannot Rebut the Presumption That Its Delay Was Unreasonable and Inexcusable ..................................10

            b.   UEI Cannot Rebut the Presumption of Material Prejudice ...........................................................................11

    C.   Equitable Estoppel Also Precludes the Award of Any Damages ...........12

        1.   UEI Represented That It Would Not File Suit .............................13

         2.   URC's Reliance on UEI's Misrepresentation Resulted in Material Prejudice to URC ..........................................................14

    D.   URC Has an Implied License to the '426 Patent .................................14

IV.  ISSUE #2:  INVALIDITY OF '426 PATENT.................................................15

    A.   Overview of the '426 Patent ................................................................16

    B.   The Memorex Remote Control Is Prior Art.........................................16

    C.   The Memorex Remote Control Anticipates or at Least Renders Obvious All of the Limitations of Asserted '426 Claims 2 and 3 ..........17

V.   ISSUE #3:  NON-INFRINGEMENT OF '426 PATENT.................................22

    A.   The Parties Agree That Claims 2 and 3 of the '426 Patent Are Limited to the Flowcharts Shown in Figures 4 and 5 ............................22

    B.   UEI Failed to Identify and Analyze the Differences Between the Accused Products and the Algorithms Specified in Figures 4 and 5 of the Patent..................................................................................23

i

C.     Claims 2 and 3 of the '426 patent Are Not Infringed Because the Accused Products Do Not Operate in the Manner Specified in Figures 4 and 5 of the Patent...................................................24

VI.    ISSUE #4:  NON-INFRINGEMENT OF '906 PATENT...............................26

A.     Overview of the '906 Patent ...........................................................26

B.     Claims 1, 10, and 12 of the '906 Patent Are Not Infringed Because the Buttons on the Accused Remote Controls Are Pressed Simultaneously, Not "Sequentially and Individually" ..............26

VII.   ISSUE #5:  NON-INFRINGEMENT OF '067 PATENT...............................28

A.     Overview of the '067 Patent ...........................................................28

B.     Claims 1, 2, 3, and 6 of the '067 Patent Are Not Infringed Because the Accused Remote Controls Do Not Have a Code to "Directly Identify" Each Home Appliance by "Make and Model"...........................................................................................29

VIII.  ISSUE #6:  ENTIRE MARKET VALUE RULE....................................31

A.     Unless UEI Can Satisfy the Entire Market Value Rule, Its Reasonable Royalty and Lost Profits Damages Calculations Must Be Apportioned......................................................................32

B.     UEI Cannot Rely on the Entire Market Value Rule Exception ..............32

C.     UEI Must Apportion Value Between Patented and Unpatented Features .......................................................................................36

IX.    ISSUE #7:  PATENT MARKING ......................................................37

A.     UEI Did Not Comply With the Marking Requirements Set Forth in 35 U.S.C. § 287(a).............................................................38

1.     UEI Has Not Met its Burden to Prove Marking .........................39

2.     The Evidence Affirmatively Shows a Failure to Mark ................40

a.     UEI Does Not Require Its Patent Licensees to Mark Their Products...................................................................40

b.     UEI Failed to Mark the '426 Covered Remotes.................41

c.     UEI Failed to Mark the '067 Covered Remotes.................42

B.     In the Absence of Compliance With the Statutory Patent Marking Requirements, Damages for Infringement of the '426 and '067 Patents Are Limited to Those Accruing After Actual Notice of Infringement Was Provided. .......................................43

X.     CONCLUSION ............................................................................44

# TABLE OF AUTHORITIES

Page(s)

CASES

*A.C. Aukerman Co. v. R.L. Chaides Construction Co.,*
960 F.2d 1020 (Fed. Cir. 1992) (*en banc*)..........................................passim

*Amazon.com, Inc. v. barnesandnoble.com, inc.,*
239 F.3d 1343 (Fed. Cir. 2001) ..........................................24, 25, 28

*American Med. Sys., Inc. v. Medical Eng'g Corp.,*
6 F.3d 1523 (Fed. Cir. 1993) ..........................................38, 41

*Amsted Indus. Inc. v. Buckeye Steel Castings Co.,*
24 F.3d 178 (Fed. Cir. 1994) ..........................................40, 43

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986).........................................................3

*Applied Mat'ls Inc. v. Advanced Semiconductor Mat'ls Amer., Inc.,*
98 F.3d 1563 (Fed. Cir. 1996) ..........................................4

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
509 U.S. 209, 125 L. Ed. 2d 168, 113 S. Ct. 2578 (1993) ..........................34

*Cafasso v. Gen. Dynamics C4 Sys.,*
637 F.3d 1047 (9th Cir. 2011)..........................................34

*Calmar, Inc. v. Emson Research,*
850 F. Supp. 861 (C.D. Cal. 1994).......................................37

*CareFusion 303, Inc. v. Sigma Int'l,*
2012 U.S. Dist. LEXIS 158 (S.D. Cal. 2012)..........................................32

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986).......................................................2

*Cornell Research Found., Inc. v. Hewlett-Packard Co.,*
2007 U.S. Dist. LEXIS 89637 (N.D.N.Y. 2007)..........................................32

*Cornetta v. United States,*
851 F.2d 1372 (Fed. Cir. 1988) ..........................................3

*Electro-Mechanical Corp. v. Power Distrib. Prods.,*
2013 U.S. Dist. LEXIS 128871 (W.D. Va. 2013)..........................................36

*Ferguson Beauregard/Logic Controls, Division of Dover Res., Inc. v. Mega Systems, LLC,*
350 F.3d 1327 (Fed. Cir. 2003) ..........................................36

*Garretson v. Clark,*
111 U.S. 120, 4 S. Ct. 291, 28 L. Ed. 371 (1884) ..........................................32, 36

*General Protecht Group, Inc. v. Leviton Mfg. Co.,*
651 F.3d 1355 (Fed. Cir. 2011) ................................................................... 15

*Georgia-Pacific Corp. v. United States Plywood Corp.,*
318 F. Supp. 1116 (S.D.N.Y. 1970) ............................................................. 36

*Hall v. Aqua Queen Mfg., Inc.,*
93 F.3d 1548 (Fed. Cir. 1996) ................................................................ 10, 11

*Hazeltine Corp. v. Radio Corp. of Amer.,*
20 F. Supp. 668 (S.D.N.Y. 1937) ................................................................. 42

*Inline Connection Corp. v. AOL Time Warner Inc.,*
465 F. Supp. 2d 312 (D. Del. 2006) ............................................................. 40

*LaserDynamics, Inc. v. Quanta Computer, Inc.,*
694 F.3d 51 (Fed. Cir. 2012) ................................................................. 32, 36

*Lucent Techs., Inc. v. Gateway, Inc.,*
580 F.3d 1301 (Fed. Cir. 2009) ................................................................... 36

*Lujan v. National Wildlife Fed'n,*
497 U.S. 871 (1990) ..................................................................................... 3

*Nike Inc. v. Wal-Mart Stores,*
138 F.3d 1437 (Fed. Cir. 1998) ................................................................... 38

*Novartis Corp. v. Ben Venue Laboratories, Inc.,*
271 F.3d 1043 (Fed. Cir. 2001) ..................................................................... 3

*Radio Systems Corp. v. Lalor,*
709 F.3d 1124 (Fed. Cir. 2013) ................................................................... 14

*Regents of the Univ. of Minn. v. AGA Med. Corp.,*
717 F.3d 929 (Fed. Cir. 2013) ..................................................................... 34

*S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.,*
690 F.2d 1235 (9th Cir. 1982) ....................................................................... 3

*Serdarevic v. Advanced Med. Optics, Inc.,*
532 F.3d 1352 (Fed. Cir. 2008) ............................................................. 11, 12

*St. Clair Intellectual Property Consultants, Inc. v. Acer, Inc.,*
2013 U.S. Dist. LEXIS 92642 (D. Del. July 2, 2013) .................................. 8, 9

*TransCore v. Electronic Transaction Consultants Corp.,*
563 F.3d 1271 (Fed. Cir. 2009) ............................................................. 14, 15

*Uniloc USA, Inc. v. Microsoft Corp.,*
632 F.3d 1292 (Fed. Cir. 2011) ................................................................... 32

*United States v. Diebold, Inc.,*
369 U.S. 654 (1992) ..................................................................................... 2

*Von Holdt v. A-1 Tool Corp.,*
  714 F. Supp. 2d 863 (N.D. Ill. 2010) ........................................................................39

*Wanlass v. Gen. Elec. Co.,*
  148 F.3d 1334 (Fed. Cir. 1998) .........................................................................passim

STATUTES

17 U.S.C. § 401 .........................................................................................................16
35 U.S.C. § 102 .......................................................................................2, 15, 16, 17
35 U.S.C. § 103 .............................................................................................2, 15
35 U.S.C. § 112 .........................................................................................................21
35 U.S.C. § 287 ..........................................................................................2, 37, 38, 39

OTHER AUTHORITIES

Fed. R. Civ. P. 56 .......................................................................................................2

## I.    INTRODUCTION

This is a patent infringement case between two competitors in the market for universal remote control devices, Plaintiff Universal Electronics, Inc. ("UEI") and Defendant Universal Remote Control, Inc. ("URC"), a smaller company.  In recent years, URC has steadily risen to become a more formidable competitor and, in retaliation, UEI has subjected URC to baseless patent infringement lawsuits—first in 2000, again in this action, and even in a third lawsuit that is co-pending with this action.  The 2000 litigation settled in 2004 and was supposed to have resolved the parties' differences and bought peace.  But UEI could not restrain its litigiousness, and has now brought this second lawsuit based on four old patents that UEI dusted off from its patent shelves.  All of these patents are directed to relatively unimportant remote control features and functionalities that URC does not use or for which URC is already licensed:

- U.S. Patent No. 5,414,426 ("the '426 patent"), which UEI had previously asserted against URC in 2004 but which it voluntarily dismissed with prejudice from that lawsuit in 2002 after URC presented UEI with invalidating prior art;

- U.S. Patent No. 5,568,367, which this Court has already ruled is invalid (and thus is not the subject of this motion);

- U.S. Patent No. 5,614,906 ("the '906 patent"), which claims an unpopular optional remote control programming method that is not even used in UEI's own cable remotes; and

- U.S. Patent No. 6,587,067 ("the '067 patent"), another old patent that expired in 2007 and had never been asserted against URC until the Complaint in this action was filed.

And although these patents are of little intrinsic value and plainly not infringed, UEI purports to seek tens of millions of dollars in damages from URC under a far-fetched, unsupported lost profits damages theory.

1

URC respectfully requests that the Court address the many critical deficiencies in UEI's case as a matter of summary judgment. Specifically, URC moves for summary judgment or partial summary judgment on the following grounds:

(1)     UEI's patent infringement claims on the '426 patent and 6,587,067 ("the '067 patent") are barred by the doctrines of laches, UEI's patent infringement claims under the '426 patent are barred by equitable estoppel, and, further, URC has an implied license to the '426 patent based on legal estoppel;

(2)     Asserted claims 2 and 3 of the '426 patent are invalid for anticipation and/or obviousness under 35 U.S.C. §§ 102 and 103;

(3)     Asserted claims 2 and 3 of the '426 patent are not infringed;

(4)     Asserted claims 1, 10, and 12 of the '906 patent are not infringed;

(5)     Asserted claims 1–3 and 6 of the '067 patent are not infringed;

(6)     UEI cannot satisfy the entire market value rule in this action, and therefore it must apportion between the values of the patented and unpatented features of the accused products for purposes of its lost profits and reasonable royalty damages calculations; and

(7)     UEI has not complied with the marking requirements of 35 U.S.C. § 287(a) with respect to the '426 and '067 patents, and, therefore, its damages for any infringement of those patents are limited to damages accruing after URC had actual notice of its alleged infringing activities, which is March 2010 for the '426 patent and March 2012 for the '067 patent.

