Peter H. Kang, SBN 158101
pkang@sidley.com
SIDLEY AUSTIN LLP
1001 Page Mill Road, Building 1
Palo Alto, California  94304
Tel:  (650) 565-7000
Fax:  (650) 565-7100

ADDITIONAL COUNSEL LISTED
ON SIGNATURE PAGE

Attorneys for Defendant
UNIVERSAL REMOTE CONTROL, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNIVERSAL ELECTRONICS, INC., <br><br> Plaintiff and Counterclaim-Defendant, <br><br> v. <br><br> UNIVERSAL REMOTE CONTROL, INC., <br><br> Defendant and Counterclaimant. | Case No. 8:12-CV-00329 AG (JPRx) <br><br> Assigned to: Hon. Andrew J. Guilford <br><br> **DEFENDANT UNIVERSAL REMOTE CONTROL, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** <br><br> Date:  March 24, 2014 <br> Time:  10:00 a.m. <br> Place:  Courtroom 10D |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................1

II.   ARGUMENT......................................................................................................2

    A.   UEI Is Not Entitled to Summary Judgment on URC's Affirmative License Defense and Breach of Contract Counterclaim ..............................................................................2

        1.   It Is Undisputed That URC Has an Express License to the '751 Patent ....................................................................................2

        2.   URC Has an Implied License to the '426 Patent as a Matter of Federal Patent Law ..................................................3

        3.   UEI's Attempt to Derogate From the '751 License Grant and '426 Implied License Constitutes a Breach of the 2004 License ..................................................................................5

        4.   California Contract Law Does Not Provide UEI With a Basis to Avoid the Implied License to the '426 Patent That Was Granted to URC Under the 2004 License ......................5

        5.   URC Is Entitled to Relief for UEI's Breach, Including Monetary Compensation for Attorneys' Fees and Costs................7

    B.   UEI's Motion for Summary Judgment Regarding URC's Patent Misuse Defense Should Be Denied..........................................................9

        1.   Legal Standard for Patent Misuse..................................................9

        2.   UEI's Conduct in Bringing This Lawsuit Reflects Anticompetitive Behavior Designed to Impermissibly Broaden the Scope of Its Patent Grant...........................................10

            a.   UEI Has Misused the '426 Patent .....................................11

                i.   UEI Is Knowingly Asserting a Licensed Patent ......11

                ii.   UEI Asserted the '426 Patent in This Action Despite the Fact That, According to UEI, the Patent Named the Wrong Inventors, and UEI Subsequently Filed a False Petition to Correct Inventorship, Rendering the Patent Invalid ............11

                iii.   UEI Asserted the '426 Patent Knowing Its Claims Were Barred by Presumptive Laches and Estoppel ...........................................................17

                iv.   UEI Asserted the '426 Patent Knowing That Its Claims Were Barred by Res Judicata......................19

                v.   UEI Asserted the '426 Patent Knowing It Was Invalid Due to Inequitable Conduct .........................21

            b.   UEI Has Misused the '067 Patent .....................................21

                  i.   UEI Asserted the '067 Patent Knowing It Was Unenforceable Due to Laches ................................21

i

ii.    UEI Asserted the '067 Patent Knowing It Was Invalid Due to Inequitable Conduct .........................22

c.    UEI Has Misused the '906 Patent .....................................23

i.    UEI Continues to Assert the '906 Patent Even Though It Admits It Has No Evidence of Infringement ............................................................23

III.    CONCLUSION ...............................................................................25

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*A. C. Aukerman Co. v. R. L. Chaides Constr. Co.*,
  960 F.2d 1020 (Fed. Cir. 1992) .......................................................................17

*ACCO Brands, Inc. v. ABA Locks Mfr. Co.*,
  501 F.3d 1307 (Fed. Cir. 2007) .......................................................................24

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
  692 F.3d 1301 (Fed. Cir. 2012) ...................................................................23, 24

*Aristocrat Techs. Austl. PTY Ltd. v. International Game Tech.*,
  709 F.3d 1348 (Fed. Cir. 2013) .......................................................................23

*Brandt v. Superior Ct.*,
  37 Cal. 3d 813, 693 P.2d 796 (1985)..................................................................8

*C.R. Bard, Inc. v. M3 Sys., Inc.*,
  157 F.3d 1340 (Fed. Cir. 1998) .........................................................................9

*Commil USA, LLC v. Cisco Sys.*,
  720 F.3d 1361 (Fed. Cir. 2013) ...................................................................24, 25

*Fleischmann Distilling Corp. v. Maier Brewing Co.*,
  386 U.S. 714. L. Ed. 2d 475, 87 S. Ct. 1404 (1967) ..........................................8

*General Protecht Group, Inc. v. Leviton Mfg. Co.*,
  651 F.3d 1355 (Fed. Cir. 2011) ...................................................................3, 4, 5

*Gray v. Don Miller & Assocs., Inc.*,
  35 Cal. 3d 498, 674 P.2d 253 (1984)..................................................................8

*Handgards, Inc. v. Ethicon, Inc.*,
  601 F.2d 986 (9th Cir. 1979) ("*Handgards I*") ................................................10

*Handgards, Inc. v. Ethicon, Inc.*,
  743 F.2d 1282 (9th Cir. 1984) ("*Handgards II*") ........................................10, 25

*Linear Tech. Corp. v. Impala Linear Corp.*,
  379 F.3d 1311 (Fed. Cir. 2004) .......................................................................15

*Lisle Corp. v. Edwards*,
  777 F.2d 693 (Fed. Cir. 1985) ...........................................................................9

*Medichem, S.A. v. Rolabo, S.L.*,
  437 F.3d 1157 (Fed. Cir. 2006) .......................................................................15

*Microsoft v. Motorola*,
  Case No. C10-1823JLR, 2013 U.S. Dist. LEXIS 113585 (W.D. Wash. Aug.
  12, 2013) .............................................................................................................8

iii

*Pacific Gas & Elec. Co. v. G.W. Thomas Drayage etc. Co.*,
  69 Cal. 2d 33, 442 P.2d 641 (1968)..................................................................6

*Pei-Hering Hor & Ruling Meng v. Ching-Wu "Paul" Chu*,
  699 F. 3d 1331, 1334 (Fed. Cir. 2012) .........................................................14

*Realtek Semiconductor Corp. v. LSI Corp.*,
  No. C-12-3541 RMW, Dkt. No. 267 (N.D. Cal. Feb. 10, 2014)..........................8

*Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*,
  264 F.3d 1344 (Fed. Cir. 2001) .....................................................................15

*Silva v. Providence Hospital of Oakland*,
  14 Cal. 2d 762, 97 P.2d 798 (1939)..................................................................5

*TransCore v. Electronic Transaction Consultants Corp.*,
  563 F.3d 1271 (Fed. Cir. 2009) .................................................................3, 5

*Trovan, Ltd. v. Sokymat SA*,
  299 F.3d 1292 (Fed. Cir. 2002) .......................................................11, 14, 15

*Wang Labs, Inc.* v. *Mitsubishi Elecs. Amer., Inc.*,
  103 F.3d 1571 (Fed. Cir. 1997) ....................................................................3

**STATUTES**

35 U.S.C. §102............................................................................................11

35 U.S.C. § 103...........................................................................................22

35 U.S.C. § 154...........................................................................................10

35 U.S.C. § 256...........................................................................................12

Cal. Civ. Code §§ 1619...................................................................................5

Cal. Civ. Code §§1621....................................................................................5

Cal. Civ. Code § 1636.....................................................................................6

**OTHER AUTHORITIES**

37 C.F.R. § 1.324.........................................................................................12

Fed. R. Civ. P. 56............................................................................................1

## I.    <u>INTRODUCTION</u>

Defendant Universal Remote Control, Inc. ("URC") hereby opposes Plaintiff Universal Electronics Inc.'s ("UEI") Motion for Summary Judgment (Dkt. 163) (cited hereinafter as "Mem."). UEI has not established that it is entitled to summary judgment under Fed. R. Civ. P. 56, and its motion should be denied.