## II.     APPLICABLE LEGAL STANDARDS

Summary judgment is proper when the record, viewed in the light most favorable to the nonmoving party, indicates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992). Partial summary judgment is also permitted for "part of each claim or defense." Fed. R. Civ. P. 56(a).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the movant does not bear the burden of proof at trial, it may show that no genuine issue of material fact exists by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Id.* at 325. The moving party is not required to produce evidence showing the absence of a genuine issue of material fact, nor is it required to offer evidence negating the non-moving party's claim. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 885 (1990).

Once the moving party meets its initial burden, the burden shifts to the opposing party to set out specific material facts showing a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). The non-movant cannot manufacture a genuine issue of material fact simply by making assertions in its legal papers—mere reliance on allegations or denials in its own pleadings, or say-so in affidavits of its own experts, is insufficient. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982); *Novartis Corp. v. Ben Venue Laboratories, Inc.*, 271 F.3d 1043, 1051 (Fed. Cir. 2001). Rather, there must be specific evidence in the record setting forth a genuine issue of material fact. *Id.*

## III.    ISSUE #1:  LACHES, ESTOPPEL, AND IMPLIED LICENSE

"Equity aids the vigilant, not those who slumber on their rights." *Cornetta v. United States*, 851 F.2d 1372, 1375 (Fed. Cir. 1988). UEI "slumbered" for more than a decade before filing this action for alleged infringement of the expired '067 patent and the expiring '426 patent by URC products that, as UEI was well aware, had been in the marketplace for years. This is the exact situation the defenses of laches and estoppel are designed to prevent. In addition, because UEI licensed U.S. Patent No. 5,959,751 ("the '751 patent") (Ex. 63[1]) to URC and because URC cannot practice the

---

[1] All exhibits cited herein as "Ex. ___" are provided as exhibits to the accompanying Declaration of Clarence Rowland.

'751 patent without practicing the '426 patent because the patents claim the same subject matter, URC has an implied license for the '426 patent. Accordingly, UEI moves for summary judgment that UEI's claims under the '426 and '067 patents are barred by laches, that UEI's claims under the '426 patent are barred due to equitable estoppel, and that URC has an implied license to the '426 patent based on legal estoppel.

## A.    Factual Background

### 1.    History Between the Parties Related to the '426 Patent

UEI first accused URC of infringing the '426 patent in October 1997—over 15 years ago. *See* Ex. 2. UEI later filed a lawsuit against URC in November 2000 alleging infringement of the '426 patent, the '751 patent, and other patents (the "First UEI Suit"). *See* Ex. 1.

The '751 patent discloses a macro key that transmits a series of commands including channel numbers, with one button press. Similarly, the '426 patent describes a favorite channel macro key that transmits a series of channel numbers to select channels with one button press. Because these two related patents disclose and claim much of the same subject matter, the USPTO required UEI to file a terminal disclaimer to avoid double patenting.[2] *See* Ex. 46.

In the First UEI Suit, UEI accused URC's SL-7000 and SL-8000 remotes based upon those remotes' inclusion of four buttons that each could be used as a "favorite channel" button. *See* Ex. 5 ¶ 7. During discovery in the First UEI Suit, UEI gained a full understanding of URC's business and its remote control product line. At that time, URC identified and produced at least 60 remote control models to UEI, including a variety of "SL-series" remotes and the MX-500 and MX-1000 products. *See* Exs. 6 & 8 (No. 1). UEI accused many of those remotes, including URC's "SL-

---

[2] A terminal disclaimer is a PTO requirement that effectively merges two patentably indistinct patents into one. *See Applied Mat'ls Inc. v. Advanced Semiconductor Mat'ls Amer., Inc.*, 98 F.3d 1563, 1568, 1577 (Fed. Cir. 1996).

4

series," the MX-500, and the MX-1000 remotes, of infringing the '426 and the '751 patents.  *See* Ex. 9 (No. 1); Ex. 33 (Nos. 211 & 216).

In a July 3, 2002 letter to UEI's counsel, URC's counsel asserted the invalidity of the '426 patent based upon a number of cited prior art references.  *See* Ex. 13.  In a responsive July 23, 2002 letter, UEI attempted to sidestep this prior art by raising an issue of inventorship:  "[I]t appears that the cited prior art was inapplicable due to an error in inventorship, which we are prepared to correct.  This, of course, will provide the earliest effective priority date and remove the references you cited as prior art." Ex. 14 at URCI005385; Ex. 33 (Nos. 10 & 12).  UEI claimed that Paul Darbee should have been listed as a co-inventor on the '426 patent.  But UEI did not take any steps to correct the inventorship at that time.[3]  Instead, in September 2002, UEI *withdrew the '426 patent*, and the Court dismissed *with prejudice* the '426 charge of infringement (the "2002 Dismissal").  *See* Ex. 17 ¶ 2; Ex. 33 (No. 8).

The First UEI Suit was ultimately settled



### 2.    History Between the Parties Related to the '067 Patent

URC has been competing with UEI and others in the cable TV remote control market since 2000.  UEI was fully aware of URC's products throughout this time.  For example, even though the '067 patent was not one of the patents asserted in the First UEI Suit, a plurality of the 60 URC remote control models disclosed to UEI during discovery in that case were capable of being programmed by using code entry, which

---

[3] As discussed *infra*, UEI did not file a petition to correct the inventorship of the patent until July 3, 2012, almost 10 years later.

UEI now alleges (albeit incorrectly) infringes the '067 patent. These models included the SL-7000 and SL-8000 models that were accused of infringement in the First UEI Suit. In addition, in 2003, URC's CEO, Chang Park, specifically discussed the code entry method asserted by UEI in this action with UEI's CEO, Paul Arling. *See* Ex. 15.

During the negotiations leading up to the 2004 License, UEI offered URC a license under the '067 patent, which URC declined. The '067 patent was specifically ███████████████████████████████████████████████████████████████████████████████████████████████████████████. Thus, it is indisputable that, as of December 2004—and with full knowledge of URC's product line—UEI was aware of the possibility of bringing infringement claims against URC under the '067 patent. No such infringement claims were ever brought against URC, however, until the Complaint in this lawsuit was filed in March 2012—more than seven years after the parties entered into the 2004 License and nearly five years after the patent's expiration.

### 3.    Activity Preceding This Action

Following the 2002 Dismissal and the 2004 License, URC did not hear from UEI until March 1, 2010, when URC suddenly received another letter from UEI reasserting the '426 patent. *See* Ex. 18. UEI's letter accused URC products that included the single favorite channel macro that had been at issue in the first lawsuit, as well as others including a rotating favorite channel macro feature, of infringing the '426 patent. URC was surprised by UEI's reassertion of the '426 patent and, in a responsive May 25, 2010 letter, reminded UEI of the invalidity of the '426 patent based on the previously asserted prior art. *See* Ex. 19. The parties traded additional correspondence and then, after further delays, UEI filed this action in March 2012, just two months before the '426 patent expired. *See* Exs. 20, 43, 44, 90.

UEI's Complaint was the first time that UEI ever formally accused URC of infringing the '067 patent. UEI made this assertion even though the '067 patent had

expired approximately five years earlier, and despite the fact that practically all remote controls that URC supplied to the cable TV market since 2000 (including numerous products that had been identified to UEI in the First UEI Suit) used the same technology that UEI now accuses of infringement.

### B.    Laches Prevents the Award of Any Pre-Suit Damages

Laches has long been recognized as an equitable defense that bars a patentee's claims for damages prior to suit. *A.C. Aukerman Co. v. R.L. Chaides Construction Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (*en banc*). Laches exists when there is (1) an unreasonable and inexcusable delay in filing suit by a patentee against an alleged infringer (2) that results in material prejudice to the alleged infringer. *Id.* at 1028; *see also Wanlass v. Gen. Elec. Co.*, 148 F.3d 1334, 1337 (Fed. Cir. 1998) (internal citation omitted). The alleged infringer bears the burden of proving laches by a preponderance of the evidence. *Aukerman*, 960 F.2d at 1045.

### 1.    UEI Has Long Had Actual and Constructive Knowledge of the Allegedly Infringing Activities

The laches clock starts running when the patentee had actual or constructive knowledge of the defendant's potentially infringing activities. *Wanlass*, 148 F.3d at 1337-38. The undisputed facts here show that UEI has had both actual and constructive notice of URC's activities for well over a decade.

### a.    UEI Had Actual Notice

It is undisputed that UEI had notice of the URC activities giving rise to UEI's claims of infringement of the '426 patent at least as early as 1997, when UEI first accused URC of infringement. It is also undisputed that, since at least as early as 2003, when UEI had in its possession numerous remote models that included the features and functionalities that UEI now accuses of infringing the '067 patent (and certainly since the 2004 License), UEI recognized the potential for bringing a formal infringement charge on that patent. *See, e.g.*, Ex. 90 ¶ 46.

UEI has been fully aware of URC and its products since before the filing of the First UEI Suit in 2000, through the 2002 Dismissal, through the 2004 License, through the March 2010-May 2011 letters and right up to the present time. *See* Ex. 33 (Nos. 194–219). UEI has admitted in this action that it keeps up with the products its competitors, including URC, are selling. UEI and URC have been exhibiting their products in numerous large and small trade shows for more than 10 years. *See* Ex. 33 (Nos. 290, 292, 294, 296, 298, 300, 302, 304, 306, 308, 310, 313, 315, 317, 319, 321, 323, 325, 327 & 329). UEI has also admitted that it has encountered URC products many times over the years and has investigated URC in connection with competitive bidding processes. *See, e.g.*, Ex. 81 at 448:3–9. UEI simply cannot dispute it had actual knowledge of URC's activities for years before filing this action.

### b. UEI Had Constructive Notice

"[C]onstructive knowledge of the infringement may be imputed to the patentee even where he has no actual knowledge of the sales, marketing, publication, public use, or other conspicuous activities of potential infringement if these activities are sufficiently prevalent in the inventor's field of endeavor." *Wanlass*, 148 F.3d at 1338. Such "pervasive, open, and notorious activities" should put the patentee on sufficient notice to investigate. *Id.* at 1338–39 (citing *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1553 (Fed. Cir. 1996)). Here, URC has participated in the cable TV remote control market with UEI since 2000, selling millions of remote control devices. *See, e.g.*, Ex. 5 ¶ 7; Exs. 87 & 88. Since 2001, URC has had a website describing its products, including many of the accused products in this action. URC's open and notorious business activities constitute constructive notice, particularly in light of the parties' history. *See Wanlass*, 148 F.3d at 1339–40 (the patentee's "failure to investigate [the defendant's products was] especially egregious in light of his past dealings with" the defendant); *see also Avocent Sports Tech. Inc.*, 2013 U.S. Dist. LEXIS 59577, at *14–15 (plaintiff had constructive knowledge when the defendant began openly marketing and selling the accused products).