UEI attempts to discredit URC's claims and defenses, describing URC's arguments pejoratively as "shot-gun" or "rambling," and repeatedly asserts that there is no evidence in the record to support URC's contentions. Contrary to UEI's bald assertions, however, the record abounds with evidence of UEI's anticompetitive, bad-faith, unfair conduct that has manifested itself in a number of ways—and for which a remedy is required.

First, pursuant to the parties' 2004 Settlement and License Agreement ("2004 License"), UEI granted URC an implied license to the '426 patent based on legal estoppel under federal patent law. UEI's arguments regarding the California parol evidence rule not only misstate California law, they are inapplicable. UEI's other assertion—that the Court has no power to provide URC with a remedy for UEI's breach—is legally incorrect.

Second, URC's patent misuse defense is well-supported by the record, which demonstrates that UEI has knowingly asserted patents that are licensed, invalid for improper inventorship, subject to *res judicata*, unenforceable due to laches and estoppel, unenforceable due to inequitable conduct, and not infringed. In short, UEI should not be permitted to saddle its smaller competitor, URC, with the costs and effort required to defend itself against baseless patent infringement claims that should never have been brought. UEI should compete in the marketplace—not in the courtroom.

## II.   ARGUMENT

### A.   UEI Is Not Entitled to Summary Judgment on URC's Affirmative License Defense and Breach of Contract Counterclaim

UEI's initial two arguments in support of its motion for summary judgment are intertwined:  UEI argues first, based on a purported application of the California parol evidence rule, that URC was not granted an express license to the '426 patent under the 2004 License; and therefore, second, URC's breach of contract counterclaim must fail.  *See* UEI Mem. at 14–17.  Such arguments reflect a fundamental misunderstanding of URC's license defense and counterclaim, however.  URC does not contend that the 2004 License granted an ***express license*** to the '426 patent, and therefore UEI's invocation of the California parol evidence rule misses the point and is a red herring.  Rather, URC asserts an ***implied license*** defense based on ***legal estoppel*** that arises out of the 2004 License by operation of federal patent law.  Further, under California law, a contractual agreement may be express or implied.  UEI's assertion of the '426 patent in this case constitutes a breach of the implied license afforded to URC under the 2004 License, and URC is entitled to full compensatory damages.  Because UEI's motion is founded entirely on a parol evidence straw man argument, and because it fails to properly address the merits of the defense and counterclaim at issue, the motion must be denied.

### 1.   It Is Undisputed That URC Has an Express License to the '751 Patent

The facts surrounding the parties' negotiation of the 2004 License are set forth in URC's pending omnibus motion for summary judgment.  *See* URC Mot. for Summ. J., Dkt. No. 161–1 at 4–6.  In short, after UEI filed its first patent infringement suit against URC in 2000 ("First UEI Suit"), the parties entered into the 2004 License to resolve the parties' differences.  *See* Exs. 1, 5 & 16.[1]  UEI does not dispute that URC

---

[1] Unless otherwise indicated, references to "Exs." herein are attached to either the

2

██████████████████████████████████████████████████████████

██████ . *See* UEI Mem. at 6; Ex. 16 §§ 1.7, 4.1.  Specifically,

██████████████████████

██████ ," Ex. 16 § 4.1, ████████████████████████

██████████████████████████ , *see id.* § 1.10.

██████████████████████████ . *See id.* §§ 5.1–5.2.

### 2. URC Has an Implied License to the '426 Patent as a Matter of Federal Patent Law

An "implied license merely signifies a patentee's waiver of the statutory right to exclude others from making, using, or selling the patented invention." *Wang Labs, Inc.* v. *Mitsubishi Elecs. Amer., Inc.*, 103 F.3d 1571, 1580 (Fed. Cir. 1997).  An implied license exists under the doctrine of legal estoppel when "the licensor . . . has licensed . . . a definable property right for valuable consideration, and then has attempted to derogate or detract from that right.  The grantor is estopped from taking back in any extent that for which he has already received consideration." *TransCore v. Electronic Transaction Consultants Corp.*, 563 F.3d 1271, 1279 (Fed. Cir. 2009).  For example, if "[t]he same products [are] accused" and "[t]he same inventive subject matter was disclosed in the licensed patents," then a finding of an implied license is particularly appropriate. *See General Protecht Group, Inc. v. Leviton Mfg. Co.*, 651 F.3d 1355, 1361 (Fed. Cir. 2011).

Here, UEI's assertion of the '426 patent against URC is a derogation from UEI's ██████████████████████████████ .  The two patents are closely related and substantively overlapping.  Both patents are continuations descending from U.S. Patent No. 4,959,810, which is also expressly licensed to URC under the 2004 License. *See* Exs. 16, 27, 63.  The relationship between the two patents is so

Declaration of Clarence Rowland filed on February 11, 2014 (Dkt. No. 161–3 *et seq.*) or the Declaration of Clarence Rowland filed herewith.

3

close that the '751 and '426 patents were merged by a terminal disclaimer filed with the United States Patent and Trademark Office ("USPTO").  *See* Ex. 46.

A more detailed comparison of the two patents is telling.  The '751 patent relates to remote control macros in general.  *See* Ex. 67 at 198.  The '751 patent discloses a macro key that transmits a series of commands including channel numbers that select channels, with one button press.  *See id.* at 203.  The '426 patent overlaps with the '751 patent, but is narrower in scope.  *Id.* at 201.  The '426 patent describes a favorite channel macro key that transmits a series of channel numbers that select channels, also with one button press.  *See id.* at 203.  Claim 1 of the '426 patent (now withdrawn) is directed to a single favorite channel macro.  *Id.*  Dependent claims 2 and 3 are further directed to a rotating favorite channel macro.  *Id.* at 206.  These single and rotating favorite channel macros are specific examples of macros covered by the broader '751 patent.  *Id.*

Not surprisingly, UEI product specifications ████████████████████ ███████████████████████████████████" *see, e.g.*, Ex. 53 at UE016490–91 & Ex. 55 at UE016851–53, and UEI has admitted that the URC accused products are covered by the claims of the '751 patent.  *See* URC Mot. for Summ. J., Dkt. No. 161–1 at 14–15; *see also, e.g.*, Ex. 81 at 470:15–25, 481:1–13.  One cannot practice the asserted claims of the '426 patent without also practicing claims of the '751 patent.  *See* Ex. 67 at 206–07.  Thus, to the extent UEI is correct that the accused URC products infringe the narrower '426 patent, they would also infringe the broader '751 patent and would be "Licensed Products" for purposes of the 2004 License.  *See* Ex. 16 § 1.10; Ex. 67 at 206–07.  UEI's attempt here to prevent URC from making and selling "Licensed Products" on the basis of its '426 infringement claims is a derogation from the rights granted to URC under the 2004 License.[2]  *See General Protecht*, 651 F.3d at 1361.

[2] Contrary to UEI's assertions, an implied license is not prevented by ████████ ████████████████████████████████████████████████████████████

### 3.   UEI's Attempt to Derogate From the '751 License Grant and '426 Implied License Constitutes a Breach of the 2004 License

Under California law, both express and implied agreements may form the basis of enforceable contracts.  *See* Cal. Civ. Code §§ 1619, 1621; *Silva v. Providence Hospital of Oakland*, 14 Cal. 2d 762, 773, 97 P.2d 798, 804 (1939) ("The law will imply that a party did make such a stipulation as under the circumstances disclosed, he ought, upon the principles of honesty, justice and fairness to have made.").  Here, URC seeks to enforce the implied license grant to the '426 patent, which flows from the express license to the '751 patent contained in the 2004 License.  By bringing suit under the '426 patent here, UEI has breached the 2004 License.  UEI's breach has caused URC substantial damage in the form of time and resources expended in defending against UEI's improper '426 infringement claims.