8

### c. UEI's Withdrawal of Certain Infringement Claims in This Action Cannot "Unring the Bell"

A laches period triggered by an earlier-manufactured product applies to a later-manufactured product, and a patentee cannot avoid a laches defense by narrowing its infringement contentions. *St. Clair Intellectual Property Consultants, Inc. v. Acer, Inc.*, 2013 U.S. Dist. LEXIS 92642, at * 7, 13 (D. Del. July 2, 2013) (citing *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1295 (Fed. Cir. 2008)). For example, in *St. Clair*—a matter in which the plaintiff was represented by UEI's counsel, Niro, Haller & Niro—the plaintiff had knowledge of allegedly infringing activities of the defendant in 2002, seven years prior to filing suit. *St. Clair*, 2013 U.S. Dist. LEXIS 92642, at *8, *10. During the litigation, however, the plaintiff narrowed its infringement contentions to omit pre-2004 products, and then argued that laches could not have been triggered until 2004. *Id.* at *12. The court rejected this gambit. *Id.* at *13.

In this case, UEI has adopted the same tactics, and the same result should obtain. In September 2013, shortly before the scheduled expiration of discovery, UEI served amended infringement contentions in which it suddenly withdrew certain infringement claims against URC's earlier products. *Compare* Ex. 22 at 4 *with* Ex. 84 at 2:18–22. For the '426 patent, UEI even withdrew claim 1 and dropped all of the earlier products that used the single favorite channel key that was the subject of the First UEI Suit. *See* Ex. 22 at 4 n.2. UEI's remaining contentions, however, allege infringement of dependent claims 2 and 3 of the '426 patent by the rotating favorite channel macro key, and each of these claims depends from claim 1, which covers a single favorite channel macro key. Just as in *St. Clair*, UEI's maneuverings are unavailing.

### 2. The Length of UEI's Delay Triggers a Presumption of Laches

UEI delayed nearly ten years before bringing this action alleging infringement of the '426 patent and more than seven years in suing on the '067 patent. When, as

9

here, the patentee's delay is six years or more, a presumption of laches arises, including a presumption that the delay is unreasonable, inexcusable, and materially prejudicial. *Wanlass*, 148 F.3d at 1337; *see also Aukerman*, 960 F.2d at 1037. This presumption shifts the burden of production to UEI to provide an adequate, reasonable excuse for the delay in bringing suit. *Wanlass*, 148 F.3d at 1337. Under this presumption, URC has no obligation to come forward with any evidence of unreasonableness or material prejudice unless UEI first comes forward with sufficient evidence to raise a genuine issue regarding at least one of the prongs of laches. *Hall*, 93 F.3d at 1553–54.

### a.   UEI Cannot Rebut the Presumption That Its Delay Was Unreasonable and Inexcusable

UEI cannot present evidence sufficient to create a material fact as to whether its delay was reasonable and excusable. Reasonableness of a patentee's delay requires an exercise of due diligence by the patentee. *Aukerman*, 960 F.2d at 1032. The Federal Circuit has recognized some circumstances that might excuse an otherwise unreasonable delay: (1) other litigation, (2) negotiations with the accused infringer, (3) the patentee's poverty or illness, (4) wartime conditions, (5) the extent of infringement and the alleged infringer's solvency, and (6) dispute over ownership of the patent. *Id.* at 1033 (citations omitted). Significantly, UEI has not offered any reasonable justification here.

Instead, UEI has offered two excuses for delay, neither of which is legally adequate. UEI's first excuse is that it "conducted little or no analyses of URC's products as to [sic] avoid disrupting the parties' [2004 License] agreement." Ex. 24 (No. 2); Ex. 25 (No. 3); Ex. 23 (No. 17); *see* Ex. 81 at 412:18–413:3. But turning a blind eye to potential infringement is the polar opposite of due diligence and is insufficient as a matter of law to avoid a finding of laches. *See Wanlass*, 148 F.3d at 1338–39.

UEI also attempts to raise the reexamination of the '067 patent from 2006–2011 as an "other litigation" excuse. *See* Ex. 26 (No. 24). Between the 2004 License and the filing of the present suit in 2012, however, UEI failed not only to charge URC with infringement of the '067 patent, but it failed to provide URC with any notice whatsoever of the reexamination's existence or of UEI's eventual intent to sue on the '067 patent after the reexamination concluded. In the absence of any such communications, UEI's delay in bringing suit was unreasonable under the circumstances here. *See, e.g.*, *Serdarevic v. Advanced Med. Optics, Inc.*, 532 F.3d 1352, 1359 (Fed. Cir. 2008) ("Serdarevic has offered no evidence suggesting that the defendants had reason to believe that they were likely to be sued once the reexamination proceedings were complete.").

### b.   UEI Cannot Rebut the Presumption of Material Prejudice

UEI cannot come forward with any evidence to rebut the presumption that URC has suffered material prejudice. *Hall*, 93 F.3d at 1554. Material prejudice to the alleged infringer can be evidentiary or economic. *Aukerman*, 960 F.2d at 1033. Evidentiary prejudice impairs the alleged infringer's ability to adequately defend itself, including loss of documents or critical witnesses. *Id.* Economic prejudice "may arise where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." *Id.*; *see Wanlass*, 148 F.3d at 1337.

Under the undisputed facts here, both evidentiary and economic prejudice exist. In an attempt to obtain priority over prior art that URC has asserted, UEI recently filed a petition at the USPTO to add Mr. Darbee as a named inventor on the '426 patent under suspicious circumstances.[4] Mr. Darbee, however, passed away in September

---

[4] The petition was not filed until July 2012, ten years after UEI originally stated its intention to correct inventorship of the '426 patent and during the pendency of this lawsuit. UEI hid the filing from URC for almost a year. Furthermore, UEI filed the petition without even investigating whether Mr. Darbee was, in fact, an inventor.

2013 and is regrettably unavailable for trial. Moreover, given that the '426 patent was filed in 1992, the memories of many witnesses as to the events surrounding the invention of the subject matter of the patent will be unreliable. *See, e.g., Serdarevic*, 532 F.3d at 1360 (discussing lack of reliable memory of long past events as reason for finding laches). UEI also indicated during discovery that its e-mails generated prior to 2006 were unavailable and not recoverable. *See* Ex. 62; Ex. 89 at 10:11–11:19. The loss of this e-mail correspondence impairs URC's ability to adequately and properly defend itself.

In addition to this evidentiary prejudice, URC suffered material, economic prejudice from UEI's unreasonable and inexcusable delay. It is now faced with the loss of investment expenditures as well as claims for damages on both the '426 and '067 patents, both of which could have been prevented (if necessary) had UEI filed suit within a reasonable period of time. The discussion of economic prejudice in the following section is applicable here and is incorporated by reference.

### C.    Equitable Estoppel Also Precludes the Award of Any Damages

Equitable estoppel exists when (1) a patentee, having knowledge of the true facts, communicates something to the alleged infringer in a misleading way that the patentee will not file suit for infringement; (2) the alleged infringer relies on that representation to continue conducting the potentially infringing activity, and (3) the

URC suspects that there was no investigation in 2012 because UEI already knew as early as 2002 that he was not an inventor, which is what led UEI to dismiss the '426 patent with prejudice at that time. Mr. Darbee himself testified that even though UEI claimed in 2002 that he was an inventor on the '426 patent, UEI did not contact him about correcting inventorship until ten years later. *See* Ex. 83 at 182:12–185:18. And when UEI did contact him, they simply told him that the inventorship needed to be corrected and to sign a form they were going to send him, without asking him if he was an inventor. *See id.* at 184:13–20. Mr. Hayes, who signed the petition on behalf of UEI, admitted that he never asked Mr. Darbee or the prosecuting attorney of the '426 patent if Mr. Darbee was an inventor. Ex. 82 at 301:10–17, 308:4–6. To make matters even worse, Kim Nguyen, one of the named inventors on the '426 patent and who also signed the petition, testified that she does not know if Mr. Darbee is an inventor and admitted that even she does not know if she is an inventor on the '426 patent. Ex. 92 at 190:16–191:15. She said she signed the petition simply because Mr. Hayes had asked her to, without any explanation from Mr. Hayes about Mr. Darbee or any of his allegedly inventive contributions. *Id.* at 188:7–191:22.

alleged infringer would be materially harmed if the patentee is later allowed to assert a claim inconsistent with the original representation. *See Aukerman*, 960 F.2d at 1041– 42. Equitable estoppel is based on the patentee's misrepresentation and the alleged infringer's reliance, which may bar the patentee from recovering damages for both prospective and retrospective relief. *Id.* A patentee's misleading conduct may include specific statements, action, inaction, or silence when there was an obligation to speak. *Id.* at 1042. Here, UEI should be equitably estopped from asserting the '426 patent against URC.

### 1.    UEI Represented That It Would Not File Suit

With respect to the first element of equitable estoppel, UEI's dismissal of the '426 patent with prejudice in 2002 constituted a misleading statement and/or conduct from which a reasonable person could infer that UEI did not intend to press an infringement claim against URC. *See Aukerman*, 960 F.2d at 1042. During the First UEI Suit, URC had provided UEI with prior art that rendered the '426 patent invalid, and UEI responded that it could overcome that prior art simply by adding Mr. Darbee as an inventor. UEI's failure to follow through on this representation for ten years, and its decision instead to dismiss the '426 patent from the litigation with prejudice, led URC to reasonably believe that UEI could not correct the inventorship and therefore could not overcome the asserted prior art. Ex. 94 at 280:20–281:19. Indeed, in deposition, UEI's corporate representative refused to explain why UEI dismissed the '426 patent from the First UEI Suit rather than having Mr. Darbee added as an inventor. UEI's corporate representative refused to answer the question based upon advice of counsel. *See* Ex. 82 at 244:6–251:4. Moreover, the 2004 License to the '751 patent covers the same subject matter as the dismissed '426 patent, reinforcing URC's belief that UEI did not intend to assert the '426 patent against URC.

## 2.    URC's Reliance on UEI's Misrepresentation Resulted in Material Prejudice to URC

The second and third elements of the equitable estoppel defense require the reasonable reliance of the alleged infringer on the patentee's misrepresentation to the material harm of the alleged infringer. "Reliance is not the same as prejudice or harm . . . [t]o show reliance, the infringer must have had a relationship or communication with the plaintiff which lulls the infringer into a sense of security in going ahead." *Aukerman*, 960 F.2d at 1043. Prejudice hinges on any changes in economic position that the defendant undertook during the period of delay due to the actions taken or not taken by the patentee. *See id.* at 1033.

As stated above, URC's conduct in the First UEI Suit lulled URC into a false sense of security going forward. For ten years after UEI dismissed the '426 patent with prejudice, URC relied on its belief that UEI did not intend to assert the patent against URC, for reasons including the patent's invalidity. URC changed its economic position by continuing to invest in and manufacture its remote controls, introduced new ones, and even expanded its product line to include the accused rotating channel feature. Since 2002, URC has sold millions of the accused remote controls to the cable TV industry. *See* Exs. 87 & 88. UEI's failure to correct inventorship and its continuing silence as to URC's alleged infringements only bolstered URC's sense of security. URC would be materially harmed if this lawsuit is allowed to continue and URC is forced to pay damages on the sales of the accused remote controls that UEI silently sat by and watched URC market and sell for years. *See Radio Systems Corp. v. Lalor*, 709 F.3d 1124, 1130-31 (Fed. Cir. 2013) (finding estoppel based on four-year delay in bringing suit).