### 4.   California Contract Law Does Not Provide UEI With a Basis to Avoid the Implied License to the '426 Patent That Was Granted to URC Under the 2004 License

UEI argues that URC's attempt to obtain the benefit of the 2004 License somehow "violates the parol evidence rule."  UEI Mem. at 14.  However, there is no need to consider California parol evidence rule.  It is undisputed that the 2004 License is a contractual agreement between the parties.  It is undisputed that ███████████ ███████████████████████████████████████████████ Ex. 16 §§ 1.7, 4.1.  It is undisputed that URC performed by ██████████████████ ██████ *See id.* §§ 5.1–5.2.  It is also indisputable that, in this action, '751 "Licensed Products" under the 2004 License are accused of infringing the related '426 patent.  Under the circumstances here, legal estoppel applies by operation of federal patent

---

██████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████."
Ex. 16 § 3.1.  The Federal Circuit has held that such language may protect the licensor "against broad claims that future patents generally are impliedly licensed, [but] it does not permit [the licensor] to derogate from the rights it has expressly granted." *TransCore,* 563 F.3d at 1279; *General Protecht*, 651 F.3d at 1362.

DEF'T UNIVERSAL REMOTE CONTROL, INC.'S MEMORANDUM OF P'S & A'S IN OPPOSITION TO PLAINTIFF'S MOT. FOR SUMM. J. – CASE NO. 8:12-CV-00329 AG (JPRX)

law, URC thus has an implied license to the '426 patent under the 2004 License, and UEI's assertion of the '426 patent in this action constitutes a breach of that agreement.

Moreover, UEI cannot reasonably dispute that URC is permitted—also under the four corners of the 2004 License—to assert its implied license defense.  Section 3.5 of the 2004 License states:

"  As a result, the 2004 License

including that the '426 patent has been impliedly licensed.  No parol evidence is needed to interpret this provision in the 2004 License.

Furthermore, the 2004 License must be interpreted to give effect to the intent of the parties.  Cal. Civ. Code § 1636.  Although it is not necessary to do so here for the reasons explained above, in California extrinsic evidence *may* be considered in that regard.  Specifically, under California law, "the test of admissibility of extrinsic evidence to explain the meaning of a written instrument is *not* whether it appears to be plain and unambiguous on its face but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage etc. Co.*, 69 Cal. 2d 33, 37, 442 P.2d 641, 644 (1968) (emphasis added).  "If the court decides,  after considering this evidence, that the language of a contract, in the light of all the circumstances, 'is fairly susceptible of either one of the two interpretations contended for . . .' extrinsic evidence relevant to prove either of such meanings is admissible."  69 Cal. 2d at 40, 442 P.2d at 646–47 (citations omitted).  Thus, in California, there is no bar to the consideration of extrinsic evidence, as UEI alleges.

Indeed, here, UEI itself relies on extrinsic evidence—a snippet of deposition testimony from URC's CEO, Chang Park—to support of its argument that URC has no license to the '426 patent.  *See* UEI Mem. at 15.  But UEI's argument

mischaracterizes the record.  The Park testimony to which UEI refers relates only to the two specific Related Patents defined in the 2004 License, which are the '067 patent and U.S. Patent No. 6,496,135.  *See* Ex. 120 at 288:12–290:8.  The '426 patent, on the other hand, was not specifically discussed during the 2004 settlement negotiations and therefore could not have been explicitly excluded from the agreement.  *See id.* at 327:14–16; Ex. 119 at 99:8–100:2, 139:4–24.  This makes sense given that the parties believed that the '751 and '426 patents were coextensive in scope.  *See* Ex. 120 at 282:14–17 ("Q Well, you understood the 426 is related to the '751 patent; right? A We believe it is the same as 751.  Right."), 229:19–230:21 (". . . A . . . It's a question of our belief that we do have a license on 426 under the agreement with UEI on 751. . ."), 265:14–17 ("At the time my understanding was 751 and 426 has a terminal disclaimer in US Patent Office so they are considered as the same patent"), 462:16–464:6, 283:1–9, 293:10–295:10, 465:7–18; 483:5–484:15, 499:3–16; Ex. 81 at 470:15–25, 478:25–481:12.  And it would not have made sense for URC to have explicitly discussed a license to the '426 patent when URC believed that UEI "gave up" on that patent "since they withdrew [it] with prejudice" in the First UEI Suit.  Ex. 120 at 327:16–18, 506:1–5 ("My thought process at that time was that UEI withdrew with prejudice after we point out the prior art, so we thought they gave up and rely on 751, which is a much broader patent.").  In response to a question concerning whether he had seen the dismissal of the '426 patent in the 2000 lawsuit, UEI's former CEO, Paul Arling replied simply that he "thought [we] entered into a license agreement."  Ex. 119 at 99:17–21.  In short, although it is not necessary to resort to extrinsic evidence, the evidence here supports the contention that UEI impliedly licensed the '426 patent to URC under the 2004 License.

### 5.  **<u>URC Is Entitled to Relief for UEI's Breach, Including Monetary Compensation for Attorneys' Fees and Costs</u>**

As a result of UEI's breach of the 2004 License, URC is entitled to relief, including compensatory damages and specific performance.  With respect to URC's

7

entitlement to compensation, UEI argues that "[u]nder the controlling California law, absent an express fee provision in the 2004 Agreement itself, URC cannot recover its attorney fees and expenses as damages for its breach of contract counterclaim." UEI Mem. at 16; *see* Ex. 100.  Contrary to UEI's contentions, however, the California Supreme Court has acknowledged that "exceptions to this general rule have been created by the courts" and that such exceptions "were created by the courts pursuant to their inherent equitable powers." *Gray v. Don Miller & Assocs., Inc.*, 35 Cal. 3d 498, 505, 674 P.2d 253, 256–57 (1984); *see also Brandt v. Superior Ct.*, 37 Cal. 3d 813, 817, 693 P.2d 796, 798 (1985) (holding attorney's fees recoverable as an economic loss in certain insurance cases).  And the United States Supreme Court has sanctioned exceptions to this so called "American Rule" "when overriding considerations of justice seemed to compel such a result" *Fleischmann Distilling Corp. v. Maier Brewing Co.*,  386 U.S. 714, 718, 18. L. Ed. 2d 475, 87 S. Ct. 1404 (1967).

Relying on these principles of equity, a number of courts have adopted an exception to the "American Rule" for a violation of a covenant not to sue, holding "the primary form of damages flowing from the breach [of the covenant] will likely be attorney's fees, and it would be inequitable to deprive the aggrieved party of those damages." *Microsoft v. Motorola*, Case No. C10-1823JLR, 2013 U.S. Dist. LEXIS 113585, at *51-52 (W.D. Wash. Aug. 12, 2013) (adopting previously unrecognized exception in Washington law after analyzing holdings in various jurisdiction) (citing *Anchor Motor Freight, Inc. v. Int'l Bhd. of Teamsters, Local Union No. 377*, 700 F.2d 1067, 1072 (6th Cir. 1983); *Widener v. Arco*, 717 F. Supp. 1211, 1217 (N.D. Tex. 1989)).  In a pending action in the Northern District of California, for instance, Judge Ronald Whyte issued preliminary jury instructions providing for an award of attorneys' fees and costs as the measure of compensatory damages for breach of contract.  *See* Ex. 125 at 25 (*Realtek Semiconductor Corp. v. LSI Corp.*, No. C-12-3541 RMW, Dkt. No. 267 (N.D. Cal. Feb. 10, 2014).  As courts have done in *Microsoft*, *Realtek*, and other cases, this Court should permit URC to recover its

8

attorneys' fees and costs as damages for UEI's breach of the 2004 License.  At a minimum, judgment as a matter of law for specific performance enjoining any further pursuit of UEI's infringement claim against URC products with the single and rotating favorite channel macro feature is now appropriate.  *See Lisle Corp. v. Edwards*, 777 F.2d 693, 695 (Fed. Cir. 1985).