### D.    URC Has an Implied License to the '426 Patent

URC has an implied license under the '751 patent grant in the 2004 License. Ex. 16 § 1.7. An implied license exists under the doctrine of legal estoppel when "a patentee has licensed or assigned a right, received consideration, and then sought to

14

derogate from the right granted." *TransCore v. Electronic Transaction Consultants Corp.*, 563 F.3d 1271, 1279 (Fed. Cir. 2009). Thus, if one patent is "broader than, and necessary to practice" a licensed patent, then the licensee "must be permitted to practice" this broader patent under an implied license to the same extent it may practice the licensed patent "to obtain the benefit of its bargain." *Id.* The Federal Circuit has also held that implied licenses may exist where the non-licensed patent and the licensed patent disclose the same subject matter. Where "continuations issue from parent patents that previously have been licensed as to certain products, it may be presumed that, absent a clear indication of mutual intent to the contrary, those products are impliedly licensed under the continuations as well." *General Protecht Group, Inc. v. Leviton Mfg. Co.*, 651 F.3d 1355, 1361 (Fed. Cir. 2011). That the asserted patent is narrower than the licensed patent does not preclude a finding of implied license. *Id.*

UEI's assertion here of the '426 patent derogates from the rights UEI granted to URC under the '751 patent in the 2004 License. *TransCore*, 563 F.3d at 1279. URC cannot practice the '426 patent without also practicing the '751 patent, including claims 1 through 3 of the '426 patent. *See* Ex. 67, Tab G. UEI admitted in deposition that the '426 and '751 patents are indistinct and that practicing the '426 patent requires practicing the '751 patent. Ex. 81 at 454:13–455:4, 470:15–25, 481:1–8. Various UEI documents also indicate that the rotating macro feature claimed in the '426 patent is also covered by the '751 patent. Ex. 53; Ex. 55; *see also* Ex. 81 at 478:25–481:12. Finally, the family relationship between the '751 and '426 patents also supports an implied license. Both patents have a common parent application. *See General Protecht*, 651 F.3d at 1361.

## IV.   ISSUE #2:  INVALIDITY OF '426 PATENT

URC is entitled to summary judgment that the asserted claims of the '426 patent are invalid for anticipation and/or obviousness under 35 U.S.C. §§ 102 and 103 in light of the Memorex prior art remote control which predates the '426 patent by years.

15

### A.    Overview of the '426 Patent

The '426 patent is titled "Favorite Key Macro Command and Chained Macro Command in a Remote Control."  The patent acknowledges that the admitted prior art includes programmable remote controls and universal remote controls.  Ex. 27 at 1:31-59.  The '426 patent discloses:

> a remote control comprising . . . a macro entry/definition program in the memory for enabling a user of the remote control to define a macro for selecting at least one favorite channel by entry of a series of keystroke commands on the keyboard; and, a macro playback program in the memory for enabling an operator of the remote control to effect rapid selection of at least one favorite channel upon subsequent depression of the at least one MACRO key.

Ex. 27 at 2:3–:21 (Summary of the Invention).

### B.    The Memorex Remote Control Is Prior Art

Memorex invented a prior art remote control which predates the '426 patent by more than two years.  UEI admits that claims 2 and 3 of the '426 patent were conceived in the summer of 1992 and reduced to practice by Dec. 11, 1992.  *See* Ex. 35 at 13.  On June 12, 1990, the Houston Chronicle published an article describing the Memorex remote control.[5]  *See* Ex. 75.  A physical sample of the Memorex remote

---

[5] The Memorex remote control is identical to a Radio Shack "Realistic" brand remote control.  *See* Ex. 67 at 40.  It should be no surprise that, for features relevant here, these two remote controls are so similar, because both Memorex and Radio Shack were, at the time, owned by the Tandy Corporation.  *See* Ex. 68 at 1 ("RADIO SHACK A Division of Tandy Corporation"); Ex. 72.  The Realistic Manual has a copyright date of 1989, three years earlier than the '426 patent's priority date.  *See* Ex. 68 at 3.  A copyright date indicates the year of first publication.  *See* 17 U.S.C. § 401(b)(2); *see also* Ex. 71 at 1–2.  On Jan. 6, 1991, a  Los Angeles Time article also described the Realistic brand remote control.  *See* Ex. 74.  Thus, the Realistic remote control and the Realistic Owner's Manual are also prior art under 35 U.S.C. §102(b) to the '426 patent.  Because the Realistic remote operates so similarly to the Memorex remote, the publication and copyright date of the Realistic manual corroborate that the Memorex remote control is likewise prior art to the '426 patent.  For simplicity, URC has referred to the Memorex prior art remote control in the body of this brief, but the Realistic prior art remote control invalidates the '426 claims for the same substantive reasons and analysis as the Memorex prior art, and constitutes an additional grounds

DEF'T UNIVERSAL REMOTE CONTROL, INC.'S MEMORANDUM OF P'S & A'S IN SUPPORT OF OMNIBUS MOT. FOR SUMM. J. – CASE NO. 8:12-CV-00329 AG (JPRX)

control has a 1990 date on the serial number label on the back of the remote. *See* Ex. 77. The operation of the Memorex invention is further disclosed by a user manual, the Memorex CP8 Turbo Universal Remote Control Owner's Manual ("Memorex Manual"). *See* Ex. 70. Thus, the Memorex remote control itself (and the various publications on the Memorex remote control) is prior art to the '426 patent under 35 U.S.C. §102(a) and/or (b).[6]

C.    **The Memorex Remote Control Anticipates or at Least Renders Obvious All of the Limitations of Asserted '426 Claims 2 and 3**

UEI's expert, Dr. Burke, does not dispute that the Memorex remote control possesses almost all of the elements of the asserted claims of the '426 patent. With respect to the few elements he does dispute, Dr. Burke is incorrect (and indeed he abandoned several of his positions at deposition.

***UEI Admits Memorex Has a "Microprocessor."*** Although he disputed the existence of a "microprocessor" in Memorex in his rebuttal expert report, when confronted with an express teaching in the Memorex Manual of a microprocessor, UEI's expert Dr. Burke admitted that the Memorex remote control expressly discloses a "microprocessor." Ex. 48 at 218:2–17.

Relatedly, Dr. Burke originally disputed the existence of two other limitations of '426 claim 1 (a "keyboard" and "IR lamp driver circuitry"), both of which are connected to the microprocessor, based on his now-abandoned position on the "microprocessor" limitation. *See* Ex. 35 at 30 (disputing keyboard and IR lamp driver circuitry because they must be connected to a microprocessor, which he denied existed). UEI's Dr. Burke also originally disputed the existence of "light emitting means" based on his now-recanted "microprocessor" position, because the "light emitting means" must be connected to the IR lamp driver circuitry which, as noted,

for summary judgment of invalidity. *See generally* Ex. 67 at 36–38, 46–49.

[6] Because the '426 patent issued prior to the effective date of the America Invents Act, the former provisions of 35 U.S.C. § 102 apply here.

17

must itself be connected to the "microprocessor." *Id.* Dr. Burke's positions on all of these claim elements now fall with his admission that Memorex discloses a "microprocessor."

**_Memorex Teaches "Macro Entry" and "Macro Playback" Programs._** UEI did not invent remote controls which can be programmed with favorite channels, yet this is precisely the feature UEI asserts is covered by the '426 asserted claims. *See* Ex. 35 at 11 ("The '426 patent describes a method and remote control apparatus for creating favorite channel macros."). The Memorex prior art includes a "macro" or programming feature of a remote control that can be used for defining and then later selecting favorite channels. This macro or programming feature (which Memorex calls the "favorite-channel feature") allows up to 32 favorite channels to be defined and then later allows a user to sequence through the favorite channels using one or more buttons. *See* Ex. 70 at 11–13, 24, 25–26.

With regard to "macro entry," the Memorex Manual teaches a step-by-step way of entering or defining favorite channels into the remote control's memory using two keys ("[LEARN]" and "[FAVORITE]") along with channel numbers keys. *See id.* at 26. Though Dr. Burke originally disputed that Memorex teaches this limitation because he argued that "Memorex makes no disclosure as to how the control and logic processing functions are performed in its remote control," he admitted at deposition that "what is stated here [in the Memorex Manual] is that there's a feature that allows you to do this and it says that a favorite channel feature allows you to enter up to 32 active or favorite channels into its memory to allow you to scroll only through those preferred channels." Ex. 48 at 222:22–223:7.

With regard to "macro playback," the Memorex Manual also teaches using specific keys to playback or retrieve the favorite channels. Dr. Burke admitted that "[w]hat is disclosed in this document is the use of . . . a favorite channel feature, and so there's some instructions as to how to do that here, and it is a disclosure of a way to scroll through a subset of the channels that could normally be tuned by the remote

18

control." Ex. 48 at 226:16–227:2. The Memorex Manual discloses "USING FAVORITE-CHANNEL" after the favorite channels have been entered by performing the following steps:

"1. Press [FAVORITE]. The FAVORITE indicator appears.

2. When you press CHANNEL [▲] or [▼], the Turbo transmits the channels from your favorite-channel list, instead of the normal CHANNEL [▲] [▼], command codes."

Ex. 70 at 26.

Dr. Burke originally argued that the Channel UP/DOWN buttons "still perform the function of tuning up/down as they did previously. In other words, the Channel-up and Channel-down buttons have not been assigned any new function, or assigned a macro, but instead perform their same function of tuning up or down one channel, except now the list from which they tune is smaller." Ex. 35 at 31. However, when confronted at deposition with express teaching from the Memorex Manual that the Channel UP/DOWN buttons do not transmit their "normal command codes" in "favorite-channel mode," Dr. Burke admitted that in the Memorex device (also termed "Turbo") "[w]hen you press channel up or down, the Turbo transmits channels from your favorite channel list *instead of the normal channel up or down command codes*." Ex. 48 at 228:20–229:6 (emphasis added).

Further, while Dr. Burke originally argued that Memorex lacks both a "macro entry" and "macro playback" because Memorex allegedly fails to teach "what components are used to perform these functions" for the favorite channel feature, as noted above, he later admitted at deposition that Memorex discloses a "microprocessor." *See* Ex. 48 at 218. Dr. Burke further admitted at deposition that Memorex teaches "to enter up to 32 active or favorite channels *into its memory*" and he also admitted that a person of ordinary skill in 1991 would know to use a memory to store digital information. *Id.* at 222:22–223:7 (emphasis added) & 219:4–14.

DEF'T UNIVERSAL REMOTE CONTROL, INC.'S MEMORANDUM OF P'S & A'S IN SUPPORT OF OMNIBUS MOT. FOR SUMM. J. – CASE NO. 8:12-CV-00329 AG (JPRX)

***Memorex Teaches a "Means for Establishing and Recalling Three Selected Channels."*** Memorex discloses a "means for establishing and recalling three selected channels upon depression of a predetermined series of keystrokes and the at least one MACRO key" as required by '426 claim 2. This is a "means-plus-function" claim term which the parties have agreed requires performing the claimed function using the instructions shown in '426 Figures 4 and 5. *See* Ex. 34 at 12.

The Memorex remote control performs the claimed function of "establishing and recalling three favorite channels by actuation of keys including a macro key." As shown above, the Memorex Manual teaches the steps needed to establish or define up to 32 favorite channels using the "Learn" and "Favorite" keys, and also teaches the function of recalling or accessing those favorite channels using either the Channel UP/DOWN buttons in "favorite-channel mode" which is activated using the "Favorite" key. *See* discussion of macro entry and playback programs above.