**B.** **UEI's Motion for Summary Judgment Regarding URC's Patent Misuse Defense Should Be Denied**

UEI alleges that URC's theories of patent misuse are "deficient as a matter of law."  UEI Mem. at 18.  But the record is replete with evidence of anticompetitive behavior by UEI constituting patent misuse.  Indeed, for years UEI—the dominant supplier of cable remote controls—has been using coercive litigation based on patents of questionable quality as a tool to restrain the growing business of URC, an important competitor in the marketplace.  UEI previously sued URC in 2000, soon after URC began to supply remote controls to cable TV operators.  After this first round of litigation was eventually settled in December 2004, UEI brought this second suit against URC in March 2012, just as URC was winning new customers and expanding its business.  UEI asserted four patents, two of which were expired or expiring, against products that were more than ten years old.  Shortly thereafter, UEI launched yet another, carefully timed suit in June 2013, asserting infringement of ten patents, four of which were long expired on products that are just as old.  *See* Ex. 126.  It is time for UEI's anticompetitive use of the court system to come to an end.

**1.** **Legal Standard for Patent Misuse**

"The defense of patent misuse . . . relates generally to the use of patent rights to obtain or to coerce an unfair commercial advantage.  Patent misuse relates primarily to a patentee's actions that affect competition in unpatented goods or that otherwise extend the economic effect beyond the scope of the patent grant."  *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372 (Fed. Cir. 1998) (emphasis added).  This

9

impermissible broadening must have an "anticompetitive effect." *Id.*  However, "misuse may arise when the conditions of antitrust violation are not met." *Id.*

The Court of Appeals for the Ninth Circuit has found anticompetitive effects from bringing an infringement action in bad faith.  *See Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1288, 1296 (9th Cir. 1984) ("*Handgards II*") (citing to *Handgards, Inc. v. Ethicon, Inc.,* 601 F.2d 986, 994–96 (9th Cir. 1979) ("*Handgards I*")).  In the *Handgards* cases, the bad-faith act was bringing a lawsuit for infringement knowing that the patent was invalid, which was anticompetitive because "subjecting a potential rival or actual rival to . . . [the burden of defending an infringement suit] may weaken him or even dissuade him from beginning or continuing the rivalry." *Handgards I*, 601 F.2d at 993 n. 12.  "The bad faith suit not only excluded the patentee's only significant competitor, [the defendant], it also checked possible future competitors until the [patent-in-suit] had been declared invalid." *Handgards II*, 743 F.2d at 1296.  Additionally, there was "harm to competition that resulted from the prosecution of a suit for a patent that was known to be invalid." *Id.*

### 2. UEI's Conduct in Bringing This Lawsuit Reflects Anticompetitive Behavior Designed to Impermissibly Broaden the Scope of Its Patent Grant

It is axiomatic that a patent holder has the "right to exclude others from making, using, offering for sale, or selling the invention . . . ." 35 U.S.C. § 154(a)(1).  Through its improper and anticompetitive conduct, however, UEI is attempting to impermissibly broaden the scope of these rights to gain competitive advantages it would otherwise be unable to obtain through its patents.  UEI's improper conduct has included (a) knowingly attempting to exclude a licensee from practicing within the bounds of the license; (b) asserting a patent that it knows is invalid for naming the incorrect inventors; (c) asserting patents that it knows are unenforceable as being barred by laches and estoppel; (d) asserting claims that it knows are unenforceable as being barred by *res judicata*; (e) asserting a patent that it knows is invalid for inequitable conduct; and (f) asserting and maintaining an action for infringement of a

10

patent for which it is undisputed that there is no evidence of actual infringement. Each of these acts of patent misuse will be discussed below.

### a.   UEI Has Misused the '426 Patent

### i.   UEI Is Knowingly Asserting a Licensed Patent

As explained above, it is clear that UEI has granted URC a license to the '751 patent and that URC has an implied license to the '426 patent.  Nevertheless, UEI has pushed forward unabashedly with its lawsuit against URC seeking monetary relief for infringement of the '426 patent.  In essence, UEI is attempting to extract additional monetary compensation from its direct competitor, URC, for practicing technology that URC has *already* paid UEI for the right to use.  The anticompetitive effects of this bad-faith conduct are indisputable.  UEI's own experts in this action have opined that

.  *See* Ex. 122, Tab 11; Ex. 96 at 55:20–56:11.  In contrast, URC is a much smaller player, although it is the largest of the remaining competitors (*e.g.*, Philips, SMK, Contec and Hango).  *See* Ex. 120 at 197:11–20, 610:5–9.   UEI's bad-faith lawsuit seeks to impermissibly expand the scope of its patent rights, hampers competition, and constitutes misuse.

### ii.   UEI Asserted the '426 Patent in This Action Despite the Fact That, According to UEI, the Patent Named the Wrong Inventors, and UEI Subsequently Filed a False Petition to Correct Inventorship, Rendering the Patent Invalid

Under 35 U.S.C. §102(f), a person is not entitled to a patent if "he did not himself invent the subject matter sought to be patented."  Accordingly, a patent that does not name the true and correct inventors of the subject matter claimed therein is invalid. *Trovan, Ltd. v. Sokymat SA*, 299 F.3d 1292, 1301 (Fed. Cir. 2002) ("A patent is invalid if more or fewer than the true inventors are named.").  Here, UEI took the position nearly a dozen years ago that the '426 patent as originally issued named the wrong inventors, but did not correct this alleged problem. *See* Ex. 14 at 3.  Despite knowing that the '426 patent was invalid on its face under its own inventorship

11

position, UEI asserted the patent against URC in its Complaint and made no mention of the inventorship issue in its Answer to URC's Counterclaims, in which it flatly denied that the '426 patent was invalid for any reason.  Ex. 90 ¶ ¶ 11–23; Ex. 118 ¶ 10.  Two months after filing a pleading in this Court denying that the '426 patent was invalid, UEI finally filed a petition to correct inventorship in the USPTO (although UEI did not disclose the existence of the petition to URC or the Court for another year).[3]  But UEI's petition improperly added Paul Darbee as a named inventor on the patent because Mr. Darbee was not actually an inventor.  Because UEI's petition was granted by the USPTO, and because Mr. Darbee is an incorrectly named inventor, the "corrected" patent is now invalid.