The '426 patent incorporates by reference the Darbee '810 Patent. *See* Ex. 27 at 4:33–39. The Darbee '810 patent expressly teaches that channel-up and channel-down keys can be macro keys. *See* Ex. 69 ('810 Patent) at 16:42–59, 17:28–32. Thus, Memorex teaches the function of the "means for recalling … upon depression of … at least one MACRO key" using the structure of a Macro Key (which '426 defines as including Channel Up or Down keys) as claimed.

With regard to the remaining structure of the "means for establishing and recalling" (*see* '426 Figures 4 and 5), for purposes of this motion, the Court should find that Dr. Burke and UEI have failed to show infringement as a matter of law (as discussed in the '426 non-infringement motion) for failure to analyze or identify ***any specific*** structure in any URC products which correspond to the structure or algorithm of '426 Figures 4 and 5. For infringement, UEI and Dr. Burke adopted a purely functional analysis devoid of any analysis of firmware, source code, or internal algorithms of URC products. Dr. Burke simply operated the accused URC products and concluded based on his observation that "establishment and recall of these three

20

favorite channels is effected by depressing a predetermined series of keystrokes and at least one MACRO key" that the products are "necessarily using software instructions coded to implement this functionality" without ever identifying that software, how it actually works, what algorithms it uses, or why it "necessarily" uses infringing algorithms. *See* Ex. 34 at 92. Thus, as detailed in the non-infringement motion that follows, the Court should rule that there is no infringement because URC's products do not use any algorithms identical or equivalent to Figures 4 and 5 of the '426 patent.[7]

If, however, the Court believes that UEI's approach to the infringement analysis of this "means" limitation is correct, then that same approach must apply to any analysis of Memorex. And, under that approach, Memorex invalidates the '426 claims. That is, under the functional analysis paradigm UEI has adopted for its infringement analysis, Memorex (as shown above) operates to allow a user to define and then rotate through a favorite channel list of at least three channels. Thus, under Dr. Burke's functional approach, Memorex must also have the structure of Figures 4 and 5 in the '426 patent and thus invalidates claims 2 and 3.

Moreover, under a proper legal approach pursuant to 35 U.S.C. § 112(f), the favorite channel storage and playback instructions in the Memorex manual demonstrate the existence of an algorithm running on the microprocessor (admitted by Dr. Burke to exist) and stored in the memory (also admitted by Dr. Burke to be known to persons of ordinary skill). As Dr. Burke stated, "What I understand from the reference is what's stated in the reference," Ex. 48 at 229:1–2, and the verbatim,

---

[7] Specifically, in his Rebuttal Report, Dr. Burke improperly adopted a narrower construction of the asserted claims that reads into the claims features and details from '426 Figure 5 that are ignored in his infringement analysis. *See, e.g.*, Ex. 35 at 32 (distinguishing Memorex based on "playback rotation count" and related steps in '426 Fig. 5; also distinguishing based on requiring "other buttons continue to perform their specified functions when they are pressed" and related steps in '426 Fig. 5). If that narrower construction is correct, then the Court should hold that URC does not infringe as a matter of law, since Dr. Burke never showed and cannot show that URC products have these features.

undisputed text of the Memorex Manual teaches express steps for both entering and then accessing favorite channel. The Memorex remote control's manual is clear evidence that Memorex has an algorithm at least equivalent to those set forth in Figures 4 and 5 of the '426 patent. *See* Ex. 67 at 54. Thus, the Memorex prior art remote control is at least equivalent to the structure of the '426 patent's "means for establishing and recalling" and therefore invalidates the '426 claims.

## V.    ISSUE #3:  NON-INFRINGEMENT OF '426 PATENT

URC respectfully requests that the Court enter summary judgment of non-infringement of the '426 patent in URC's favor, for the reasons that follow. An overview of the '426 patent is provided above.

### A.    The Parties Agree That Claims 2 and 3 of the '426 Patent Are Limited to the Flowcharts Shown in Figures 4 and 5

Claims 2 and 3 of the '426 patent are asserted. *See* Ex. 38 (reprinting the text of the asserted claims, along with the applicable claim constructions). The parties have agreed to a claim construction that limits claims 2 and 3 to the "instructions shown in Figs. 4 & 5" of the '426 patent. *See* Ex. 36 at 2:15; *see also* Ex. 48 at 150:12–155:25 (agreeing claims 2 and 3 are limited to the instructions in Figures 4 and 5). The Court has held that "the parties will be bound" by this agreed-upon construction. *See* Ex. 37 at 37:7.

Figures 4 and 5 of the '426 patent, and the associated text in the specification, describe very specific algorithms that use "*rotation counters*" for associating three favorite channels with one macro key on a remote control, such that every time the macro key is pressed, the remote control rotates to the next of the three favorite channels. *See* Ex. 27 at 4:47–5:68 & Figs. 4–5. According to Fig. 4, a "storage rotation count" is incremented each time a favorite channel is programmed and, when the storage rotation count reaches "4," it is reset to "1," meaning that "[i]f one attempts to establish a *fourth* macro for a fourth selected channel, the *first* macro for the first selected channel will be erased and overwritten." *Id.* at 5:12–14 (emphasis

added).  According to Fig. 5, a "playback rotation count" is incremented each time the macro key is pressed and, when the playback rotation count reaches "4," it is reset to "1" so that the remote control circles back to the first favorite channel.  Thus, "[i]f only *one* selected macro is created, the second and third keystrokes of a MACRO key will cause *nothing* to happen and the fourth keystroke will repeat the selection of the first selected macro to select the single selected channel." *Id.* at 5:15–19 (emphasis added).  The behavior of the fourth favorite channel "overwriting" the first one is shown in the "Yes" path circled in the portion of Figure 4 reprinted below, and the behavior of repeated macro keystrokes rotating through empty slots of favorite channels and causing "nothing to happen" is shown by the "No" path circled in the portion of Figure 5 reprinted below:

 

Ex. 27, Figs. 4 & 5.

### B.    UEI Failed to Identify and Analyze the Differences Between the Accused Products and the Algorithms Specified in Figures 4 and 5 of the Patent

UEI has stipulated that it is relying "solely" on its expert, Dr. Burke, to present its infringement case, *see* ECF No. 153 at 2:19–22, but Dr. Burke's infringement

analysis is fatally flawed: Dr. Burke admits that claims 2 and 3 of the '426 patent are limited to the flowcharts shown in Figures 4 and 5 of the '426 patent, *see* Ex. 48 at 150:12–155:25, yet his infringement analysis does *not* compare the accused products to the specific flowcharts shown in Figures 4 and 5 of the '426 patent, *see, e.g.*, Ex. 34 at 53–54. Instead, Dr. Burke provides only a conclusory statement that the accused devices "follow a process as described in Figures 4 and 5 of the '426 patent, and associated text." *See, e.g., id.* at 54. Dr. Burke failed to compare the accused products to the specific flowcharts shown in Figures 4 and 5, most notably the two requirements described above: the remote control must "cause *nothing* to happen" on the second and third keystrokes if only *one* favorite channel has been programmed, *see* Ex. 27 at 5:15–19, and trying to program a *fourth* favorite channel must overwrite the *first* favorite channel instead, *see id.* at 5:12–14.

C.    **Claims 2 and 3 of the '426 patent Are Not Infringed Because the Accused Products Do Not Operate in the Manner Specified in Figures 4 and 5 of the Patent**

Had Dr. Burke performed a proper analysis, he would have been forced to conclude that the accused products do not operate in the manner specified by Figures 4 and 5 of the '426 patent, and thus under the agreed-upon construction they do not infringe claims 2 or 3 of the '426 patent.

UEI's expert repeatedly emphasized in his rebuttal report on *validity* that to meet the limitations of claims 2 and 3, the requirements of Figures 4 and 5 must be satisfied, including the use of "rotation counters." For example, in an attempt to distinguish the Memorex prior art, UEI's expert emphasized that claim 2 requires "a playback rotation count that can only increment upwards, until it 'rolls over' and returns to the first entry (see step 'INCREMENT PLAYBACK ROTATION COUNT', the test 'ROTATION COUNT = 4?' and logical paths flowing from that test, including the 'roll over' occurs in the step 'PLAYBACK ROTATION COUNT = 1' at '426 Fig. 5)." Ex. 35 at 32. Yet for purposes of his *infringement* analysis, UEI's expert failed to show that the accused products implement "rotation counters"

24

in the manner specified by Figures 4 and 5 of the '426 patent. That is legally impermissible: "A patent may not, like a 'nose of wax,' be twisted one way to avoid anticipation and another to find infringement." *Amazon.com, Inc. v. barnesandnoble.com, inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001). Rather, "the claims must be interpreted and given the *same* meaning for purposes of both validity and infringement analyses." *Id.* (emphasis added).

The accused products do not have a "storage rotation count" or a "playback rotation count" and thus they do not meet the two requirements of Figures 4 and 5 described in the previous section: they do not "cause *nothing* to happen" on the second and third keystrokes if only *one* favorite channel has been programmed, *see* Ex. 27 at 5:15–19, and trying to program a *fourth* favorite channel will not overwrite the *first* favorite channel instead, *see id.* at 5:12–14.

For example, the URC "R6" remote control is one of the remote controls accused of infringing claims 2 and 3 of the '426 patent. *See* Ex. 34 at 2, 53–54 (UEI's expert report). As described in the manual for the "R6" remote control, "Each button can program up to 5 favorite channels." Ex. 42 at 18. But if *fewer* than five favorite channels are programmed — say if only three of the five channels are programmed — the R6 does *not* "cause *nothing* to happen" on the fourth and fifth keystrokes. Instead, the fourth keystroke emits the command for the first favorite channel and the fifth keystroke emits the command for the second favorite keystroke. *See id.* Furthermore, if you have programmed three favorite channels in the R6, and then later you try to program a fourth favorite channel, you will *not* overwrite the first favorite channel with the fourth favorite channel. Instead, you will delete *all* of the favorite channels and only the new favorite channel(s) will be saved. *See id.*

The burden is on UEI to show that each and every accused remote control operates in the manner specified in Figures 4 and 5 of the '426 patent. UEI has not met this burden, and in fact the accused remote controls operate differently, as

25

described above.  For all of these reasons, none of the accused products infringe claims 2 or 3 of the '426 patent.

## VI.    ISSUE #4:  NON-INFRINGEMENT OF '906 PATENT

URC respectfully requests that the Court enter summary judgment of non-infringement of the '906 patent in URC's favor, for the reasons that follow.

### A.    Overview of the '906 Patent

The '906 patent is referred to as the "Quick Set" patent by UEI and its expert. It concerns matching a remote control with a device, such as a television, so that the commands from the remote control will work with that device.  The '906 patent discloses:

> The method includes assigning multiple effects observable commands (e.g. a "power off" command) from a group of command sets stored in the remote control to multiple user actuated switches or keys of the remote control.

> The user then actuates the switches or keys, one at a time, with the corresponding assigned effects observable command being transmitted.  The user continues to actuate keys until the user observes the remotely controlled device responding properly to the transmitted command.  The user then terminates the selection procedure with the remote control setting the active command set to the command set from which the successful effects observable command was assigned.

Ex. 28 at 2:39–43 (Summary of the Invention).

### B.    Claims 1, 10, and 12 of the '906 Patent Are Not Infringed Because the Buttons on the Accused Remote Controls Are Pressed Simultaneously, Not "Sequentially and Individually"

Claims 1, 10, and 12 of the '906 patent are asserted.  *See* Ex. 39 (reprinting the text of the asserted claims, along with the applicable claim constructions).  All three asserted claims require the following, found in step (b) of claim 1:  "actuating

26

*sequentially and individually* each one of the plurality of assignable user actuated switches or keys, to individually transmit each assigned effects observable command until the proper effect is observed." Ex. 28 at 7:32–35 (emphasis added).