*First*, although UEI attempts to characterize its correction of inventorship as the correction of a mere "technical defect," UEI Mem. at 20, UEI's purported correction of inventorship was made in an attempt to manufacture an earlier priority date for the '426 patent, and in the process circumvent five years of invalidating prior art that had been identified by URC in the First UEI Suit.  As issued, the '426 patent named Frank A. O'Donnell, Qiuju Luo and Kimthoa T. Nguyen as inventors and claimed priority to a prior application dated October 14, 1987.  *See* Ex. 27.  During the First UEI Suit, URC informed UEI that the claim to priority in the '426 patent was improper since none of the named inventors of the '426 patent were named inventors on the application from which priority was claimed.  *See* Ex. 13 at 1.  Specifically, URC informed UEI of the invalidity of the '426 patent in view of prior art, including the Tandy remote and the CORE remote, the Wozniak patent, and the '810 patent.  *See id.*

---

[3] A request to correct inventorship may be filed in the USPTO when the error in inventorship arose without deceptive intent and is accompanied by (1) "a statement from each person who is being added as an inventor that the inventorship error occurred without any deceptive intention on his or her part; (2) A statement from the current named inventors . . . agreeing to the change of inventorship or stating that they have no disagreement in regard to the requested change;" and (3) "[a] statement from all assignees of the parties submitting a statement under paragraphs (b)(1) and (b)(2) of this section agreeing to the change of inventorship in the patent."  *See* 35 U.S.C. § 256; 37 C.F.R. § 1.324.

at 2. In response, UEI did not contest the significance of this prior art. Rather, UEI acknowledged the defect in priority and alleged that "it appears that an error was unintentionally made in the inventorship, which we are prepared to correct. This, of course, will provide the '426 patent with the earliest effective priority date and remove the references you cited as prior art." Ex. 14 at 3.

Despite UEI's contention that this alleged inventorship "error" was an easily correctable formality, UEI did not make any such correction during the First UEI Suit. Instead, two months after it said it would make the correction, *UEI opted to withdraw the '426 patent with prejudice*. *See* Ex. 17. In the present case, UEI's corporate designee refused to explain why UEI made its decision to withdraw the '426 patent with prejudice two months later rather than to immediately correct inventorship, citing the attorney-client privilege as a basis for his refusal to answer. *See* Ex. 95 at 302:15–20, 306:1–307:14. Therefore, UEI has no basis to challenge the obvious conclusion to be drawn from UEI's prior course of action: that UEI and its counsel had conducted a further investigation in 2002, had determined that Mr. Darbee was not, in fact, a co-inventor, and had decided to dismiss the infringement claims with prejudice rather than filing a false petition to correct inventorship.

Subsequently, from 2002 through 2010, UEI made no effort to enforce its alleged rights under the '426 patent against URC, even though, as discussed below, throughout that time period URC was selling products having the features that UEI now contends infringe. UEI also made no effort to "correct" the inventorship of the '426 patent, as it had promised, during this almost ten-year period.

Having taken no steps to make any corrections to the patent, UEI filed its Complaint in the present lawsuit on March 2, 2012. Thus, UEI asserted the '426 patent against URC knowing that, under its own inventorship position, the patent did not name the correct inventors, which rendered the patent facially invalid if true. After its Complaint was filed, UEI waited months before it finally sought to correct inventorship. When it did so, although it had the option of requesting that the Court

13

order the correction, *see* 35 U.S.C. § 256(b), UEI chose instead to file a petition with the USPTO without informing the Court or URC.[4] *See* Ex. 21 at UE184032. Undoubtedly UEI adopted this veiled strategy because, had it taken the more straightforward path and asked the Court to make the correction under section 256, the Court likely would have denied the request due to UEI's ten-year delay in seeking the correction. *See Pei-Hering Hor & Ruling Meng v. Ching-Wu "Paul" Chu*, 699 F. 3d 1331, 1334 (Fed. Cir. 2012) (applying six-year laches period in context of inventorship corrections under 35 U.S.C. § 256). Although URC eventually discovered UEI's USPTO petition on its own during related USPTO *inter partes* review proceedings, UEI's failure to timely advise URC that it was seeking to correct inventorship—and thereby attempt to gain an earlier priority date—hindered URC's ability to analyze the prior art invalidity issues associated with the '426 patent.

*Second*, the inventorship petition that UEI did eventually file, which was granted by the USPTO, was improper because the newly-named individual, Mr. Darbee, was not actually an inventor. The '426 patent is thus invalid for incorrect inventorship. UEI attempts to avoid this result by relying on the burden of proof, arguing that the '426 patent would only be invalid if URC presented "clear, convincing and corroborated evidence" that the correction was improper. UEI Mem. at 20 (citing *B-K Lighting, Inc. v. Vision3 Lighting*, 930 F. Supp. 2d 1102, 1128 (C.D. Cal. 2013). Incredibly, UEI avers that "[t]here is no such evidence in the record." UEI Mem. at 20. This is simply incorrect. The record is replete with such evidence.

"Because conception is the touchstone of inventorship, each joint inventor must generally contribute to the conception of the invention. Conception is the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." *Trovan*, 299 F.3d at

---

[4] Indeed, during the claim construction process, which took place months after UEI had filed its inventorship petition, UEI provided a copy of the '426 file history to the Court that conspicuously *omitted* a copy of the petition. *See generally* Dkt. 50.

14

1302 (citations and quotations omitted).  Significantly, in order to address concerns that "a party claiming inventorship might be tempted to describe his actions in an unjustifiably self-serving manner in order to obtain a patent or to maintain an existing patent," *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350 (Fed. Cir. 2001), an inventors testimony must be "sufficiently ***corroborated*** under a 'rule of reason' analysis." *Trovan*, 299 F.3d at 1302 (emphasis added).  "Credibility concerns undergird the corroboration requirement, the purpose of which is to prevent fraud." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1170 (Fed. Cir. 2006).  The most reliable proof of corroboration comes from "[d]ocumentary or physical evidence that is made contemporaneously with the inventive process."  *Sandt*, 264 F.3d at 1350–51.  Corroborating evidence may take the form of "oral testimony of someone other than the alleged inventor, but "post-invention oral testimony is more suspect, as there is more of a risk that the witness may have a litigation-inspired motive to corroborate the inventor's testimony, and that the testimony may be inaccurate." *Id.* at 1351.

Here, there are ***no*** documents (such as lab notebooks or the like) contemporaneous with the alleged conception that corroborate UEI's assertion that Mr. Darbee is an inventor of the '426 patent.  *See* Ex. 123 at 11–15.  The lack of contemporaneous documentary evidence alone is fatal to UEI's inventorship allegations.  *See, e.g.*, *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1327–29 (Fed. Cir. 2004).

Certainly, Mr. Darbee and Ms. Nguyen, as well as Mr. Hayes on behalf of assignee UEI, did later submit declarations to the USPTO in support of UEI's Petition to Correct Inventorship.  *See* Exs. 101–05.  All of the declarations agreed to the change of inventorship to add Mr. Darbee as an inventor and stated that the omission of Mr. Darbee as an inventor was "not done with any deceptive intention." *Id.*  The deposition testimony of the declarants paints a different story, however.  For example, Mr. Darbee testified that he was never asked by anyone at UEI if he was an inventor of the '426 patent.  Rather, UEI's counsel merely told him that he needed to be added

15

as an inventor to the '426 patent and that he should just sign the form that would be sent to him.  *See* Ex. 98 at 271:5–24.  The form that UEI's counsel then sent did not even include a copy of the '426 patent for Mr. Darbee to review.  *Id.* at 272:24–273:8.

Ms. Nguyen, an originally-named inventor on the '426 patent, conceded at deposition that she did not know why Mr. Darbee was originally omitted from the application or what his inventive contribution may have been.  For example, Ms. Nguyen testified that she did not know what the legal requirements for inventorship are.  *See* Ex. 121 at 190:16–191:15.  She had not spoken to Mr. Darbee for many years and had no recollection of ever discussing the inventorship of the '426 patent with him.  *See id.* at 124:22–125:8, 197:23–198:1.  Ms. Nguyen had no recollection of who contributed to the inventions claimed in the '426 patent.  *See id.* at 119:20–122:17. Not only did Ms. Nguyen not know why Mr. Darbee had been omitted from the patent application, she had no basis to say in her declaration that the omission had been made without deceptive intent.  *See id.* at 191:23–192:21.  Ms. Nguyen conceded that she did not review the details of her USPTO declaration and simply signed it because Mr. Hayes (her boss) had asked her to do so.  *See id.* at 57:7–15.