Neither the Court nor the parties have suggested that the phrase "sequentially and individually" requires construction beyond its plain meaning. The limitation plainly requires pressing keys one after another, and only one at a time.

The accused products do not infringe claims 1, 10, and 12 of the '906 patent because the accused functionality requires pressing keys *simultaneously*, not "sequentially and individually" as required by all the asserted claims. For example, the URC "R6" remote control is one of the remote controls accused of infringing claims 1, 10, and 12 of the '906 patent. *See* Ex. 34 at 2, 55–58 (UEI's expert report). As described in the manual for the "R6" remote control, you must press keys *simultaneously* as part of the accused Quick Set-Up Method: "Point the AVEX R6 toward the component that you want to program (in this case the TV set) and press and hold the component button (in this case the TV button). *While holding down the component button*, begin to press numeric keys, one number at a time, starting from 1, continuing to 2, 3 ... 0 until component (in this case the TV) turns off." Ex. 42 at 7 (emphasis in original).

UEI's expert has relied upon the claim limitation "sequentially and individually" to distinguish prior art, such as the Goldstar GHV-410 remote control, that discloses "pressing a number button and the Power button *simultaneously*." Ex. 35 at 94. UEI's expert distinguished the GHV-410 prior art by arguing that "the Power button and numeric keys are actuated together in order to select and load a command set; buttons are *not actuated sequentially and individually*." *Id.* at 95 (emphasis added). The prior art GHV-410 remote works almost exactly like the accused URC products: in both remotes, buttons must be pressed simultaneously in order to program the remote. For purposes of validity, UEI's expert has given "sequentially and individually" its ordinary meaning, which plainly requires pressing

the keys one after another, and only one at a time. But under that same construction, none of the accused products infringes the asserted claims of the '906 patent. "A patent may not, like a 'nose of wax,' be twisted one way to avoid anticipation and another to find infringement." *Amazon.com, Inc. v. barnesandnoble.com, inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001). Rather, "the claims must be interpreted and given the *same* meaning for purposes of both validity and infringement analyses." *Id.* (emphasis added).[8]

## VII.   ISSUE #5:  NON-INFRINGEMENT OF '067 PATENT

URC respectfully requests that the Court enter summary judgment of non-infringement of the '067 patent in URC's favor, for the reasons that follow.

### A.     Overview of the '067 Patent

Dr. Burke refers to the '067 patent as being directed toward the "direct entry technique" for matching a remote to a home appliance based upon the user's entry of a code using pushbuttons. *See* Ex. 35 at 138. Thus, like the '906 patent, the '067 patent concerns matching a remote control with a device, such as a television, so that the commands from the remote control will work with that device. (The '906 and '067 patents disclose two different methods for achieving the same result.) The '067 patent discloses:

> STEP 1. Look up *make and model* number of the controlled
> apparatus in a table provided to the user in an instruction
> booklet.
> STEP 2. Model number is found and matched with a series
> of 8"R"s and "G"s.

Ex. 29 at 10:44–10:52 (emphasis added).

---

[8] If Dr. Burke's infringement analysis were to be adopted by the Court, then URC requests that the Court find the '906 asserted claims invalid in light of the GHV-410 prior art remote control. *See generally* Ex. 67 at 94–95, 118–22.

28

**B.      Claims 1, 2, 3, and 6 of the '067 Patent Are Not Infringed Because the Accused Remote Controls Do Not Have a Code to "Directly Identify" Each Home Appliance by "Make and Model"**

Claims 1, 2, 3, and 6 of the '067 patent are asserted. *See* Ex. 40 (reprinting the text of the asserted claims, along with the applicable claim constructions).

The parties have agreed that the phrase "plurality of different home appliances of different manufacturers" means a "plurality of home appliances of differing *make and model*." Ex. 36 at 3:11. The Court has held that "the parties will be bound" by this agreed-upon construction. *See* Ex. 37 at 37:7.

Furthermore, there is no dispute that this agreed-upon claim construction applies in every place where the asserted claims use the phrase "plurality of different home appliances of different manufacturers." *See* Ex. 48 at 103:10–110:9. For example, each of the asserted claims requires pressing keys (*e.g.*, entering a 3-digit code) "to directly identify each of the *plurality of different home appliances of different manufacturers* to which the universal remote control is to be matched." *See* Ex. 40 (reprinting the text of the asserted claims). Thus, applying the agreed-upon construction, each of the asserted claims requires pressing keys (*e.g.*, entering a 3-digit code) "to *directly identify* each of the plurality of home appliances of differing *make and model* to which the universal remote control is to be matched."[9] It is important to note that this limitation was added during prosecution to overcome certain prior art, *see* Exs. 78–79 (rejection followed by amendment to overcome "Core" prior art), and UEI agreed to the "make and model" claim construction no doubt to avoid prior art.

The accused products do not infringe claims 1, 2, 3, or 6 of the '067 patent because the codes in those products do not *directly identify* the home appliance to be matched by *make and model*. Instead of directly identifying a home appliance, the

---

[9] Requiring "make and model" for the term "plurality of different home appliances of different manufacturers" throughout the claims is consistent with the '067 patent's disclosure as well as the Court's construction of certain phrases in which the same term appears. For example, Figure 17 of the '067 patent teaches that if the "Model No." is not found (NO branch of step 2) then another method (Search & Set) should be tried instead. *See* Ex. 29, Fig. 17.

29

accused codes identify "command sets" that typically are used by multiple manufacturers for multiple makes and models.  For example, the URC "FX-1" remote control is one of the remote controls accused of infringing claims 1, 2, 3, and 6 of the '067 patent.  *See* Ex. 34 at 2, 23–26 (UEI's expert report).  Reprinted below are some of the codes provided in the manual for the "FX-1," and as can be seen, these codes never **directly identify** the home appliance to be matched by **make and model** — instead each manufacturer has one or more codes (as shown by the red rectangle), and the same code can be associated with multiple manufacturers (as shown by the red circles):

## TV

| BRAND | CODE NUMBERS |
| --- | --- |
| | * * * * * |
| CURTIS MATHES | 116 01 004 143 |
| CXC | |
| DAEWOO | 004 016 043 044 076 103 114 125 127 143 |
| DAYTRON | 004 143 |
| DELL | 319 320 321 |
| DIMENSIA | 333 |
| DREAMVISION | 235 |
| DUKANE | 163 025 |
| DUMONT | 116 073 |
| DURABRAND | 096 |
| DWIN | 177 257 |
| DYNASTY | 043 |
| EIKI | 187 |
| ELECTROBAND | 070 |
| ELECTROHOME | 143 024 076 196 |
| ELEKTRA | 072 |
| EMERSON | 028 048 043 155 005 116 004 047 050 051 076 096 143 153 154 |
| ENVISION | 116 |

Ex. 41 at UE182131.

As can be seen above, the codes do not provide any sort of direct identification of a particular home appliance, let alone by make or model, as required by the claims.  Tellingly, UEI's expert failed to identify the make and model of the devices he matched or even the specific codes he tried to match those devices (presumably to

hide the fact that he often had to try *multiple* codes before finding one that would work). The reason for this lack of specificity is simple: the codes he used do not directly identify any home appliance. For example, Dr. Burke states that he matched the FX1 remote to a "Zenith TV, Motorola cable box, and Sony DVD player." Ex. 34 at 24. The FX1 manual lists at least four different codes for each of these device categories without specifying which model is using which code. *See* Ex. 41 at UE182134 (Zenith TV), UE182136 (Motorola cable box), UE182140 (Sony DVD).[10]

## VIII.  ISSUE #6:  ENTIRE MARKET VALUE RULE

The Court should enter partial summary judgment in favor of URC regarding the proper scope of damages in this action. Specifically, URC respectfully requests that the Court enter partial summary judgment that (1) the "entire market value rule" exception is inapplicable in this case because there is no evidence that the patented features—which under the most charitable view represent only minor, incremental improvements—form the basis for consumer demand for the entire accused remote control devices; and accordingly (2) UEI is required under the law to apportion between the unpatented and allegedly patented features for purposes of calculating its alleged damages, both for purposes of lost profits and under a reasonable royalty analysis. Such an order is legally required under the undisputed facts in order to set proper economic bounds on this case, given that UEI persists in seeking damages based on sales of the entire accused devices without regard for an apportionment of the value of the actual inventions. Clarity on this issue will appropriately regulate the parties' expectations and enhance opportunities for resolution before trial.

---

[10] Further, the manual states that the codes provided may not even work with any particular device, even if the device is made by one of the manufacturers listed in the manual. Thus the manual explains, "IMPORTANT:  If the Code Entry Method did not work with your components, try the Auto-Search Method next as outlined on page 7." Ex. 41 at UE182118. UEI's expert admits that the "Auto-Search" method does not infringe any asserted claim of the '067 patent. *See* Ex. 48 at 177:4–15.

DEF'T UNIVERSAL REMOTE CONTROL, INC.'S MEMORANDUM OF P'S & A'S IN SUPPORT OF OMNIBUS MOT. FOR SUMM. J. – CASE NO. 8:12-CV-00329 AG (JPRX)

### A.    Unless UEI Can Satisfy the Entire Market Value Rule, Its Reasonable Royalty and Lost Profits Damages Calculations Must Be Apportioned

"[T]he patentee . . . must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative," or, in the alternative, prove that "the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature." *Garretson v. Clark*, 111 U.S. 120, 121, 4 S. Ct. 291, 291–92, 28 L. Ed. 371, 372 (1884).  The latter option—now known as the entire market value rule—is a "narrow exception" to the apportionment requirement. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012).  Here, UEI cannot demonstrate that damages should be awarded on the basis of the entire value of the accused remote control devices and thus is required to apportion between the values of the patented and unpatented features for purposes of calculating damages.

### B.    UEI Cannot Rely on the Entire Market Value Rule Exception

Under the entire market value rule, to establish that the entire value of an apparatus is attributable to the patented feature, the patentee must demonstrate that the patented feature is the "basis for customer demand or substantially creates the value of the component parts." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011).  It is insufficient for a patentee to merely show that a patented feature is "valuable, important, or even essential" to the overall product, or even that the overall product would be "commercially unviable" in the absence of the patented feature. *LaserDynamics*, 694 F.3d at 68–69.  The entire market value rule applies to both lost profits and reasonable royalty damages methodologies. *Cornell Research Found., Inc. v. Hewlett-Packard Co.*, 2007 U.S. Dist. LEXIS 89637, at *198 n.44 (N.D.N.Y. 2007) (Rader, J.).  Whether a patentee may rely on the entire market value rule in a particular case is a matter that is appropriate for summary judgment. *Id.* at *95; *see also, e.g.*, *CareFusion 303, Inc. v. Sigma Int'l*, 2012 U.S. Dist. LEXIS 158, at

32

*5–10 (S.D. Cal. 2012) (granting the alleged infringer's motion for summary judgment that the entire market value rule was inapplicable).