Mr. Hayes, who was not an inventor on the '426 patent, similarly had no recollection of speaking to Mr. Darbee or Thomas Vigil, UEI's patent attorney, to ask them about inventorship.  *See* Ex. 95 at 308:4–6, 309:10–17.  Mr. Hayes testified that he believed that Mr. Darbee was an inventor simply because the name "Darbee et al." appeared on the transmittal letter when the application was filed.  *See id.* at 290:13–17.  He admitted that he had not read the entire file history.  *See id.* at 382:24–383:10.

Had Mr. Hayes read the file history of the '426 patent, he would have realized that Mr. Darbee had been ***intentionally omitted*** as an inventor during the original prosecution.  For example, at the outset of the original prosecution process, in 1993, the USPTO initially denied the application a filing date because it failed to name the inventors.  *See* Ex. 106.  In reply, UEI submitted a petition stating that the application had been filed with an unsigned declaration listing the named inventors, Frank A.

16

O'Donnell, Qiuju Luo and Kimthoa Nguyen.  *See* Ex. 107.  Mr. Darbee was not listed. Along with this petition, UEI submitted a signed copy of a declaration listing and signed by the named inventors (*see* Ex. 108), a Small Entity Declaration listing and signed by the named inventors  (*see* Ex. 109), and an assignment document transferring rights from each of the named inventors to UEI (*see* Ex. 110).  In none of these instances was Mr. Darbee listed as an inventor.  Since inventorship was of primary concern in the patent's prosecution at that time, it stands to reason that if Mr. Darbee were an inventor, UEI would have named him in these documents.

On June 14, 1993, the USPTO granted the petition and afforded the application a filing date on the grounds that the failure to name the inventors on filing "has been deemed to be an inadvertent error." Ex. 111.  The decision noted that the actual inventors were Frank O'Donnell, Qiuju Luo, and Kimthoa Nguyen, and the USPTO specifically stated:  "***Paul Darbee is not one of the inventors of this application***."  *Id.* (emphasis added).  UEI did not dispute these findings.  In view of this clear statement by the USPTO that Mr. Darbee was not an inventor, it again stands to reason that if Mr. Darbee had been, in fact, an inventor, UEI would have taken advantage of this third opportunity to correct the record.  But UEI did not, presumably because it knew that Mr. Darbee was not an inventor.  UEI's litigation-driven assertion—made twenty years later—that Mr. Darbee's omission as an inventor was an inadvertent error is inconsistent with UEI's conduct during the prosecution of the '426 patent, is uncorroborated and incorrect, and has now rendered the '426 patent invalid for incorrect inventorship.

### iii.  UEI Asserted the '426 Patent Knowing Its Claims Were Barred by Presumptive Laches and Estoppel

UEI's failure to assert the '426 patent for more than six years triggers a ***presumption*** of laches, including the presumption that its delay was unreasonable, inexcusable, and caused material prejudice.  *See A. C. Aukerman Co. v. R. L. Chaides Constr. Co.*, 960 F.2d 1020, 1037 (Fed. Cir. 1992) (holding that "a *prima facie*

17

defense of laches is made out upon proof by the accused infringer that the patentee delayed filing suit for six years after actual or constructive knowledge of the defendant's acts of alleged infringement"). UEI was well aware of its unreasonable delay and the legal presumption that flows from this delay. UEI is also equitably estopped from asserting the '426 patent, as detailed in URC's pending motion for summary judgment. *See* URC Mot. for Summ. J., Dkt. No. 161-1 at12–14. Thus, by filing this suit and seeking damages under the '426 patent, UEI was knowingly asserting patent rights to which it is not entitled.

Having delayed over six years, it is UEI's burden to overcome the presumption and demonstrate that laches should not be applied. In an attempt to do so, UEI argues that URC did not change the accused functionality in its remote controls after being put on notice of infringement. *See* UEI Mem. at 22. UEI cites for support Chang Park's testimony that the rotating favorite channel feature was not removed from URC's remotes because this functionality was thought to be covered by the 2004 License. *See* Ex. 120 at 223:2–224:8 ("I do not think I gave that instruction because I feel that it being covered under the license we entered with UEI in 2004, so there's no need."). But UEI improperly simplifies the facts. In 2010, UEI accused URC of infringing the '426 patent with respect to both single favorite channel macros and rotating favorite channel macros. Further, by 2010 the '426 patent was nearing its 2012 expiration date, and as noted in URC's response to UEI's 2010 letter, URC did not believe that any valid and enforceable claim of the '426 patent was infringed by URC's products. *See* Ex. 19 at 2. Indeed, URC still believed at that time that UEI would not sue on the '426 patent because, *inter alia*, UEI still had not corrected inventorship. When UEI finally filed its complaint in this litigation in March of 2012, there were only two months of even potential liability before expiration of the '426 patent, and thus modification of products at this point was not a viable option, even if the claims were valid and infringed, which they are not.

Had URC been notified at the proper time—many years before the current lawsuit—that it was again being accused of infringing the '426 patent, URC would have had the option to modify its products to avoid the alleged infringement if necessary. However, since URC thought it was licensed, and since UEI failed to assert the '426 patent over this long period of time, URC had no reason to change any of the designs of its remote controls. Instead, URC continued to invest in and expand this market. Thus, URC's failure to make design changes only highlights the severe prejudice that URC would suffer if UEI had not unreasonably delayed.

Nonetheless, despite the fact that UEI knows that its claims are barred by laches, it has forced URC to spend substantial time and money defending itself against these claims. UEI's assertion of these claims represents an improper attempt to expand its rights under this patent to recover damages to which it knows it is not entitled. Such a bad-faith assertion of an unenforceable right constitutes *Handgards*-type patent misuse that renders the '426 patent unenforceable.[5]

### iv. UEI Asserted the '426 Patent Knowing That Its Claims Were Barred by *Res Judicata*

As noted above, UEI previously asserted the '426 patent in the First UEI Suit against a wide variety of URC products, only to withdraw its '426 claims of infringement **with prejudice**. This dismissal with prejudice acted as a final determination of all infringement claims that UEI made or could have made at that time under well-established *res judicata* principles. UEI's reassertion of the '426 patent in this action against the very same accused products is inexplicable, blatantly improper, and is yet another example of UEI's attempt to expand its patent rights beyond that to which it is entitled.

---

[5] UEI's brief simply ignores the fact that its infringement claims under the '426 patent are also barred by equitable estoppel. URC's co-pending Motion For Summary Judgment on the issue of estoppel explains in detail why UEI is barred from asserting infringement of the '426 patent. *See* URC Mot. for Summ. J. at 12–14.

19

UEI has argued that since it dropped claim 1 and is currently only asserting claims 2 and 3 of the '426 patent relating to the "rotating" macro in the present litigation, and only then with respect to new products that were introduced after the prior litigation was settled, that its claims in this action are unaffected by its previous dismissal of the patent, and *res judicata* does not apply.  But UEI fails to mention that its '426 infringement assertions for most of this case were much broader, and that it did not narrow its contentions to an even arguably reasonable scope until late 2013. From the 2010 notice letter, to the March 2012 filing of this lawsuit, during claim construction and throughout almost all of fact discovery, UEI's infringement contentions accused the ***same*** single favorite channel macro products of infringing claim 1 of the '426 patent as it had accused in the First UEI Suit.  *See* Ex. 18; Ex. 20; Ex. 90 at 3; Ex. 84 at 2; Ex. 112 at 4.  As a specific example, in both the First UEI Suit and in this lawsuit, UEI accused the MX-500, one of the most popular URC products sold during the 2001–2010 time period, of infringing claim 1 of the '426 patent.  *See* Ex. 24 at 8; Ex. 112 at 4.  This very same product was being sold as far back as 2001, and UEI was well aware of this product at that time and at the time of the 2004 License.  *See, e.g.*, Ex. 9 at 6.  *Res judicata* indisputably applies to bar claims against products that, like the MX-500, were specifically identified as infringing the '426 patent in the First UEI Suit and in this lawsuit until it was withdrawn.