Here, UEI has not shown, and cannot show, that any of the patented features form the basis for customer demand for, or substantially create the value of, the accused URC remote control devices. As the specifications of the patents-in-suit describe, there are many important components and software features included in the accused remote controls that UEI has no claim to inventing. For example, the asserted claims include hardware components such as a "microprocessor," a "CPU," a "memory," a "keyboard," an "IR lamp driver circuitry," and a "light emitting means." Ex. 27 at 6:36–41. The '426 patent specification explains that those components were previously disclosed in earlier remote control patents. *See id.* at 1:41–47. The patented features, on the other hand, represent, at most, merely a small subset of the accused remote control devices' overall functionalities, and there simply is no basis in the record from which a reasonable juror could conclude that these particular features drive consumer demand for the entire accused devices.

For example, UEI's experts contend that the '426 patent "describes a method and remote control apparatus for creating favorite channel macros." Ex. 34 at 8; Ex. 30 at 25. UEI's expert, Dr. Burke, describes the patented feature as the "rotating favorite channel macro feature." Ex. 48 at 71:3-7. UEI's expert, Mr. Bernatowicz explains that the feature relates to a macro enabling "favorite channels [to] be accessed by the remote by continually pressing the same key, thus rotating through the selections." Ex. 30 at 25.

Similarly, according to UEI, the '906 patent "describes an efficient method for selecting a matching command set from a group of command sets stored in a remote control." Ex. 34 at 8; Ex. 30 at 25. UEI's experts refer to this functionality as the "QuickSet" or "Quick Search" functionality. Ex. 34 at 21; Ex. 48 at 69:2-70:3; Ex. 30 at 25. This functionality is one particular "method for enabling and programming the remote," among other possible methods. Ex. 30 at 25. Dr. Burke describes this

33

patented feature as "one of the ways [to] enable[] a user to match the remote control to consumer appliances." Ex. 48 at 124:5-13.

With respect to the '067 patent, UEI contends that it also "relates to matching a universal remote control to different home appliances of different manufacturers." Ex. 34 at 9; Ex. 30 at 24. As Mr. Bernatowicz explains, "[w]ith this technology, the cable installer or home user may enter a unique 3 digit code at the remote to enable its interface with different external devices such as a TV, VCR, etc. from different manufacturers." Ex. 30 at 25. UEI's experts refer to this patented feature as the "3 Digit matching feature" or the "3 Digit Codes." Ex. 34 at 21; Ex. 30 at 25.

Although no evidence in the record supports the proposition that any of these relatively minor features drives consumers to purchase remote control devices, UEI's damages expert, Mr. Bernatowicz, maintains that the patented features drive demand for the accused products. But his testimony is conclusory in nature, *see* Ex. 12 at 68:11-18; 145:5-18, and it is well-settled that such conclusory allegations are insufficient to defeat a well-grounded motion for summary judgment. *Regents of the Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 941 (Fed. Cir. 2013) ("Conclusory expert assertions cannot raise triable issues of material fact on summary judgment."); *Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1061 (9th Cir. 2011) ("To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations.").

Moreover, Mr. Bernatowicz's assertions contradict the record. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242, 125 L. Ed. 2d 168, 113 S. Ct. 2578 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."). For example, UEI's own Vice President of Sales, Steven Gutman testified: "I mean IR codes and databases can be complicated, so entering in a code to work a device, I think the end user *doesn't care* how that's accomplished, just so it's done simple and

34

easy." Ex. 10 at 139:7–25 (emphasis added). UEI's Rule 30(b)(6) witness on the issue of demand for the patented features, Pat Hayes, testified that UEI does not undertake market surveys or track consumer demand for product features. Ex. 82 at 72:8–11, 73:4–11. UEI's Executive Vice President, Mark Kopaskie, testified that "each customer is different," Ex. 56 at 86:16–25; 225:24–226:18, that purchasing decisions are driven by a variety of factors, including price and various aspects of the technology, *see id.* at 79:24–81:6; 84:25–86:25, and that he could not identify the extent to which any of the patented features at issue here drive sales, *see id.* at 100:4–25, 101:15–25, 142:9–143:19. Mr. Kopaskie's inability to make such an identification should not be surprising, since it appears that UEI does not even use the '906 patented features in its cable remotes. *See* Ex. 86; *see also* Ex. 56 at 157:22–158:17. Similarly, many of UEI's remote controls have a single favorite channel feature instead of the '426 patent's rotating favorite channel feature. From URC's standpoint, no URC customers have ever requested that the '426 or '906 features be incorporated into remote controls. *See, e.g.*, Ex. 93 at 449:17–450:1. And the '067 patent expired in 2007.

Finally, the procurement requirements of cable customers such as Time Warner are also inconsistent with Mr. Bernatowicz's conclusions. For example, the

Ex. 31 at UE083723. Likewise,

. *Id.* OCAP specifications are extensive and include, for example, Table 25-5, which references a variety of "keycodes that SHALL be sent to OCAP applications when the corresponding key is pressed by a user." Ex. 32 at 237. Those keycodes include

"power on/off," "Channel Down," "Channel Up," "0-9," and many others—but OCAP does not mandate any keycodes associated with the patented features. *See id.*

### C. UEI Must Apportion Value Between Patented and Unpatented Features

Because the record does not disclose any basis upon which a reasonable juror could find that "the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature," the entire market value rule is inapplicable. The corollary is that UEI's damages calculations—in whatever form they take—must include an apportionment of the value of the patented features from the value of the unpatented features. *Garretson*, 111 U.S. at 121, 4 S. Ct. at 291–92, 28 L. Ed. at 372. To avoid any ambiguities, and to make it clear that a proper apportionment is required regardless of whether UEI proceeds under a reasonable royalty or lost profits theory of damages, the Court's order should make this apportionment requirement explicit.

It is well-established that apportionment between patented and unpatented features is required in connection with a reasonable royalty analysis. *See, e.g., LaserDynamics*, 694 F.3d at 67 ("[I]t is generally required that royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit.'") (citing *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 283, 287–88 (N.D.N.Y. 2009)). This requirement is in accordance with Factor 13 of the well-known Georgia-Pacific factors, which mandates consideration of "[t]he portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer." *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); *see also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1332–33 (Fed. Cir. 2009).

In the context of lost profits, the Federal Circuit has held that a plaintiff seeking damages based on lost profits must also make an "allocation of profits that would have

36

been made 'but for' the infringement of the [patent-in-suit]" and subtract out any "profits that could fairly be allocated to customer demand related to [other] features." *Ferguson Beauregard/Logic Controls, Division of Dover Res., Inc. v. Mega Systems, LLC*, 350 F.3d 1327, 1346 (Fed. Cir. 2003) (reversing and remanding lost profits award); *see also Electro-Mechanical Corp. v. Power Distrib. Prods.*, 2013 U.S. Dist. LEXIS 128871, at *16 (W.D. Va. 2013) (reversing a jury's award of lost profits where the patentee improperly used the entire market value rule to avoid apportionment). This requirement is reflected in the Model Patent Jury Instructions for the Northern District of California:

> "You must allocate the lost profits based upon the customer demand for the patented feature of the infringing [product] [method]. That is, you must determine which profits derive from the patented invention that [alleged infringer] sells, and not from other features of the infringing [product] [method]."

N.D. Cal. Model Patent Jury Instr. No. 5.2.

In accordance with these established principles, the Court should enter partial summary judgment that UEI is not entitled to damages calculated on the basis of the value of the entire accused remote control devices, and accordingly that any damages sought by UEI must comply with the apportionment requirement. This ruling will temper the parties' expectations concerning damages. Simply put, to the extent UEI prevails, it will only be entitled to damages that fairly compensate it for the value of the actual inventions—and not for a multitude of remote control features and functionalities that it has no claim to inventing.

## IX.    ISSUE #7:  PATENT MARKING

To obtain pre-suit damages, a patentee is required to do one of two things:  (1) provide constructive notice of infringement by complying with the statutory patent marking requirements; or (2) provide the alleged infringer with actual notice of the infringement.  35 U.S.C. § 287(a).  "The burden of proving notice, either by marking

37

or by actual notice, rests on the patent owner." *Calmar, Inc. v. Emson Research*, 850 F. Supp. 861, 867 (C.D. Cal. 1994) (citing *Dunlap v. Schofield*, 152 U.S. 244, 247–248, 38 L. Ed. 426, 14 S. Ct. 576 (1894)).  Here, URC respectfully requests that the Court enter summary judgment that UEI has not complied with the marking requirements with respect to the '426 and '067 patents, and accordingly that its damages for any infringement of those patents are limited to damages accruing after UEI provided URC with actual notice of its alleged infringement.  The Court should further find that the dates on which UEI provided actual notice of infringement to URC were, for the '426 patent, March 1, 2010, and, for the '067 patent, March 2, 2012.  Finally, since the '067 patent expired in 2007 prior to the date upon which URC received actual notice of infringement, the Court should find that UEI is not entitled to any recovery for infringement of that patent.

A.  **UEI Did Not Comply With the Marking Requirements Set Forth in 35 U.S.C. § 287(a)**

UEI failed to properly mark its '426 covered products with the '426 patent number prior to March 1, 2010 and its '067 covered products with the '067 patent number prior to the filing of the complaint on March 2, 2012.[11]  URC is entitled to summary judgment that UEI did not adequately mark the '426 Covered Remotes or the '067 Covered Remotes (collectively the "Covered Remotes") because (1) UEI has not met its burden of proving statutory marking; (2) the evidence produced in discovery, in fact, affirmatively shows that UEI did not properly mark its products; and (3) UEI did not direct its licensees to mark their products.

---

[11] UEI's sales and identification of  large quantities of covered remotes for the '426 patent from 2001–2012 are set forth in Ex. 85 ("the '426 Covered Remotes").  UEI's sales and identification of large quantities of covered remotes for the '067 patent from 2001–2007 are set forth in Ex. 86 ("the '067 Covered Remotes").  *See generally* Ex. 56 at 107:8–109:5, 149:5–17.

### 1.    UEI Has Not Met its Burden to Prove Marking

To carry its burden of proof on the issue of marking, the patentee must show, *inter alia*, that it "consistently" marked "substantially all" of its patented articles with the patent number and that "once marking was begun, the marking was substantially consistent and continuous." *Nike Inc. v. Wal-Mart Stores*, 138 F.3d 1437, 1446 (Fed. Cir. 1998); *Sentry*, 400 F.3d at 918. The patentee must also show that it is "no longer distributing unmarked products." *American Med. Sys., Inc. v. Medical Eng'g Corp.*, 6 F.3d 1523, 1538 (Fed. Cir. 1993); *see also Von Holdt v. A-1 Tool Corp.*, 714 F. Supp. 2d 863, 871 (N.D. Ill. 2010).

UEI has failed to produce any evidence that "substantially all" of the Covered Remotes have been "consistently" marked with the patents-in-suit. UEI produced few sample Covered Remotes and, with respect to the few devices that it did produce, only a small number had the required patent markings and at best represent only a small sampling of the numerous models that make up the Covered Remotes. *See, e.g.,* Ex. 50 at 12–21; *see also* Ex. 49 at 15 (exemplary specification with no marking requirement).

In an attempt to establish compliance with the marking requirements, UEI primarily produced four categories of documents (collectively "Policy documents"): (1) product specifications; (2) documented corporate policies and procedures; (3) QA Product Approval Submission Checklists and QA Specification Review Checklists; and (4) results of UEI's quality assurance inspections documented in Product Design Verification Documents. *See* Ex. 50 at 12–21; *see also* Ex. 80 at 704:24–705:13. On their face, these documents do not provide any evidence that UEI marked any products with the '426 and '067 patent numbers. To the extent that the documents are alleged to reflect some general UEI "policy" associated with patent marking, any such "policy," without more, is insufficient for purposes of § 287(a). "[E]vidence of current company policy and practice, without any other evidence of compliance with the marking requirement during the relevant time period, is insufficient to overcome a

39

motion for summary judgment." *Von Holdt*, 714 F. Supp. 2d at 871–72 (citation omitted).