But it was not until ***September 2013***, eighteen months after UEI filed its Complaint in this suit, after the claim construction process and *Markman* hearing, and after the originally-scheduled close of discovery in this litigation, that UEI modified its claims to drop claim 1 and withdraw its infringement allegations against products using the single favorite channel macro.  *See* Ex. 22 at 4 n.4.  This substantial and voluntarily reduction in the scope of its '426 claims was effectively an admission by UEI that its claims were indeed barred by *res judicata* and should never have been brought in the first place.  UEI's delay in dropping these baseless infringement claims further evidences UEI's anticompetitive conduct and patent misuse.

20

**v.     UEI Asserted the '426 Patent Knowing It Was Invalid Due to Inequitable Conduct**

UEI alleges that URC had made only vague and conclusory allegations of inequitable conduct, which fall short of the necessary "clear and convincing" standard. *See* UEI Mem. at 22–23.   With respect to the '426 patent, UEI ignores the very clear (and convincing) record that one of the purported inventors knew about a prior art reference even before the patent application was filed.

For example, UEI asserts that URC "does not even allege, much less come forward with clear and convincing evidence, that 'the CORE remote control' is material, that whoever allegedly withheld 'the CORE remote control' knew that is was material, and that person made 'a deliberate decision to withhold it.'"  UEI Mem. at 23.  However, UEI's purported inventor, Paul Darbee, admitted that he saw the CORE remote control at a trade show possibly as early as 1986, well before the purported priority date of the '426 patent.  *See* Ex. 98 at 34:23–36:7.  As explained in detail in the expert report served by URC's invalidity expert (*see* Ex. 124 at 43–45, 69–76), the CORE remote control prior art was extremely material to the prosecution of the '426 patent, and the patent examiner should have been made aware of it. Further, a reasonable jury could conclude that the reference was intentionally withheld, because otherwise the claims would have been rejected.  Certainly, UEI has made no showing that Mr. Darbee did not intend to withhold the reference.  At a minimum there are triable issues of material fact—whether Mr. Darbee knew of, and intentionally withheld disclosure of, the CORE remote control—and summary judgment must be denied.

**b.     UEI Has Misused the '067 Patent**

**i.     UEI Asserted the '067 Patent Knowing It Was Unenforceable Due to Laches**

UEI asserts that URC has made "unsupported allegations of wrongful use of patents."  UEI Mem. at 21.  Such an assertion ignores, among other things, the well-

21

supported allegations that UEI is barred from asserting the '067 patent against URC due to laches. *See* URC Mot. for Summ. J. at 7–11. As with the '426 patent discussed above, UEI's nearly eight-year delay in asserting the '067 patent gives rise to a presumption of laches and that UEI's delay was unreasonable, inexcusable, and caused URC material prejudice. UEI was of course well aware of its own unreasonable delay, and thus, upon filing this suit and seeking damages under the '067 patent, it was knowingly asserting rights to which it was not entitled and forcing URC to defend against meritless claims. UEI's assertion of its '067 infringement claims represents yet another example of UEI's anticompetitive attempts to expand its patent rights beyond their permissible scope. In fact, not only should UEI's motion for summary judgment be denied, but URC should be granted summary judgment that UEI's '067 infringement claims (as well as its '426 infringement claims) are barred by laches, as set forth in URC's pending summary judgment motion.

### ii. UEI Asserted the '067 Patent Knowing It Was Invalid Due to Inequitable Conduct

Although UEI criticizes URC's inequitable conduct defense related to the '067 patent as being "rambling," UEI Mem. at 23, UEI recognizes that URC's argument is based on misleading conduct of the applicants during the prosecution of the '067 patent that resulted in claims being allowed by the examiner when they plainly should not have been. This constituted inequitable conduct, and UEI's assertion of the '067 patent against URC in this action, knowing that the patent had been secured improperly, is another example of UEI's patent misuse.

Specifically, in the Office Action mailed January 27, 2003, claims 1–3, 5–8, and 10 were rejected under 35 U.S.C. § 103 as being obvious over Rumbolt (U.S. Pat. No. 4,703,359) in view of the CORE Reference Manual. *See* Ex. 113 at URCI000813. Claims 4 and 9 were objected to as being dependent upon a rejected base claim, "but would be allowable if rewritten in independent form including all of the limitations of the base claim and any intervening claims." *Id.* at URCI000814.

22

In response to this Office Action, applicants amended claims 1, 4, 6, and 9 and cancelled claims 3, 5, 8 and 10. *See* Ex. 114 at URCI000803–07. The applicants stated: "In response to this rejection, the applicants have elected to amend independent claims 1 and 6 to include the subject matter of claims 4 and 9 that was indicated to be allowable." *Id.* at URCI000807. The Examiner then withdrew the rejections "because subject matter previously indicated as allowable have [sic] been incorporated into the claims." Ex. 115 at URCI000797. Contrary to UEI's assurances to the Examiner, however, UEI's amendment to claim 1 ***did not*** include the subject matter of claims 3 and 4, which the Examiner indicated to be the allowable subject matter. *See* Ex. 124, Tab F, at 191–94. Thus, as issued, claim 1 of the '067 patent is broader in scope than that to which UEI is entitled. In addition, claims 4 and 9 (which ultimately became claims 3 and 6 of the '067 patent) were not amended to include all of the limitations of claim 1 from which they depended. *See id.* at 194–97. As a result, issued claims 3 and 6 of the '067 patent are also broader in scope than that to which UEI is entitled. In spite of its prior misrepresentation to the Examiner, and in the face of the Examiner's obvious mistake, UEI remained silent, never correcting the record and informing the Examiner of his error, thus securing issuance of these overly broad and unpatentable claims. UEI's assertion of these claims in the present suit is yet another example of UEI's efforts to impermissibly expand the scope of its patent rights to the competitive disadvantage of URC.

**c.**      <u>**UEI Has Misused the '906 Patent**</u>

**i.**      <u>**UEI Continues to Assert the '906 Patent Even Though It Admits It Has No Evidence of Infringement**</u>

UEI accuses URC of infringing claims 1, 10, and 12 of the '906 patent, which are method claims that can only be infringed when each step of the claimed method is directly performed. *See Aristocrat Techs. Austl. PTY Ltd. v. International Game Tech.*, 709 F.3d 1348, 1362 (Fed. Cir. 2013). To prove either direct or indirect infringement, UEI has the burden of proving direct infringement of these method

23

claims. *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1308, 1350 (Fed. Cir. 2012). UEI has admitted, however, that—despite having had a full opportunity to take discovery—UEI does not have any evidence that the '906 asserted method claims have ever been directly performed by *any* party, much less by URC and/or its customers. *See* Ex. 95 at 557:22–558:7. UEI's expert and sole witness on infringement, Dr. Burke, also failed to provide any such evidence, *see* Ex. 116 at 30–43, and the Federal Circuit has ruled that an expert's *ipse dixit* in such circumstances is insufficient. *See ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007) (finding no evidence of direct infringement when the patent holder "proffered no witness testimony of actual [accused product] users, or surveys of [the accused infringer's] customers, that would indicate that a user, aside from the expert retained for this particular litigation, directly infringed the [asserted] patent"); *see also Ormco Corp. v. Align Tech., Inc.*, 609 F. Supp. 2d 1057, 1068 (C.D. Cal. 2009) ("Circumstantial evidence is insufficient to meet a patentee's burden of demonstrating direct infringement."). Furthermore, "[h]ypothetical instances of direct infringement are insufficient to establish vicarious liability for indirect infringement." *ACCO*, 501 F.3d at 1313.