Tellingly, UEI's Rule 30(b)(6) witness on the issue of patent marking, Pat Hayes, even with the above-listed documents at his disposal, could not testify whether any of the Covered Remotes were appropriately marked or even if the policy applied to any particular remote. Ex. 80 at 642:5–24; 6:44:20–645:17; 648:13–20; 650:3–12; 661:11–663:25; 668:16–669:6; 674:16–675:17; 681:6–688:20; 695:2–9. Mr. Hayes testified that one would need to undertake a multi-step process of examining the documents and the remote controls themselves. Mr. Hayes admitted that he had not undertaken this analysis. *See id.* at 739:21–740:21.

As further evidence of alleged marking, UEI also produced illegible tooling drawings and photographs of mostly low volume retail and OEM remotes that appear to actually confirm a lack of marking. *See* Ex. 47 (exemplary illegible document). Indeed, during his deposition, Mr. Hayes could not identify many of the remotes from the photographs, nor make out the patent markings on the products. *See* Ex. 80 at 681:13–683:12; 687:2–24.

### 2.   The Evidence Affirmatively Shows a Failure to Mark

Although URC does not bear the burden of establishing the absence of marking, the undisputed evidence demonstrates that UEI did not in fact mark its products in accordance with the patent marking statute.

#### a.   UEI Does Not Require Its Patent Licensees to Mark Their Products

The marking requirements also apply to a licensee. *Amsted*, 24 F.3d at 185. Here, UEI does not typically require its licensees to mark their products with UEI's patent numbers, and there is no evidence that they have ever done so. Of the eleven patent licenses UEI produced in discovery in which they were the licensor, only one license arguably has a marking provision. See Ex. 91 ¶ 11 & Ex. B. UEI concedes that, when it grants a license, the issue of marking is negotiable and is something UEI

40

is willing to give up. *See* Ex. 82 at 55:1–9, 62:11–16; Ex. 81 at 588:2–10. UEI's failure to require marking by its licensees is fatal to any assertion by UEI that it has complied with the marking requirements. *See, e.g., Inline Connection Corp. v. AOL Time Warner Inc.*, 465 F. Supp. 2d 312, 317 (D. Del. 2006).

### b.    UEI Failed to Mark the '426 Covered Remotes

In the 2006–2012 damages period, the Atlas family of remotes accounted for over ▉ of the '426 Covered Products. *See generally* Ex. 85; Ex. 86; Ex. 91 ¶¶ 5–7 & Ex. A. The Atlas family of remotes includes two basic body types. *See* Ex. 80 at 657:11–658:1; 660:4–11. The Atlas remotes have been one of UEI's standard and most popular lines of remotes since at least as early as 2001. *See* Ex. 50; Ex. 10 at 232:14–233:12; 234:1–4. UEI never marked *any* of the Atlas remotes with either the '426 patent or the '067 patent numbers. *See, e.g.,* Exs. 54 & 58 (photos of Atlas remotes showing failure to mark). Tellingly, UEI failed to produce *even one* Atlas remote control that was marked with the '426 or '067 patent numbers.

UEI's discovery conduct underscores its failure to mark. URC was twice forced to move to compel UEI's production of its marking evidence. Prior to the most recent motion to compel, UEI insisted that it had no sample remotes. *See* Ex. 80 at 736:22–24, 752:20–23. After URC's motion to compel was granted, UEI finally produced a number of new remotes in January 2014—but many were not marked with the '426 or '067 patent numbers, *including 5 Atlas remotes*. *See* Ex. 54.

The documents that UEI did produce further illustrate UEI's failure to mark the Atlas remotes. For example, many Product Specification and Product Design Verification documents that generally relate to Atlas remotes do not include patent marking requirements for the '426 and '067 patents (although they refer to other patent numbers). *See, e.g.,* Ex. 57.

In summary, during the 2006–2012 time period, over 90% of the '426 Covered Remotes were not marked with the '426 patent number. *See* Ex. 85; Ex. 91 ¶¶ 5–7 & Ex. A. Given this almost complete failure to mark, no reasonable juror could find that

41

UEI "consistently marked substantially all of its patented products" with the '426 patent number as required. *American Medical*, 6 F.3d at 1538.

### c.    UEI Failed to Mark the '067 Covered Remotes

It is UEI's position that almost every product sold by UEI from 2003–2007 (the life of the '067 patent) was covered by the '067 patent, *see* Ex. 80 at 639:22–640:4, but UEI failed to properly mark these products with the '067 patent number during the 2006–2007 damages period. First, as with the '426 patent, UEI failed to mark its Atlas remotes with the '067 patent number. *See supra*. The Atlas remotes constituted about ██% of the '067 Covered Remotes in 2006 and about ██% in 2007. *See* Ex. 86; Ex. 91 ¶¶ 8–10 & Ex. A. The failure to mark Atlas products alone is sufficient to demonstrate a failure to mark "substantially all" products with the '067 patent number. *See, e.g.*, *Hazeltine Corp. v. Radio Corp. of Amer.*, 20 F. Supp. 668, 671–72 (S.D.N.Y. 1937) (finding a failure to mark, even for a time period where patentee may have marked up to 87% of its products with the patent number).

UEI's failure to mark with the '067 patent number during 2006–2007 goes well beyond Atlas remotes, however. For example, in 2006, its DirectTV remote controls accounted for about ██% of the '067 Covered Remotes, and about ██% in 2007. *See* Ex. 86; Ex. 91 ¶¶ 8–10 & Ex. A. But UEI has not produced any product samples or documents showing that any DirectTV '067 Covered Products were marked with the '067 patent number in 2006 or 2007. Product design verification documents for 2006–2007 that UEI did produce lack any reference to the '067 patent. *See* Ex. 60 (UE205835–41; UE205842–48; UE205974–78; UE205979–83). UEI also produced several 2005 product design verification documents that do mention the '067 patent, but state that marking the patent number "is not required" on the product. *See* Ex. 59 (UE204037–41; UE204083–88). The DirectTV remotes, combined with the Atlas remotes, raises the percentage of unmarked remotes for the '067 patent to be about ██% in 2006 and about ██% in 2007. *See* Ex. 86; Ex. 91 ¶¶ 8–10 & Ex. A.

42

As a further example, UEI failed to produce any product samples or documents showing that the Motorola DRC800 '067 Covered Products were marked with the '067 patent number in 2006 or 2007. Motorola DRC800 remote controls accounted for about ██% of the '067 Covered Remotes in 2006, and about ██% in 2007. *See* Ex. 86; Ex. 91 ¶¶ 8–10 & Ex. A. This, combined with the Atlas and DirectTV remotes, raises the percentage of unmarked remotes for the '067 patent to be about ██% in 2006 and about ██% for 2007. *Id.*

Similarly, UEI failed to produce any product samples or documents showing that Radio Shack 3-in-1, Radio Shack 4-in-1 Family Favorite, or Radio Shack 5-in-1 Family Favorite Covered Products were marked with the '067 patent number in 2006 or 2007. These Radio Shack remote controls accounted for about ██% of the '067 Covered Remotes in 2006, and about ██% in 2007. This, combined with the Atlas, DirectTV and Motorola remotes, raises the percentage of unmarked remotes for the '067 patent to be about ██% in 2006 and about ██% for 2007. *See* Ex. 86; Ex. 91 ¶¶ 8–10 & Ex. A.

**B.**    **In the Absence of Compliance With the Statutory Patent Marking Requirements, Damages for Infringement of the '426 and '067 Patents Are Limited to Those Accruing After Actual Notice of Infringement Was Provided.**

UEI is limited to damages incurred after the date it provided actual notice of infringement. *Id.* "Actual notice of infringement requires the affirmative communication of a specific charge of infringement by specific accused product or device." *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994). Notice "must be of 'infringement,' not merely of the patent's existence or ownership." *Id.* The onus of providing notice lies squarely on the patentee, regardless of whatever knowledge of possible infringement the alleged infringer might have. *Id.*

UEI admits that it did not provide actual notice of URC's alleged infringement of the '426 patent until March 1, 2010. *See* Ex. 90 ¶ 11. For purposes of this motion, the Court may accept this allegation as true. Thus, absent a showing of adequate

43

marking, it is undisputed that UEI's damages on the '426 patent are limited to those accruing no earlier than March 1, 2010.

With respect to '067 patent, UEI did not provide actual notice of infringement until it filed the Complaint in this action on March 2, 2012. That is the first time that URC received from UEI an affirmative communication of a specific charge of infringement by specific accused product or device. Thus, absent any showing of adequate marking, UEI is not entitled to any damages at all, because the '067 patent had already expired in 2007, well before the filing of the Complaint.

UEI has alleged, however, that URC had notice of its alleged infringement of the '067 patent on one of two potential dates: December 16, 2004 and May 27, 2011. *See* Ex. 90 ¶¶ 46–47. But the ███████████████████████████ ████████████████. *See* Ex. 16 §1.8. This cursory reference falls far short of the specific communications required to establish actual notice of infringement. In fact, UEI at that time offered URC a license under the '067 patent unaccompanied by a specific charge of infringement by specific accused product or device. *See* Ex. 81 at 407:20–413:6; Ex. 52 at 143:5–144:25, 148:1–8. The May 27, 2011 letter is inadequate for the same reasons. *See* Ex. 20. The undisputed facts show that the events that occurred on these dates did not rise to the level of actual notice of infringement as a matter of law. In neither case did UEI make an affirmative communication of a specific charge of infringement by specific accused product or device, as required.

## X. CONCLUSION

URC's omnibus motion for summary judgment should be GRANTED.

DEF'T UNIVERSAL REMOTE CONTROL, INC.'S MEMORANDUM OF P'S & A'S IN SUPPORT OF OMNIBUS MOT. FOR SUMM. J. — CASE NO. 8:12-CV-00329 AG (JPRX)

Dated:  February 11, 2014

Respectfully submitted,

By:  _____/s/*Peter H. Kang*_____
Peter H. Kang, SBN 158101
pkang@sidley.com
SIDLEY AUSTIN LLP
1001 Page Mill Road, Building 1
Palo Alto, California  94304
Tel:  (650) 565-7000
Fax:  (650) 565-7100

Theodore W. Chandler, SBN 219456
tchandler@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, California  90013
Tel:  (213) 896-6000
Fax:  (213) 896-6600

Samuel R. Miller, SBN 66871
srmiller@sidley.com
Teague I. Donahey, SBN 197531
tdonahey@sidley.com
SIDLEY AUSTIN LLP
555 California Street
San Francisco, California  94104
Tel:  (415) 772-1200
Fax:  (415) 772-7400

Brian K. Brookey, SBN 149522
brian.brookey@tuckerellis.com
TUCKER ELLIS LLP
515 South Flower Street
Forty-Second Floor
Los Angeles, California  90071
Tel:  (213) 430-3400
Fax:  (213) 430-3409

Douglas A. Miro
dmiro@ostrolenk.com
Michael F. Hurley
mhurley@ostrolenk.com
OSTROLENK, FABER LLP
1180 Avenue of the Americas
New York, New York  10036
Tel:  (212) 596-0500
Fax:  (212) 382-0888

Attorneys for Defendant
UNIVERSAL REMOTE CONTROL, INC.

45