Dr. Burke's attempted reliance on certain activities, inadmissible and circumstantial evidence, and the testimony of one of URC's employees, Ms. Lynnette Caro, does not support UEI's infringement claim. *See* Ex. 117 at 5–6; Ex. 116 at 34–36. Although Dr. Burke makes many assertions regarding Ms. Caro's activities, there is simply no evidence that she was able to successfully program any remote controls ***using the methods claimed in the asserted claims of the '906 patent***. *See* Ex. 116 at 12–13. Ms. Caro's testimony is insufficient to demonstrate that the claimed methods have been practiced, which is what must be shown for infringement purposes.

Dr. Burke further opines that URC actively induced infringement of these claims. *See* Ex. 117 at 3–5. But there can be no indirect infringement if the underlying direct infringement has not been proven, *see, e.g.*, *Akamai*, 692 F.3d at

24

1308, and thus UEI's indirect infringement claims fail for the reasons explained above. Moreover, active inducement requires evidence of the state of mind of the accused indirect infringer (here, URC). *See, e.g.*, *Commil USA, LLC v. Cisco Sys.*, 720 F.3d 1361, 1366–67 (Fed. Cir. 2013). Dr. Burke fails to address or even allege that URC intended to induce actions that would infringe the asserted claims of the '906 patent. *See* Ex. 116 at 30. Dr. Burke does not discuss when or even whether URC had actual knowledge that the alleged induced acts constitute infringement of the contested method claims. *See id.* at 30–31. In fact, Dr. Burke fails to even identify when URC became aware of the existence of the '906 patent. *See id.* In the absence of the requisite knowledge and intent, URC could not possibly have induced—and indeed did not induce—infringement of the contested method claims of the '906 patent. *See Commil*, 720 F.3d at 1366–67.

UEI's continued assertion of the '906 patent in light of its admission that it has no evidence that the asserted method claims of the '906 patent have ever been practiced is anticompetitive under *Handgards* and defeats any claim by UEI that there is no triable issue of fact as to the patent misuse.

## III. <u>CONCLUSION</u>

UEI's motion for summary judgment should be DENIED in its entirety.

Dated: February 25, 2014 Respectfully submitted,

By: _____/s/Peter H. Kang_____
Peter H. Kang, SBN 158101
pkang@sidley.com
SIDLEY AUSTIN LLP
1001 Page Mill Road, Building 1
Palo Alto, California 94304
Tel: (650) 565-7000
Fax: (650) 565-7100

Theodore W. Chandler, SBN 219456
tchandler@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, California 90013
Tel: (213) 896-6000
Fax: (213) 896-6600

25

Samuel R. Miller, SBN 66871
srmiller@sidley.com
Teague I. Donahey, SBN 197531
tdonahey@sidley.com
SIDLEY AUSTIN LLP
555 California Street
San Francisco, California  94104
Tel:  (415) 772-1200
Fax:  (415) 772-7400

Brian K. Brookey, SBN 149522
brian.brookey@tuckerellis.com
TUCKER ELLIS LLP
515 South Flower Street
Forty-Second Floor
Los Angeles, California  90071
Tel:  (213) 430-3400
Fax:  (213) 430-3409

Douglas A. Miro
dmiro@ostrolenk.com
Michael F. Hurley
mhurley@ostrolenk.com
OSTROLENK, FABER LLP
1180 Avenue of the Americas
New York, New York  10036
Tel:  (212) 596-0500
Fax:  (212) 382-0888

Attorneys for Defendant
UNIVERSAL REMOTE CONTROL, INC.

DEF'T UNIVERSAL REMOTE CONTROL, INC.'S MEMORANDUM OF P'S & A'S IN OPPOSITION TO PLAINTIFF'S MOT. FOR SUMM. J. – CASE NO. 8:12-CV-00329 AG (JPRX)

**PROOF OF SERVICE**

STATE OF CALIFORNIA          )
                                               ) SS
COUNTY OF LOS ANGELES )

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 years and not a party to the within action.  My business address is 555 California Street, Suite 2000, San Francisco, California  94104.

On February 4, 2014, I served the foregoing document(s) described as **DEFENDANT UNIVERSAL REMOTE CONTROL, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** on all interested parties in this action as follows (or as on the attached service list):

☐     (VIA U.S. MAIL) I served the foregoing document(s) by U.S. Mail, as follows:  I placed true copies of the document(s) in a sealed envelope addressed to each interested party as shown above.  I placed each such envelope with postage thereon fully prepaid, for collection and mailing at Sidley Austin LLP, Los Angeles, California.  I am readily familiar with Sidley Austin LLP's practice for collection and processing of correspondence for mailing with the United States Postal Service.  Under that practice, the correspondence would be deposited in the United States Postal Service on that same day in the ordinary course of business.

☐     (VIA EXPRESS MAIL) I served the foregoing document(s) by Express Mail, as follows:  I placed true copies of the document(s) in a sealed envelope addressed to each interested party as shown above.  I placed each such envelope, with Express Mail postage thereon fully prepaid, for collection and mailing at Sidley Austin LLP, Los Angeles, California.  I am readily familiar with Sidley Austin LLP's practice for collection and processing of Express Mail for mailing with the United States Postal Service.  Under that practice, the Express Mail would be delivered to an authorized courier or dealer authorized by Express Mail to receive document(s) in the United States Postal Service on that same day in the ordinary course of business.

☐     (VIA FACSIMILE) I served the foregoing document(s) by facsimile transmission by use of facsimile machine number (415) 772-7400 to each interested party at the facsimile machine telephone number shown.  Each transmission was reported as complete and without error.  A transmission report was properly issued by the sending facsimile machine for each interested party served.

1

☐   (VIA FEDEX) I served the foregoing document(s) by FedEx for overnight delivery. I placed true copies of the document(s) in a sealed envelope addressed to each interested party as shown above. I placed each such envelope, with FedEx fees thereon fully prepaid, for collection and delivery at Sidley Austin LLP, Los Angeles, California. I am readily familiar with Sidley Austin LLP's practice for collection and delivery of express carrier package for delivery with FedEx. Under that practice, the FedEx package(s) would be delivered to an authorized courier or dealer authorized by FedEx to receive document(s) on that same day in the ordinary course of business.

☐   (VIA DHL) I caused each such document(s) to be sent by DHL for overnight delivery. I placed true copies of the document(s) in a sealed envelope addressed to each interested party as shown above. I placed each such envelope, with DHL fees thereon fully prepaid, for collection and delivery at Sidley Austin LLP, Los Angeles, California. I am readily familiar with Sidley Austin LLP's practice for collection and delivery of express carrier package for delivery with DHL. Under that practice, the DHL package(s) would be delivered to an authorized courier or dealer authorized by DHL to receive document(s) on that same day in the ordinary course of business/

☐   (VIA HAND DELIVERY) I caused the foregoing document(s) to be personally served by hand to the addressee(s) shown above at the address(es) shown above.

☐   (VIA HAND DELIVERY BY COURIER) I personally served the foregoing document(s) in this action by delivering such document(s) by hand to the addressee(s) shown above at the address(es) shown above, unless otherwise noted above.

☑   (VIA E-MAIL OR ELECTRONIC TRANSMISSION) Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent to the person(s) at the e-mail address(es) listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 4, 2014, at Los Angeles, California.

_____

2