UNITED  STATES  DISTRICT  COURT

FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA

UNIVERSAL ELECTRONICS, INC.,

        Plaintiff,

v.

UNIVERSAL REMOTE CONTROL, INC.

        Defendant.

CASE NO. SACV 12-00329 AG (JPRx)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT UNIVERSAL REMOTE CONTROL, INC.'S OMNIBUS MOTION FOR SUMMARY JUDGMENT**

Defendant Universal Remote Control, Inc. ("Defendant") moves for summary judgment on seven separate issues. Plaintiff Universal Electronics, Inc. ("Plaintiff") opposes the Motion. The Motion is GRANTED IN PART and DENIED IN PART.

**BACKGROUND**

Plaintiff and Defendant are competitors in the universal remote control business. On March 2, 2012, Plaintiff filed this suit, alleging infringement of U.S. Patents Nos. 5,414,426 ("'426 Patent"), 5,614,906 ("'906 Patent"), 6,587,067 ("'067 Patent"), and 5,568,367 ("'367 Patent"). Both the '426 Patent and the '067 Patent have expired. On February 1, 2013, the Court issued its Claim Construction Order, which invalidated the only relevant claim in the '367 Patent. On May 2, 2013, the Court denied Defendant's motion to stay the case pending *inter partes* review. On May 14, 2013, the Court denied Plaintiff's Motion for Reconsideration of Claim Construction. Defendant sought to file three summary judgment motions, with overlength briefing. The Court denied Defendant the excessive length it sought, but allowed opening and opposition briefs of 45 pages, and a reply of 20 pages. Plaintiff's separate motion for summary judgment is addressed in an accompanying order. Trial is set for May 6, 2014.

**LEGAL STANDARD**

Summary judgment is appropriate where the record, read in the light most favorable to the non-moving party, indicates that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Material facts are those necessary to the proof or defense of a claim, as determined by reference to substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In deciding a motion for

summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 269.

The burden initially is on the moving party to demonstrate an absence of a genuine issue of material fact or to demonstrate that the nonmoving party will be unable to make a sufficient showing on an essential element of its case for which it has the burden of proof. *Celotex*, 477 U.S. at 323. Only if the moving party meets its burden must the non-moving party produce evidence to rebut the moving party's claim and create a genuine issue of material fact. *Id*. at 322-23. If the non-moving party meets this burden, then the motion will be denied. *Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc*., 210 F.3d 1099, 1103 (9th Cir. 2000).

The legal standards applicable to each issue on which Defendant seeks summary judgment will be discussed in the appropriate portion of the Analysis section.

**ANALYSIS**

**1.   LACHES, ESTOPPEL, AND IMPLIED LICENSE**

Defendant argues that Plaintiff knew of Defendant's alleged infringement of the '067 Patent and '426 Patent for over a decade before filing this action. (Mot. 3.) Defendant also argues that it has an implied license to the '426 Patent because (1) Plaintiff licensed U.S. Patent No. 5,959,751 ("'751 Patent") to Defendant and (2) Defendant cannot practice the '751 Patent without practicing the '426 Patent because the patents claim the same subject matter. (Mot. 3-4.) Plaintiff responds that the lawsuit it filed against Defendant in 2000 ("2000 Litigation") involved claims 1 and 4 of the '426 Patent, but not claims 2 and 3 of that patent, which are the claims at issue in this case. (Opp'n 2.) In the 2000 Litigation, Plaintiff dismissed its claim for infringement of the '426 Patent in 2002, and then in 2004, the parties entered into a settlement and license agreement for the "Patents-In-Suit." (Opp'n 2, Decl. of Clarence Rowland In Supp. of Mot. ("Rowland Decl.") Exs. 16-17.) The parties agree that at the time, Plaintiff offered Defendant a license to other patents, including the '067 Patent, which Defendant declined. (Mot.

4-6, Opp'n 2-3.)  But the parties dispute whether the '426 Patent was part of that offer, and whether it was impliedly licensed through the express license to the '751 Patent.  (Mot. 4-6, Opp'n 2-3.)

## 1.1    Laches ('426 Patent and '067 Patent)

### 1.1.1   Legal Standard

"As equitable defenses, laches and equitable estoppel are matters committed to the sound discretion of the trial judge," reviewed for abuse of discretion.  *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc).  "[L]aches may be defined as the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." *Id*. at 1028-29.  Laches may operate to bar damages otherwise within the six year recovery period provided by 35 U.S.C. § 286.  *Id*. at 1030.

[T]o invoke the laches defense, a defendant has the burden to prove two factors:

1. the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant, and

2. the delay operated to the prejudice or injury of the defendant.

*Id*. at 1032.  "Such prejudice may be either economic or evidentiary." *Id*. at 1033.  "Evidentiary, or 'defense' prejudice, may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts." *Id*. Economic prejudice may arise where there is a "change in the economic position of the alleged infringer during the period of delay." *Id*.  "[E]conomic prejudice is not a simple concept but rather is likely to be a slippery issue to resolve." *Id*.  "A court must also consider and weigh any

1  justification offered by the plaintiff for its delay." *Id*. (providing non-exhaustive list of

2  justifications).

3      "A patentee may also defeat a laches defense if the infringer has engaged in particularly

4  egregious conduct which would change the equities significantly in plaintiff's favor." *Id*.

5  (internal citations and quotations omitted).  "Conscious copying may be such a factor weighing

6  against the defendant, whereas ignorance or a good faith belief in the merits of a defense may tilt

7  matters in its favor." *Id*.  In patent cases, there is a presumption of laches where the patentee

8  delayed filing suit for more than six years after actual or constructive knowledge of the

9  infringement. *Id*. at 1035-36.  Laches must be shown by a preponderance of the evidence. *Id*. at

10 1045.

11

12          *1.1.2   The Reasonableness of Plaintiff's Delay*

13

14      Defendant argues that although the '067 Patent was specifically referenced in the 2004

15 license as a "UEI Related Patent" that potentially could be the subject of an infringement action

16 in the future, and although Plaintiff had full knowledge of Defendant's product line, Plaintiff

17 delayed bringing claim for infringement of the '067 Patent until March 2012, more than seven

18 years after the 2004 license and almost five years after the '067 Patent expired.  (Mot. 6,

19 Rowland Decl. Ex. 16 §§ 1.8, 3.5.)  Plaintiff accused Defendant of infringing the '426 Patent on

20 March 1, 2010.  (Mot. 6, Rowland Decl. Ex. 18.)  Defendant argues that Plaintiff admitted that it

21 keeps abreast of its competitor's products, has encountered Defendant's products many times

22 over the years, and has investigated Defendant for reasons concerning competitive bidding

23 processes.  (Mot. 8 (citing Sept. 12, 2013 Deposition of Pat Hayes ("Sept. 12, 2013 Hayes

24 Dep.") 448:3-9, Rowland Decl. Ex. 81).)

25      Defendant's quotation ends at page 448, line 9 of the deposition, but lines 10-22 undercut

26 the idea that Plaintiff knew of Defendant's activities that might infringe the '067 Patent "for

27 years" before filing this action.  Specifically, the following question and answer revealed that the

28 only time the deponent could recall Plaintiff "investigating what URC was doing" "as part if its

5

1    . . . due diligence and in trying to position itself as well as possible" in competitive business

2    processes was in 2010, when Defendant was promoting a feature called "Quick Step" or "Quick

3    Set." (Sept. 12, 2013 Hayes Dep. 448:10-22, Rowland Decl. Ex. 81.)

4         Defendant also argues that Plaintiff had constructive notice because Defendant's sale of

5    millions of remote control devices and website describing many of the accused products

6    rendered the allegedly infringing activity "sufficiently prevalent in the inventor's field of

7    endeavor." (Mot. 8 (quoting *Wanlass v. Gen. Elec. Co.*, 148 F.3d 1334, 1338 (Fed. Cir. 1998)

8    ("[T]he law is well settled that where the question of laches is in issue the plaintiff is chargeable

9    with such knowledge as he might have obtained upon inquiry, provided the facts already known

10   by him were such as to put upon a man of ordinary intelligence the duty of inquiry.").) While

11   Plaintiff has narrowed its infringement contentions by dropping its claims against Defendant's

12   earlier products, Defendant argues that the withdrawal of infringement contentions against

13   earlier products cannot "unring the bell" as to laches. (Mot. 9 (citing *St. Clair Intellectual Prop.*

14   *Consultants, Inc. v. Acer, Inc.*, 2013 U.S. Dist. LEXIS 92642, *7 (D. Del. July 2, 2013)).)

15   Therefore, Defendant argues, Plaintiff's delay of nearly ten years on the '426 Patent and over

16   seven years on the '067 Patent triggers a presumption of laches. (Mot. 9-10.)

17        Defendant argues that Plaintiff cannot rebut the presumption that its delay was

18   inexcusable because Plaintiff's proposed excuses are that (1) it "conducted little or no analyses

19   of [Defendant's] products as to avoid disrupting the parties' [2004 License] agreement" (Mot.

20   10 (quoting Plaintiff's Response to Interrogatory No. 2, Rowland Decl. Ex. 24), and (2) the '067

21   Patent was being reexamined from 2006-2011 (Mot. 11 (citing Response to Interrogatory No.

22   24, Rowland Decl. Ex. 26 (the Court was unable to locate any reference to a reexamination in

23   that Interrogatory response—perhaps the relevant portion of the response was not submitted in

24   the exhibit)).) As to the first excuse, Defendant argues that turning a blind eye to infringement is

25   the opposite of diligence, and as to the second excuse, Defendant argues that Plaintiff provided it

26   no notice of the reexamination or Plaintiff's eventual intent to sue after its conclusion. (Mot. 10-

27   11.)

28

1    Plaintiff responds that its delay was reasonable because after settling the 2000 Litigation

2    in 2004 through a license, Plaintiff proceeded with its business believing that Defendant "was

3    operating in accordance with its license agreement, and building product using the license[d]

4    technologies as intended under the settlement agreement." (Opp'n 3 (quoting Sept. 12, 2013

5    Hayes Dep. 423-24, Decl. of Brian Haan In Supp. of Opp'n ("Haan Decl.") Ex. 8).) Plaintiff

6    argues that it became aware of Defendant's possible infringement in 2010, when one of

7    Plaintiff's executives brought two remote controls to the attention of Plaintiff's counsel, and that

8    it only began analyzing infringement of the '067 Patent after it emerged from reexamination in

9    February 2011. (Opp'n 3, 5 (citing Pl.'s Response to Interrogatory No. 23 7, Rowland Decl. Ex.

10   26, Sept. 12, 2013 Hayes Dep. 421-22, Haan Decl. Ex. 8).)

11   Plaintiff argues that it is not asserting infringement in this case against any products

12   identified in its October 1997 notice letter, which was the prelude to the 2000 Litigation. (Opp'n

13   3.) It argues that none of the accused remotes in the 2000 Litigation included the "rotating

14   favorite channel macro" feature found in the currently accused products, and that Defendant first

15   introduced that feature in 2007. (Opp'n 3.) It argues that the rotating favorite channel macro (1)

16   is required for infringement of claims 2 and 3 of the '426 Patent, which were not asserted in the

17   2000 Litigation, (2) require more structure than claim 1 of the '426 Patent, and (3) were invented

18   five years later than claim 1 of the '426 Patent. (Opp'n 3-4 (citing claim chart from 2000

19   Litigation 89-90, Rowland Decl. Ex. 9, Sept. 17, 2013 Deposition of Chang K. Park 454-456,

20   Haan Decl. Ex 10).) The distinction between the various claims of the '426 Patent is discussed

21   further in Section 1.3, in the context of analyzing whether Defendant has an implied license to

22   the '426 Patent.

23   Defendant responds that Plaintiff originally accused pre-2006 products in this suit, and

24   that its withdrawal of those products from the lawsuit in September 2013 cannot solve the laches

25   problem. (Reply 2 (citing *St. Clair Intellectual Prop. Consultants, Inc. v. Acer, Inc.*, 2013 U.S.

26   Dist. LEXIS 92642 (D. Del. July 2, 2013).) But in *St. Clair*, the court held that the plaintiff's

27   narrowing of its infringement contentions did not avoid laches where the narrowing was not

28   based on any information unavailable before the beginning of the laches period, and that the

1   "record does not contain evidence from which a reasonable factfinder could conclude that

2   changes were made to the accused products which would trigger a new laches period." *St. Clair*,

3   2013 U.S. Dist. LEXIS 92642 *13.  Here, there are such disputes, and allegations that there were

4   product changes during the laches period.

5        Plaintiff argues that once it became aware of Defendant's infringement in 2010, it

6   promptly conducted an investigation and sent notice letters in March 2010 and May 2011, and

7   then filed suit in early 2012.  (Opp'n 8 (citing notice letters, Rowland Decl. Exs. 18 and 20).)

8        Defendant has not shown an absence of genuine dispute that Plaintiff knew, or in the

9   exercise of reasonable diligence, should have known before 2010 that Defendant was selling

10  products that utilized Plaintiff's patents beyond those that Defendant licensed in 2004,

11  particularly since Defendant could have taken, but chose not to take, a license to either the '426

12  or '067 Patent in 2004.  Plaintiff's evidence, which must be credited on summary judgment,

13  shows that it believed that Defendant was operating within the parameters of the license.  *See*

14  *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 774 (Fed. Cir. 2004) (holding that

15  patentee's testimony of his belief that the defendant would comply with a 1979 agreement

16  supported the reasonable inference that patentee had no reason to sue until at least 1986, when

17  patentee saw evidence of infringement).  Nor has Defendant shown the absence of a genuine

18  dispute concerning whether the delay between Plaintiff's 2010 discovery of the infringement and

19  the 2012 suit was unreasonable.

20

21        *1.1.3   Whether the Delay Prejudiced Defendant*

22

23        Given the Court's determination in Section 1.1.2, the Court need not evaluate prejudice,

24  but does so in the interest of completeness.  As to economic prejudice, Defendant argues that it

25  was "lulled . . . into a false sense of security."  (Mot. 12, 14.)  But Defendant does not show what

26  it would have done differently.  As to evidentiary prejudice, Defendant argues that evidence

27  relating to Plaintiff's petitioning the PTO to add a Mr. Darbee as a named inventor on the '426

28  Patent has been lost.  (Mot. 11-12.)  Plaintiff petitioned for correction ten years after Plaintiff

1   stated its intention to do so, and Darbee's death in September 2013 makes him unavailable for

2   trial. (Mot. 11-12.)  Further, Defendant argues that the memories of witnesses concerning the

3   invention of a patent filed in 1992 will have faded, and notes Plaintiff's position that Plaintiff's

4   emails generated before 2006 were not reasonably accessible.  (Mot. 11-12 (citing October 2013

5   discovery correspondence, Rowland Decl. Ex. 62).)  Defendant also contends that it has suffered

6   economic prejudice from the loss of investment and claims for damages which could have been

7   avoided if Plaintiff had filed suit within a reasonable period of time.  (Mot. 12.)

8         Plaintiff responds that Darbee's death does not prejudice Defendant because Defendant

9   took Darbee's full-day deposition on September 16, 2013, and Defendant has not specified any

10   fact that could have been proved by Darby's trial testimony.  (Opp'n 10.)  Plaintiff further argues

11   that Defendant did not depose two co-inventors of the '426 Patent, O'Donnell and Luo, and

12   failed to pursue the depositions of patent attorneys after serving subpoenas on them.  (Opp'n 10

13   (citing subpoenas, Haan Decl. Ex. 20).)  Plaintiff points out that it offered to share the cost of

14   trying to restore its pre-2006 emails for production, but Defendant declined.  (Opp'n 10 (citing

15   discovery correspondence, Rowland Decl. Ex. 62) (any offer by Plaintiff to share in the cost of

16   restoration does not seem to appear in this particular correspondence chain)).)  And Plaintiff

17   correctly points out that Defendant's assertion of economic prejudice is conclusory, as

18   Defendant presents no evidence that it would have acted differently had suit been brought

19   earlier.  (Opp'n 10-11.)

20         The testimony of unavailable trial witnesses is commonly presented by deposition.

21   Defendant can so present Darbee's testimony, and has not specifically shown that the passage of

22   time has otherwise caused it evidentiary prejudice.  For example, it appears that Defendant has

23   not obtained the available testimony of other co-inventors.  As to the unavailable pre-2006

24   email, the estimated cost of restoration was $30,000.  (Sept. 25, 2013 discovery correspondence,

25   Rowland Decl. Ex. 62.)

26         While not a trivial amount, $30,000 is not outsized in the context of patent litigation e-

27   discovery or the amount at issue here.  Defendant's decision not to incur the cost shows that

28   Defendant itself believed that the expected value of the information, in terms of supporting

Defendant's positions, was less than $30,000—or if higher, that it was less than the expected value of using the uncertainty about what *might* have been obtained as an argument in favor of laches.  (*See* Oct. 2, 2013 discovery correspondence, Rowland Decl. Ex. 62 (Defendant declines to proceed with the email restoration, and instead "stand[s] by its position that the unavailability of this important discovery constitutes substantial evidentiary prejudice to [Defendant]'s defense of this suit.").)

The Court finds that Defendant has not shown the absence of a genuine issue concerning prejudice from the delay.

## 1.2    Equitable Estoppel ('426 Patent)

### 1.2.1   Legal Standard

Equitable estoppel is a defense addressed to the sound discretion of the district court. *A.C. Aukerman*, 960 F.2d at 1041.  "Where there has been contact or a relationship between the parties during the delay period which may give rise to an inference that the plaintiff has abandoned its claim against the defendant, the facts may lend themselves to analysis under principles of equitable estoppel," which is a defense that "focuses on what the defendant has been led to reasonably believe from the plaintiff's conduct."  *Id*. at 1034.

> An [equitable] estoppel case . . . has three important elements. [1] The actor, who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence. [2] The other relies upon that communication. [3] And the other would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct.

*Id*. at 1041 (quoting *Remedies* § 2.3, at 42).  In a patent case, the misleading message conveyed by words or silence is that the patentee did not intend to press an infringement claim.  *Id*. at 1042.  "In the most common situation, the patentee specifically objects to the activities currently asserted as infringement in the suit and then does not follow up for years."  *Id*.  To satisfy the

reliance element, the accused infringer must show that it substantially relied on the patentee's misleading conduct in taking some action. *Id*. at 1042-43. The harm element can be shown through a change of economic position or loss of evidence. *Id*. at 1043. Finally, the court must consider any other facts bearing on the equities of the parties. *Id*.

While equitable estoppel may be determined on summary judgment, the inference that the patentee's conduct communicated that the patentee was not going to enforce the patent "must be the *only* possible inference from the evidence." *Id*. at 1043-44. Equitable estoppel must be shown by a preponderance of the evidence. *Id*. at 1045.

### 1.2.2   Application

Defendant argues that Plaintiff's 2002 dismissal of the '426 Patent with prejudice from the 2000 Litigation constituted a misleading communication that Plaintiff did not intend to sue for infringement of that patent. (Mot. 13.) After being confronted with potentially invalidating prior art in the 2000 Litigation, Plaintiff responded that it could overcome the prior art by adding Darbee as an inventor. (Mot. 13.) But instead of doing so, Plaintiff dismissed the '426 Patent from the case, leading Defendant to believe that Plaintiff could not add Darbee as an inventor and that Plaintiff recognized the invalidity of the claims without Darbee's co-inventorship. (Mot. 13.) Plaintiff disputes that those circumstances communicated its intention not to assert the '426 Patent, particularly because Defendant was not aware that Plaintiff did not petition to correct inventorship (which Plaintiff finally did in 2012, 10 years after the issue arose). (Opp'n 12.)

Plaintiff's actions and inaction communicated that it did not intend to assert the '426 Patent. Plaintiff acknowledged the merit of the invalidity argument Defendant raised in the 2000 Litigation, but stated that it could be overcome by adding Darbee as an inventor. Instead of doing so, Plaintiff dismissed the patent from the case, which reasonably gave rise to the inference that it was unable to add Darbee as an inventor. Further, in resolving the 2000 Litigation by settlement in 2004 (Rowland Decl. Ex. 16), Plaintiff did not inform Defendant that

it needed to take a license to the '426 Patent to resolve the dispute.  While the '426 Patent had been dropped from the case earlier, if inventorship was going to be corrected as Plaintiff stated in its July 23, 2002 letter (Rowland Decl. Ex. 14 3), then it would have been logical to include it in the settlement and license agreement.  But Plaintiff did not even raise that issue.  While the '426 Patent was not specifically raised one way or the other, given the totality of the circumstances, the only possible inference is that Defendant was led to reasonably believe that Plaintiff did not intend to assert the '426 Patent.

Defendant also argues that because the licensed '751 Patent covers the same subject matter as the '426 Patent, it believed that Plaintiff would not assert the '426 Patent.  (Mot. 13.) That argument is better considered in evaluating Defendant's implied license defense, which the Court does in Section 1.3.

As to reliance, Defendant argues that it relied on these misleading communications by continuing to invest in, and by selling millions of, remote controls that included the accused rotating channel feature.  (Mot. 14.)  Plaintiff responds that Defendant's CEO testified that Defendant always believed that the '426 Patent was invalid and so would not have done anything differently even if Plaintiff sued in 2006.  (Opp'n 11.)  Plaintiff provides no evidentiary citation for that assertion, but may have intended to cite to the September 17, 2013 Deposition of Chang K. Park, which includes the following exchange:

**Q:** Can you identify for me any business decisions or design decisions of the actual physical products themselves that URC has made after being told by UEI that it believed URC was infringing the 426 patent?

[objection]

**A:** UEI patent is the software issue, not a hardware issue, so in terms of hardware design itself is irrelevant in this lawsuit.

**Q:** Okay. Well, tell me any software changes URC has asked Ohsung or itself has taken after receiving notice from UEI that UEI believed URC was infringing its 426 patent.

[objection]

1    **A:**  I do not recall making any request to change on 426 issue.

2    (Haan Decl. Ex. 10 244).  While this exchange might suggest a lack of reliance, it does not

3    address the fact that the '426 Patent expired on May 9, 2012, only two years after Plaintiff's

4    notice letter, and only two months after the Complaint.  If it was reasonable for Plaintiff to delay

5    filing suit for two years, then it may have been reasonable for Defendant to take the same

6    amount of time to act on the issue, and by that time, the '426 Patent had expired.  As such,

7    Park's deposition testimony does not demonstrate lack of reliance.  But neither has Defendant

8    come forward with actual facts demonstrating reliance, as is its burden.  It instead relied on the

9    notion that it would have done something differently, but has not explained precisely, or

10   submitted evidence showing, what course of action it would have taken.  Defendant has

11   therefore not demonstrated the absence of a genuine issue of material fact concerning its

12   affirmative defense of equitable estoppel.

13

14   ### 1.3    Implied License / Legal Estoppel ('426 Patent)

15

16   *1.3.1   Legal Standard*

17

18   "Legal estoppel refers to a narrow[ ] category of conduct encompassing scenarios where a

19   patentee has licensed or assigned a right, received consideration, and then sought to derogate

20   from the right granted."  *TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271,

21   1279 (Fed. Cir. 2009) (citing *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571,

22   1581 (Fed. Cir. 1997)).  The development of the doctrine in the patent context has an interesting

23   trajectory.  In *AMP Inc. v. United States*, the court held that:

24       [W]hen a person sells a patent which employs an invention which infringes a prior

25       patent, the person selling is estopped from bringing an action against his grantee

26       for that infringement, even though the earlier patent is acquired after the sale of the

27       later patent. The same principle applies to the grant of a patent right by license as

28       well as assignment.

389 F.2d 448, 451 (Ct. Cl. 1968).  Picking up that strain many years later, the Federal Circuit in *TransCore* expanded the doctrine, holding that whether the later-acquired patent existed before the licensed patent was a distinction without a difference, and that an implied license arose when the asserted patent was broader than, and thus necessary to practice, the licensed patent.  563 F.3d at 1279.  Because the non-licensed patent in *TransCore* was "broader than, and necessary to practice" the licensed patent, the court concluded that the patentee was legally estopped from asserting it, and had granted an implied license.  *Id*.  That was so even though the license stated that it did not apply to any other patents to be issued in the future, because while that language was generally operative, it did not permit the patentee to derogate from the rights it expressly granted.  *Id*.

Two years later, the Federal Circuit expanded the doctrine again.  *Gen. Protecht Grp., Inc. v. Leviton Mfg. Co., Inc.*, 651 F.3d 1355 (Fed. Cir. 2011).  In *General Protecht*, the patentee argued that the doctrine did not apply because at least some claims of its continuation patents were narrower than the previously asserted claims, so denying an implied license would not derogate from the right to practice the licensed claims.  *Id*. at 1361.  The patentee pointed to specific limitations in the asserted patents that did not appear in the licensed claims.  *Id*.  The Federal Circuit rejected the patentee's argument, finding that the continuation patents were based on the same disclosure as the licensed patents, and by definition, could not claim any invention not already supported in the earlier issued patents.  *Id*.  *General Protecht* thus expanded *TransCore* by holding that the relative breadth of the patents was not controlling, and that narrower claims could be subject to the implied license, at least where the patents share the same disclosure.  651 F.3d at 1362.

*General Protecht's* focus on the patents' disclosure, rather than their claims, is somewhat anomalous given the law, stated in the case upon which *General Protecht* relies, that "the grant of a patent does not provide the patentee with an affirmative right to practice the patent but merely the right to exclude," *TransCore*, 563 F.3d at 1275, coupled with the "'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  Also curious is *General Protecht*'s conclusion that it "reasonably follows" from *TransCore* that where "continuations issue from parent patents that previously have been licensed as to certain products, it may be presumed that, absent a clear indication of mutual intent to the contrary, those products are impliedly licensed under the continuations as well." 651 F.3d at 1361.  *TransCore* specifically turned on the relative breadth of the claims, not the mere fact that the patents bore a specific familial relationship.  So whether or not *General Protecht* is sound policy, it is hard to say it "reasonably follows" from *TransCore*.

Finally, *General Protecht* stated that it was merely articulating an interpretive presumption that "parties are free to contract around."  *Id.*  Yet, it held unavailing the provisions of the license expressly preserving the patentee's "right to sue on related patents," although it did not quote those provisions or discuss them in detail.  *Id.*  While not outcome determinative here, *General Protecht* may have implications for the Federal Circuit's concern for "predictability in the resolution of patent disputes," *Lighting Ballast Control LLC v. Philips Electronics N. Am. Corp.*, __ F. 3d __, 2014 WL 667499 (Fed. Cir. Feb. 21, 2014), and predictability in patent licensing.

### 1.3.2   Application

Defendant argues that by licensing the '751 Patent in the 2004 License, it received an implied license to the '426 Patent.  (Mot. 14.)  Both patents share a common ancestor application, No. 07/586,957, filed in 1990 ("'957 Application"), which is a continuation of the application that resulted in U.S. Patent No. 4,959,810 to Darbee ("'810 Patent ").  The application resulting in the '426 Patent was filed as a continuation-in-part of the '957 Application in 1992, meaning that it contained a portion or all of the disclosure of the '957 Application / '810 Patent together with added matter not present in the those documents. *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304, n.3 (Fed. Cir. 2008).  The application resulting in the '751 Patent was filed in 1997 as part of a chain of continuation and

1  divisional applications of the '957 Application, meaning that its disclosure contains no new

2  matter absent from the '957 Application or '810 Patent.  *Id.*;  *Pfizer, Inc. v. Teva Pharm. USA,*

3  *Inc.*, 518 F.3d 1353, 1359 (Fed. Cir. 2008).

4       The 2004 License specifically licenses only the "UEI Patents-In-Suit," defined as a list of

5  four patents that included the '751 Patent, but did not include the '426 Patent.  (Rowland Decl.

6  Ex. 16 ¶ 1.7.)  The 2004 License specifically excludes the "UEI Related Patents," defined as

7  "any patent or patents that are based on a continuation or divisional application of the UEI

8  Patents-in-suit . . . including but not limited to U.S. Patent Nos. 6,587,067 and 6,496,135."

9  (Rowland Decl. Ex. 16 ¶ 1.8.)  The '426 Patent undisputably falls into that category, although

10  listing it might have simplified the issues to be addressed here.  Because the '426 Patent was not

11  expressly licensed in the 2004 License, we must examine whether asserting it would allow

12  Plaintiff to "derogate from the rights it has expressly granted."  *TransCore*, 563 F.3d at 1279.

13       Defendant argues that Plaintiff's assertion of the '426 Patent derogates from its rights

14  under the 2004 License because Defendant cannot practice the '426 Patent without also

15  practicing the '751 Patent.  (Mot. 15.)  Under *TransCore*, that argument would be backwards:

16  Defendant **has** an express license to the '751 Patent.  It would only necessarily derogate from the

17  license to the '751 Patent if Defendant could not practice the **'751 Patent** without infringing the

18  '426 Patent, or perhaps if a significant portion of the activity covered by the '751 Patent would

19  infringe the '426 Patent, which Defendant has not demonstrated here.  (*See* Mot. 15 ("if one

20  patent is '**broader** than, and necessary to practice' a licensed patent, then the licensee 'must be

21  permitted to practice' this **broader** patent'" (emphasis added, quoting *TransCore*, 563 F.3d at

22  1279)).)  The question is whether Defendant remains free to practice the '751 Patent without

23  infringing the '426 Patent.

24       As would be expected due to their partially shared disclosure, there are some similarities

25  between the '751 and '426 Patents.  Contrary to Plaintiff's arguments, the similarity extends to

26  claim 1 of the '426 Patent and claim 7 of the '751 Patent.  Plaintiff's expert, Burke, presents a

27  comparison of the language of those claims, pointing out that claim 1 of the '426 Patent is

28

narrower than claim 7 of the '751 Patent.  (Decl. of Shawn Burke ("Burke Decl.") Ex. B 175-176.)  For example, Burke presents a comparison of corresponding clauses from each claim:

| '751 Patent claim 7 | '426 Patent claim 1 |
| --- | --- |
| transmission circuitry coupled to said microprocessor | IR lamp driver circuitry coupled to said microprocessor; light emitting means for generating and emitting IR signals coupled to said IR lamp driver circuitry |

(BurkeDecl. Ex. B 175.)  Burke then argues that the scope of '751 Patent claim 7 is narrower than that of '426 Patent claim 1, because it speaks of transmission circuitry in terms that could include RF wireless or wired circuitry, while the '426 Patent claim 1 is limited to infrared transmission.  (Burke Decl. Ex. B 175.)  But Burke does not compare, under *General Protecht*, the **disclosure** of the '751 Patent to '426 Patent claim 1.  So, while Burke makes an accurate observation, he ignores that in the '751 Patent's disclosure, infrared transmission circuitry is the primary, and perhaps only, form of transmission circuitry disclosed.   Similar observations can be made regarding the other distinctions Burke draws between the claims.  Therefore, it appears that Defendant does have an implied license to claim 1 of the '426 Patent under *General Protecht*.

But Plaintiff's opposition wisely focuses on '426 Patent claims 2 and 3, and Defendant must show that it has an implied license to the specific subject matter of those claims.  Plaintiff argues that their subject matter was added years after the '810 Patent.  (Opp'n 14.)  Plaintiff's expert argues:

> Irrespective of whether Claim 1 of the '426 Patent has a different scope than Claim 7 of the '751 Patent, as a Continuation in part the '426 patent, in particular Claims 2 and 3, disclose specific inventive structure (rotating favorite channel macros) not taught or suggested in '751 Patent Claim 7, or embodied in '426 Patent Claim 1.

(Burke Decl. Ex. B 176-177.)  Defendant's expert agrees with this analysis, which supports Defendant's invalidity theory.  (Bristow Rep., Haan Decl. Ex. 21 30-31 ("These statement in the

'426 Patent are admissions that 'parts of the favorite channel macro program and of the rotating macro program' are new matter in the '426 Patent over what was disclosed in the Darbee '810 Patent"; "Darbee[] admitted during his deposition . . . that the subject matter of asserted claims 2-3 was Mr. O'Donnell's idea and that it was not contemplated until 1992.").)

Despite that distinction, Defendant now argues that "UEI admitted in deposition that the '426 and '751 patents are indistinct and that practicing the '426 patent requires practicing the '751 patent." (Mot. 15 (citing Sept. 12, 2013 Hayes Dep. 454:13-455:4, 470:15-25, 481:1-8, Rowland Decl. Ex. 81).) Again, while the '751 Patent is broader than the '426 Patent, such that practicing the narrower '426 Patent may involve practicing the '751 Patent, that does not suffice —because it is backwards—under *TransCore*. Under *General Protecht*, the cited deposition testimony does not support the proposition that the patents are "indistinct." Instead, Plaintiff's witness, Hayes, drew a distinction between different types of favorite channel buttons, only some of which are within the scope of the '751 Patent (Sept. 12, 2013 Hayes Dep. 454:13-455:4, Rowland Decl. Ex. 81), and testified that programming a single macro would be covered both by the '751 Patent and **claim 1** of the '426 patent, but that programming more than one macro would be covered by claims 2 and 3 of the '426 Patent, and not at all by the '751 Patent. (Hayes Dep. 470:15-471:8.)

Finally, the fact cited by Defendant that some of Plaintiff's internal product specifications list both patents under the rotating macro function discussion (Mot. 15) is far too slender a reed to support a jury's finding of implied license in light of the language of the 2004 License and the actual relationship between the patents. This is particularly so since the '426 Patent uses the term "rotating macro" seven times, while the '751 Patent never does so. If the functionality were described in the '751 Patent through other words, Defendant could have pointed that out, but it did not.

Defendant has not shown its entitlement to summary judgment of an implied license to claims 2 and 3 of the '426 Patent, even under a *General Protecht* analysis of the disclosure, rather than the claims, of the patents. To the contrary, Plaintiff has shown that there is no genuine issue that Defendant does not have a license to the '426 Patent, and for the reasons

already discussed, the Court will grant summary judgment to Plaintiff on that issue in the accompanying Order on Plaintiff's motion for summary judgment.

### 1.4     Conclusion

As to issue 1, laches, equitable estoppel, and implied license, the Motion is DENIED.

## 2.     INVALIDITY OF THE '426 PATENT

While Defendant's brief addresses invalidity of the '426 Patent before noninfringement of that patent, it treats invalidity as a backup or footnote to its noninfringement argument.  That is, Defendant does not attempt to show that all the elements of the challenged claims are found in the prior art reference, but instead argues that if Plaintiff's evidence is enough to show infringement, the same approach also shows invalidity: "With regard to the remaining structure . . . the Court should find that [Plaintiff and its expert] have failed to show infringement as a matter of law. . . . If, however, the Court believes that [Plaintiff's] approach to the infringement analysis of this 'means' limitation is correct, then that same approach must apply to any analysis of [the prior art]."  (Mot. 20-21.)  With that in mind, the Court treats the issues in the same order as Defendant, both for ease of reference and because considering the invalidity issues first does help to illuminate some of the noninfringement issues.

### 2.1     Legal Standard

Claims of issued United States patents are presumed valid.  35 U.S.C. § 282.  "A party seeking to establish that particular claims are invalid must overcome the presumption of validity in 35 U.S.C. § 282 by clear and convincing evidence."  *State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1067 (Fed. Cir. 2003).  "Although an

exact definition is elusive, 'clear and convincing evidence' has been described as evidence that 'place[s] in the ultimate factfinder an abiding conviction that the truth of its factual contentions are highly probable.'" *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 n.5 (Fed. Cir. 2007) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).

## 2.2    Application

### 2.2.1   The Asserted Claims

Plaintiff asserts infringement of claims 2 and 3 of the '426 Patent, both of which depend from claim 1.  All three are reproduced here:

**1.** A remote control comprising:

a microprocessor including a CPU and memory means;

a keyboard coupled to said microprocessor and including a set of keys including at least one MACRO key;

IR lamp driver circuitry coupled to said microprocessor;

light emitting means for generating and emitting IR signals coupled to said IR lamp driver circuitry;

code data stored in said memory means for creating the IR signals, which are sent by said light emitting means to a controlled device to cause the controlled device to perform specific command functions;

a macro entry/definition program in said memory means for enabling a user of said remote control to define a macro for selecting at least one favorite channel by entry of a series of keystroke commands on said keyboard; and,

a macro playback program in said memory means for enabling an operator of said remote control to effect rapid selection of at least one favorite channel upon subsequent depression of said at least one MACRO key.

**2.** The remote control of claim 1 wherein said macro entry/definition program includes means for establishing and recalling three selected channels upon depression of a predetermined series of keystrokes and the at least one MACRO key.

**3.** The remote control of claim 2 wherein said keyboard further includes specific keys designated to initiate macro definition and strokes of said specific keys define the predetermined series of keystrokes.

The parties have stipulated that in claim 2, the "means for establishing and recalling three selected channels upon depression of a predetermined series of keystrokes and the at least one MACRO key" are the "instructions shown in Figs. 4 & 5" of the '426 Patent.  (Jt. Claim Construction Chart 2, Dkt. No. 56.)

Figure 4, at right, "is a flow chart of the steps performed by a macro entry definition program stored in the remote control and entitled: ROTATING MACROS: entry and definition."  ('426 Patent 3:15-18.)



FIG. 4

Figure 5, at right, "is a flow chart of the steps performed by a macro playback program stored in the remote control and entitled: MACRO: playback."  ('426 Patent 3:19-21.)



FIG. 5

The parties have also agreed that a "MACRO key" is a "key which can be assigned a macro program for effecting a sequence of functions with one stroke of that key and/or rotating functions on successive depressions of that key."  (Jt. Claim Construction Chart 2, Dkt. No. 56.) The parties have agree that "a macro entry/definition program" is "a program that enables a user to create and define a macro."  (Jt. Claim Construction Chart 1, Dkt. No. 56.)

### 2.2.2   The Memorex Prior Art

Defendant argues that the asserted claims of the '426 Patent are invalid under 35 U.S.C. § 102 as anticipated or under  35 U.S.C. § 103 as obvious in light of a prior art remote control by Memorex and publications describing that remote ("Memorex").  (Mot. 15-17.)  The parties dispute whether Memorex assigns a macro program to a MACRO key "for establishing and recalling three selected channels upon depression of a predetermined series of keystrokes and the at least one MACRO key" using the processes described by Figures 4 and 5.  (Opp'n 14.)

Defendant argues that Memorex includes a macro, which Memorex calls a "favorite channel feature," that allows up to 32 favorite channels to be defined and then allows a user to sequence through those channels.  (Mot. 14 (citing Memorex product manual, Rowland Decl. Ex. 70 24-26).)  Defendant argues that for "macro entry," Memorex teaches "a step-by-step way of entering or defining favorite channels into the remote control's memory using two keys ('[LEARN]' and '[FAVORITE]') along with channel number keys," and "using specific keys to playback or retrieve the favorite channels."  (Mot. 18.)  Defendant argues that Plaintiff's expert, Burke, admitted that the Memorex Manual disclosed the components necessary for the Memorex remote to perform the favorite channel feature and macro entry.  (Mot. 18-19 (citing Jan. 30, 2014 Deposition of Shawn Burke ("Burke Dep.") 218:13-18, 222:22-223:7, Rowland Decl. Ex. 480).)  Essentially, Burke simply agreed that the Memorex Manual says what it says, and that he had no other understanding of what it meant.

Those "step-by-step way" and "using specific keys" are explained in the Memorex manual as follows:

**FAVORITE-CHANNEL SELECTION**

Your Turbo has a favorite-channel feature that allows you to specify up to 32 favorite-channels for each of the eight devices the Turbo can command.

1. Press [LEARN]. The LEARN indicator appears. SELECT and KEY alternately appear on the display.

2. Press [FAVORITE]. The FAVORITE indicator appears and CHN** appears on the display.

3. Enter your two-digit favorite-channel. Example: If you press 04, CHN 04 appears on the display.

4. Repeat Step 3 to continue adding your favorite channels, up to 32 channels.

Note: If the Turbo stops accepting favorite channels, press [STORE].

5. When you finish adding channels to the favorite-channel list, press [STORE].

Notes:
- The Turbo stores your favorite-channels in numerical order.
- To review the favorite-channel list, use SCROLL [▲] or [▼].
- You cannot add more than 32 channels to the favorite-channel list. If you already have 32 channels stored on your favorite-channel list, you must delete channels before adding new ones to the list. See "Editing Favorite-Channel Selection."

**EDITING FAVORITE-CHANNEL SELECTION**

To delete a channel from the favorite-channel list:

1. Press [LEARN]. The LEARN indicator appears. SELECT and KEY alternately appear on the display.

2. Press. [FAVORITE]. The FAVORITE indicator appears and the display shows the first channel on your favorite channel list.

3. Use the SCROLL [▲] or [▼] keys to locate the desired channel. Press NO [DELETE] to delete the channel. To add a channel to the list, enter the two digits for that channel. Press [STORE] after you delete or add a channel.

**USING FAVORITE-CHANNEL**

You can program a favorite-channel list for each device name on the Turbo. After you program your favorite-channel list into the Turbo, follow these steps to use the favorite-channel feature.

1. Press [FAVORITE]. The FAVORITE indicator appears.

2. When you press CHANNEL [▲] or [▼], the Turbo transmits the channels from your favorite-channel list, instead of the normal CHANNEL [▲] [▼] command codes.

3. Use the SELECT [◄] or [►] keys to change devices. The favorite-channel list becomes active for any device that you select.

4. Press [FAVORITE] or [CANCEL] to leave the favorite-channel mode without changing your entries.

Note: If you select a device that you have not programmed a favorite-channel list for, the FAVORITE indicator goes out. If you use SELECT [◄] or [►] to return to a device that you have programmed with a favorite-channel list, the FAVORITE indicator appears again.

(Rowland Decl. Ex. 70 24-25.)

Because the parties have agreed that the "means" for establishing three selected channels are the instructions in Figures 4 and 5, the question concerning anticipation is whether Memorex contains the instructions in those figures. A direct comparison is complicated by the fact that Figures 4 and 5 are written from the perspective of the remote control, while the Memorex instructions are written from the perspective of the human operator. Rewriting the patent figure from the perspective of the human operator obscures certain important details that will be discussed, but provides a helpful overview of the similarities and differences between the processes. We will start with Figure 5, assuming remote controls that have already been programmed with three favorite channels:

| '426 Patent Fig. 5 (Operator View) | Using Memorex Favorite Channel |
|---|---|
| 1. Press MACRO key: remote transmits the first channel from your stored list of three. [Remote increments playback rotation count, and if that results in rotation count being four, returns it to 1.] | 1. Press [FAVORITE]. The FAVORITE indicator appears. |
| 2. Press MACRO key: remote transmits the second channel from your stored list of three. [Remote increments playback rotation count, and if that results in rotation count being four, returns it to 1.] | 2. When you press CHANNEL [▲] or [▼], the Turbo transmits the channels from your favorite channel-list, instead of the normal CHANNEL [▲] [▼] command codes. |
| 3. Press MACRO key: remote transmits the third channel from your stored list of three. [Remote increments playback rotation count, and if that results in rotation count being four, returns it to 1.] [Repeat as many times as you like.] | 3. Use the SELECT [←] or [→] keys to change devices.  The favorite channel list becomes active for any device that you select. |
| 4. To perform other functions, just press another key on the remote. | 4. Press [FAVORITE] or [CANCEL] to leave the favorite-channel mode without changing your entries. |

Certain differences are apparent.  Returning to the remote control's perspective, in Figure 5, the remote responds to the press of the MACRO key by fetching the playback rotation count for that key (that is, whether it is the first, second, or third press of the key), retrieving the channel stored for whichever of the three rotation count positions has just been referenced, transmitting that channel, and updating the rotation count, returning it to 1 if it has reached 4. ('426 Patent, Fig. 5.)  By contrast, Memorex uses two (or optionally, three) different buttons to rotate through the favorite channels.  Pressing the [FAVORITE] button alone does not result in the transmission of a favorite channel.  Instead, the remote only does so after both [FAVORITE]

and [▲] or [▼] are pressed.  From the evidence presented, it is unknown whether Memorex updates the rotation count with each press.

   We now turn to a comparison of Figure 4 with programming Memorex:

| '426 Patent Fig. 4 (Operator View) | Memorex Favorite Channel Selection |
|---|---|
| 1. Press "I" Key, then "III" Key. | 1. Press [LEARN].  The LEARN indicator appears.  SELECT and KEY alternat[l]ey appear on the display. |
| 2. Press MACRO key. [Remote fetches rotation count for that key and prepares to record a channel to that rotation count position.] | 2. Press [FAVORITE]. The FAVORITE indicator appears and CHN** appears on the display. |
| 3. Enter channel. Once channel entry is completed, press "I" Key, then "III" Key, to store channel selected. [Remote stores channel in rotation count position, increases rotation count by 1, and if that results in rotation count being four, returns it to 1.] | 3. Enter your two-digit favorite-channel. Example: If you press 04, CHN 04 appears on the display. |
| 4. Repeat step 3 as many times as you want, but only the last three channels will be stored. [A specific channel macro can be deleted by selecting the macro, then pressing the "I" Key, the "0" Key, followed by the "III" Key.] | 4. Repeat Step 3 to continue adding your favorite channels, up to 32 channels.  Note: if the Turbo stops accepting favorite channels, press [STORE]. |
| | 5. When you finish adding channels to the favorite channel list, press [STORE]. [Channels can be deleted by using the delete button.] |

   The parties dispute the significance of these differences, and whether it means that Memorex has a "MACRO key" as jointly defined by the parties: "A key which can be assigned a

1  macro program for effecting a sequence of functions with one stroke of that key and/or rotating

2  functions on successive depressions of that key."  (Jt. Claim Construction Chart 1, Dkt. No. 56.)

3      Defendant correctly argues that the Darbee '810 Patent, incorporated by reference into the

4  '426 Patent, teaches that channel-up and channel-down keys can be macro keys.  (Mot. 20,

5  Rowland Decl. Ex. 69 at 16:42-59, 17:28-32.)  Plaintiff responds that Figure 4, in conjunction

6  with the parties' definition, requires "a single key that is assigned a macro program for

7  establishing and recalling three selected channels."  (Opp'n 15-16.)  Further, according to

8  Plaintiff, Defendant has failed to show that the Memorex reference discloses this feature.

9  (Opp'n 16.)  Defendant replies, correctly, that Plaintiff conflates a number of elements in the

10 claims and attempts to consolidate into the MACRO key a number of elements that appear

11 elsewhere in the claims.  (Reply 8.)  Under the Court's construction, the MACRO key itself does

12 not need to include all the limitations to which Defendant objects.

13     Plaintiff parses the claim terms, agreed definitions, and figures in an attempt to make the

14 elements of the claims found in general terms in Memorex very specific, while generalizing the

15 specific aspects of the claims not found in the accused devices.  Plaintiff recasts fetching storage

16 rotation counts, recording to rotation counts, and incrementing storage rotation counts as

17 "associating a particular memory location with a channel for each stroke of the MACRO key."

18 (Opp'n 16.)  This both generalizes the particular memory operation claimed into the more

19 general "associating a particular memory location," and restricts the claim to one covering only a

20 single key depressed multiple times for cycling through favorite channels.  While the claim

21 certainly covers such a key, a close examination of the claim language and Figures 4 and 5 of the

22 '426 Patent show that a two-button favorite channel macro key arrangement is not excluded.

23     Plaintiff argues that its expert, Burke, opined that Memorex's channel up/down buttons

24 perform the same function in favorite channel mode as in normal operation, and that the remote

25 just transmits codes from a smaller list.  (Opp'n 16-17, Burke Decl., Ex. B., Expert Report 31.)

26 But Defendant points out that at his deposition, Burke was confronted with the Memorex

27 manual, which Burke understood to say that in favorite channel mode, Memorex "transmits

28 channels from your favorite channel list instead of the normal channel up or down command

1    codes." (Mot. 19, Jan. 30, 2014 Burke Dep. 228:20-229:6, Rowland Decl. Ex. 48.)  Plaintiff

2    objects that the cited testimony is just Burke reading the reference.  (Opp'n 17.)  But Burke

3    specifically stated in his answer to the cited question that "[w]hat I understand from the

4    reference is what's stated in the reference."  (Jan. 30, 2014 Burke Dep. 229:1-2, Rowland Decl.

5    Ex. 48.)  Plaintiff cannot now argue that the reference means something other than what it says.

6        That aside, one clear difference between Memorex and the asserted claims is that because

7    Memorex can store up to 32 channels, it does not return the rotation count to 1 when it reaches 4

8    any time the remote is programmed with 4 or more channels.  But it is unclear whether Memorex

9    uses a rotation counter in the same way as depicted in Figure 5, such that it would satisfy Figure

10   4 when programmed with only three favorite channels.  Another difference is that Memorex does

11   not overwrite channels if more than the total (32) are stored.  Instead, a separate delete function

12   must be used.  Also unpersuasive is Defendant's argument that a "storage rotation count" is not

13   part of the asserted claims because it is separately claimed in dependent claim 7.  (Reply 8.)

14   That argument ignores the presence of the storage rotation count in Figure 4, and the parties

15   have agreed that Figure 4 is the means corresponding to the function in claim 2.

16       Further, repeating the point that appears at the beginning of this section, Defendant does

17   not actually attempt to specifically demonstrate that all of the elements of Figures 4 and 5 of the

18   '426 Patent are found in Memorex.  (Mot. 20-21.)  Instead, it argues that the Court should find

19   noninfringement as to these elements, but that if the loose functional approach Plaintiff uses for

20   infringement is correct, then Memorex would invalidate the patent.  (Mot. 20-21.)  Defendant is

21   correct that "a patent may not, like a 'nose of wax,' be twisted one way to avoid anticipation and

22   another to find infringement."  *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343,

23   1351 (Fed. Cir. 2001).  But Defendant has not demonstrated its entitlement to summary

24   judgment of invalidity.

25

26       **2.3    Conclusion**

27

28       As to issue 2, invalidity of the '426 Patent, the Motion is DENIED.

**3.      NON-INFRINGEMENT OF THE '426 PATENT**

### 3.1      Legal Standard

Determining patent infringement is a two step process.  *Cybor Corp. v. FAS Techs, Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998).  "First, the court determines the scope and meaning of the patent claims asserted and then the properly construed claims are compared to the allegedly infringing device."  *Id.* (citations omitted).  Because the ultimate burden of proving infringement rests with the patentee, an accused infringer may establish that summary judgment is proper "either by providing evidence that would preclude a finding of infringement, or by showing that the evidence on file fails to establish a material issue of fact essential to the patentee's case."  *Novartis Corp. v. Ben Venue Labs., Inc.,* 271 F.3d 1043, 1046 (Fed. Cir. 2001).  If the moving party meets this initial burden, the burden shifts to the party asserting infringement to set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248.  "[A] party does not meet this evidentiary threshold merely by submitting the affidavit of an expert who opines that the accused device meets the claim limitations."  *Novartis*, 271 F.3d at 1051.

"Whether an accused device or method infringes a claim either literally or under the doctrine of equivalents is a question of fact."  *Schoell v. Regal Marine Indus., Inc.*, 247 F.3d 1202, 1207 (Fed. Cir. 2001) (citing *Tanabe Seiyaku Co. v. U.S. Int'l Trade Comm'n*, 109 F.3d 726, 731 (Fed. Cir. 1997)).  A patentee claiming infringement must present proof that the alleged infringing device meets "each and every claim limitation."  *Forest Labs., Inc. v. Abbott Labs.*, 239 F.3d 1305, 1310 (Fed. Cir. 2001); *see Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1370 (Fed. Cir. 2000) affirming district court's grant of summary judgment of no literal infringement in the absence of even one claim limitation).

### 3.2     Application

Defendant argues that Figures 4 and 5 of the '426 Patent include, and through their incorporation into claims 2 and 3, require, very specific algorithms that use "rotation counters." (Mot. 22.)  Specifically, Defendant notes that in Figure 4, the "storage rotation count" is incremented each time a favorite channel is programmed, and when the storage rotation count reaches 4, it is reset to 1, meaning that "[i]f one attempts to establish a fourth macro for a fourth selected channel, the first macro for the first selected channel will be erased and overwritten." (Mot. 22 (quoting '426 Patent 5:12-14).)  Likewise, Defendant notes that in Figure 5, a "playback rotation count' is incremented with each key press, and it also resets to 1 every time it reaches 4, such that "[i]f only one selected macro is created, the second and third keystrokes of a MACRO key will cause nothing to happen and the fourth keystroke will repeat the selection of the first selected macro to select the single selected channel."  (Mot. 23 (quoting '426 Patent 5:15-19).)  Defendant has made an unrebutted showing that in its "R6" remote control, one of the accused products, each button can program up to 5 favorite channels, but when only three are programmed, the remote does not "cause nothing to happen" on the fourth and fifth keystrokes. (Mot. 25 (citing R6 Owner's Manual 18, Rowland Decl. Ex. 42).)  Instead, the "sequence starts all over again."  (R6 Owner's Manual 18, Rowland Decl. Ex. 42.)

Defendant also argues that if you program the R6 with three favorite channels, and then later try to program a fourth favorite channel, instead of overwriting only the first favorite channel as in Figure 4, the first three favorite channels will be deleted, leaving only the single favorite channel.  (Mot. 25.)  But Defendant provides no evidentiary citation for this argument, and its foundation is not apparent in the material cited in the same paragraph.  And when repeating this point in reply, Defendant merely cites back to the Motion at 25:21-24, again without pointing to any evidentiary support.  (Reply 11.)  The Court therefore does not consider the argument.

Plaintiff does not dispute the facts, but contests Defendant's understanding of the claims, arguing that the '426 Patent's statement that "[i]f one attempts to establish a fourth macro for a

fourth selected channel, the first macro for the first selected channel will be erased and overwritten" is just a "preferred embodiment." (Opp'n 23.) Of course, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

But that is not what Defendant here urges. The parties have **agreed** that claim 2 incorporates the structure of Figures 4 and 5. Defendant's quotations from the specification are merely describing what appears in those figures, not the details of some optional features found in a preferred embodiment. While it is helpful that the specification spells out in English the consequences of the flow charts, the logic of Figures 4 and 5 themselves results in the conclusions that "[i]f one attempts to establish a fourth macro for a fourth selected channel, the first macro for the first selected channel will be erased and overwritten" ('426 Patent 5:12-14), and that "[i]f only one selected macro is created, the second and third keystrokes of a MACRO key will cause nothing to happen and the fourth keystroke will repeat the selection of the first selected macro to select the single selected channel." ('426 Patent 5:15-19.) Thus, Defendant's arguments pointing out that its remotes function differently are not a "straw man" based on "irrelevant additional features," as Plaintiff argues. (Opp'n 24.) Instead, in showing that the accused products' playback function differs from Figure 5, they show unrebutted evidence of noninfringement.

### 3.3     Conclusion

As to issue 3, non-infringement of the '426 Patent, the Motion is GRANTED.

1   **4.   NON-INFRINGEMENT OF THE '906 PATENT**

2

3     **4.1    Overview of the '906 Patent**

4

5      The '906 Patent is titled "Method for Selecting a Remote Control Command Set." In the

6 method, a group of multiple command sets are stored in a remote control. ('906 Patent 1:7-8.)

7 The purpose of having multiple command sets stored in the remote control is for one remote to

8 be able to control various devices. ('906 Patent 1:9-10.) The prior art contained various

9 methods of selecting the correct command set to control a given device. In one system, the

10 remote automatically cycled through the entire list of command sets, transmitting a test

11 command from each until the user interrupts the cycle. ('906 Patent 1:29-40.) A second

12 method, similar to the first, was to have the user cycle through each command set. ('906 Patent

13 1:44-54.) A third method was a "direct entry–quick set" procedure, where the user looked up the

14 make and model of the device from a printed list, and then inputted the code to select the

15 appropriate command set. ('906 Patent 1:55-61.) Other methods also existed. ('906 Patent

16 1:62-2:32.)

17      In the '906 Patent's method, multiple "effects observable commands"—for example, a

18 "power off" command—from a group of command sets are assigned to multiple buttons on the

19 remote control. ('906 Patent 2:35-43.) The user then presses the buttons one at a time until the

20 device responds as desired, which shows that the remote has transmitted a command from the

21 correct command set. ('906 Patent 2:44-49.) The user then stops the procedure, thus

22 programming the remote to the correct command set. ('906 Patent 2:49-53.)

23      Plaintiff asserts infringement of claims 1, 10 and 12 of the '906 Patent, reproduced here:

24

25     **1.** A method for selecting an appropriate one of a plurality of command sets stored

26          in a remote control having a plurality of assignable user actuated switches

27          or keys for controlling a remotely controllable electronic device, comprising

28          the steps of:

(a) assigning an effects observable command from each of said plurality of command sets to one of said plurality of assignable user actuated switches or keys, each assigned, effects observable command to be transmitted when the corresponding one of the assignable user actuated switches or keys is actuated;

(b) actuating sequentially and individually each one of the plurality of assignable user actuated switches or keys, to individually transmit each assigned effects observable command until the proper effect is observed;

(c) halting the actuating of the plurality of assignable user actuated switches or keys; and

(d) setting the remote control to transmit future remote control commands from the command set containing the last transmitted effects observable command.

**10.** The method of claim 1, wherein said effects observable command is a power off command.

**12.** The method of claim 1, wherein said remote control further includes a plurality of user actuated mode keys for selecting one of a plurality of modes and said method further includes the step of selecting one of the plurality of modes prior to the step of assigning an effects observable command, such that, the method for selecting an appropriate one of a plurality of command sets can be performed to separately set a different command set for each mode.

### 4.2    Analysis

Defendant argues that in its accused products, the keys are not pressed "sequentially and individually," because they require pressing keys simultaneously.  (Mot. 27.)  Defendant argues that the user manual for its R6 remote control instructs the user to:

> Point the AVEX R6 toward the component that you want to program (in this case the TV set) and press and hold the component button (in this case the TV button).  **While holding down the component button**, begin to press numeric keys, one number at a time, starting from 1, continuing to 2, 3 . . . ) until component (in this case the TV) turns off.

(R6 Owner's Manual, Rowland Decl. Ex. 42 7 (emphasis in original).)  Defendant argues that because the user presses the numeric keys while holding down the component button, the keys are not being pressed "individually."  (Mot. 27.)  Defendant points out that Plaintiff's expert distinguished a prior art remote by arguing that "the Power button and numeric keys are actuated together in order to select and load a command set; buttons are not actuated sequentially and individually," and so argues that Plaintiff's expert believes that "sequentially and individually" excludes holding down one button while pushing another.  (Mot. 27 (quoting Burke Decl. Ex. B 95).)

Plaintiff responds that holding the component button is simply an additional step, and that the asserted claims, written in "comprising" transitional language, allow for additional steps. (Opp'n 26 (citing *Solvay S.A. v. Honeywell Int'l, Inc.*, 742 F.3d 998, 1005 (Fed. Cir. 2014).) Plaintiff further points out that the "keys" that need to be actuated "sequentially and individually" are the "assignable user activated" keys, and that the "component" button is not such a key.  (Opp'n 26.)  Plaintiff argues that Defendant's expert admitted that he was unaware of any evidence that the component button on the accused remotes can send an effects observable command, but unfortunately, the deposition page Plaintiff cites in support was missing from the exhibit.  (Opp'n 26-27 (citing Feb. 6, 2014 Deposition of Stephen Bristow ("Bristow Dep.") 379:12-20, Haan Decl. Ex. 22).)  In any event, Plaintiff argues that the legally

1  relevant keys in the accused remotes are in fact being pressed "sequentially and individually."

2  (Opp'n 26.)

3       Plaintiff also argues that Defendant mischaracterized its expert's testimony, and that

4  rather than relying on "sequentially and individually" to distinguish the prior art, he

5  distinguished it because it described a single key—the power button—having an effects

6  observable command.  (Opp'n 27.)  Plaintiff's expert did distinguish that prior art on the grounds

7  that the "[p]ower button and numeric keys are actuated together in order to select and load a

8  command set; buttons are not actuated sequentially and individually."  (Burke Decl. Ex. B 95.)

9  But Plaintiff's expert also argued that the prior art failed to meet the "actuating sequentially and

10  individually each one of the plurality of assignable user actuated switches or keys" limitation

11  both because "the numeric keys are not assigned" and because "the (non-assigned) numeric keys

12  are not actuated individually."  (Burke Decl. Ex. B 95.)  The latter seems to be the argument that

13  Plaintiff now denies its expert made.  Further, the prior art remote control manual that Plaintiff's

14  expert was distinguishing is ambiguous as to whether the power key needs to be pressed

15  separately to test the function after the power and numeric keys are pressed together to select a

16  code set.  (Burke Decl. Ex. B 94 (compare steps 2 and 5 with steps 3 and 4).)

17       No matter.  Defendant has not demonstrated that the component button in the accused

18  products is an "**assignable** user actuated" key.  Therefore, the fact that it is pressed

19  simultaneously with assignable user actuated keys does not show that the assignable user

20  actuated keys are not pressed individually.  Defendant has therefore not demonstrated the

21  absence of a genuine issue of material fact on this issue.

22       In a footnote, Defendant asks the Court to invalidate the asserted claims of the '906

23  Patent if Plaintiff's expert analysis were to be adopted by the Court.  (Mot. 28, n.8.)  Plaintiff did

24  not cross-move for summary judgment of infringement of the '906 Patent, so the Court is not

25  "adopting" Plaintiff's infringement analysis.  In any event, Defendant will need to present its

26  invalidity argument to the jury.

27

28

### 4.3    Conclusion

As to issue 4, non-infringement of the '906 Patent, the Motion is DENIED.

## 5.    NON-INFRINGEMENT OF THE '067 PATENT

### 5.1    Overview of the '067 Patent

The '067 Patent is titled "Universal Remote Control with Macro Command Capabilities." The specification teaches two principal ways to match equipment to the remote control: the "step-and-set" method illustrated in Figure 16, and the "direct-entry/quick set" procedure illustrated in Figure 17.  (Claim Construction Order 30, Dkt. No. 60.)  The asserted claims concern the "direct-entry/quick set" procedure.  "Quick-Matching is a way to set the device directly to match any controlled equipment in its library."  ('067 Patent 18:34-37.)  The specification provides two ways to obtain that code.  First, the user can look up the make and model of the device in a booklet that lists the codes.  ('067 Patent Fig. 17, 10:48-50.)  If the device is not listed in the booklet, the user can first match the device using the step-and-set method, and then have the remote provide the code once set through trial and error.  ('067 Patent Fig. 17, 19A, 19B, 18:33-44.)

Plaintiff asserts infringement of claims 1, 2, 3, and 6 of the '067 Patent.  All four claims include the phrase "to directly identify each of the plurality of different home appliances of different manufacturers to which the universal remote control is to be matched."

### 5.2    Analysis

Defendant argues that it does not infringe because the parties agreed that the phrase "plurality of different home appliances of different manufacturers" means "a plurality of home appliances of different make and model," and that its product codes do not directly identify the

home appliance to be matched by make and model.  (Mot. 29.)  Defendant provides an image of some of the codes from the accused "FX-1" remote's manual, which Defendant has annotated to show that a manufacturer can have multiple codes, and that a given code can be associated with multiple manufacturers:



(Mot. 30, FX-1 Owner's Manual, Rowland Decl. Ex. 41.)

Defendant's argument fails.  First, the Court specifically construed "to directly identify each of the plurality of different home appliances of different manufacturers to which the universal remote to control is to be matched" to mean "directly identify each particular home appliance to which the universal remote control is to be matched."  (Claim Construction Order 34, Dkt. No. 60.)  While the parties stipulated to the meaning of "plurality of different home appliances" in another part of the claim, it is the Court's construction of the actual term at issue that controls.

True, Defendant could make the same argument based on the words in the Court's construction—that if the same code is used for multiple manufacturers' devices, the code is not directly identifying "each particular home appliance."  But Defendant's argument actually goes beyond both the Court's construction and the parties' stipulated construction.  Defendant essentially offers a new and more restrictive claim construction: that the code not only directly,

37

but also **uniquely**, identifies the appliance.  The claims as written and as construed contain no such requirement, and if Defendant thought that unique identification was required, it should have clearly advanced that argument during the claim construction proceedings.

Defendant's own evidence, showing that the remote control is matched to different manufacturers' appliances through the use of a code, demonstrates at least a genuine issue of fact concerning whether the accused remotes directly identify each particular home appliance to which it is to be matched.  The fact that the same code may apply to more than one manufacturer's equipment would only show noninfringement if the claims required the use of a code that uniquely identified the product.  But that is not what the claim requires.

### 5.3     Conclusion

As to issue 5, non-infringement of the '067 Patent, the Motion is DENIED.

## 6.     ENTIRE MARKET VALUE RULE & APPORTIONMENT

Defendant seeks partial summary judgment that:

(1) the "entire market value rule" exception is inapplicable in this case because there is no evidence that the patented features—which under the most charitable view represent only minor, incremental improvements—form the basis for consumer demand for the entire accused remote control devices; and accordingly

(2) UEI is required under the law to apportion between the unpatented and allegedly patented features for purposes of calculating its alleged damages, both for purposes of lost profits and under a reasonable royalty analysis.

(Mot. 31.)  Ultimately, the relief Defendant seeks would require the Court to resolve a number of disputed facts, and to exclude as a matter of law methods of analysis more appropriately attacked by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."  *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 596 (1993).

But, mindful of Defendant's hope that [c]larity on this issue will appropriately regulate the parties' expectations and enhance opportunities for resolution before trial" (Mot. 31), the Court provides its views on some of the issues debated between the parties, without prejudging issues that may arise during the presentation of evidence and motions for judgment as a matter of law.

### 6.1    Legal Standard and Analysis

A prevailing patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."  35 U.S.C. § 284.  Defendant starts its argument with *Garretson v. Clark*, an 1884 Supreme Court case admirable for its brevity—450 words—and style.  Quoting Circuit (and soon to be Supreme Court) Judge Blatchford, *Garretson* held that

> 'The patentee,' . . . 'must in every case give evidence tending to separate or
> apportion the defendant's profits and the patentee's damages between the patented
> feature and the unpatented features, and such evidence must be reliable and
> tangible, and not conjectural or speculative; or he must show, by equally reliable
> and satisfactory evidence, that the profits and damages are to be calculated on the
> whole machine, for the reason that the entire value of the whole machine, as a
> marketable article, is properly and legally attributable to the patented feature.'

111 U.S. 120, 121 (1884) (quoting *Garretson v. Clark*, 15 Blatchf. 70, C.C.N.D.N.Y. 1878) (Blatchford also served as a reporter of decisions.  *See* "Justice Blatchford Dead," New York Times, July 8, 1893)).  *Garretson* was decided under the Patent Act of 1870, which entitled the patentee to the profits of the defendant, as well as damages caused by the infringement.  *Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1440 (Fed. Cir. 1998) (citing Patent Act of 1870, 16 Stat. 201 § 55).  While apportionment had a particular significance under the 1870 Act due to the patentee's ability to recover the infringer's profits, the existence of which is firmer than the

1  hypothetical lost profits of the patentee, Defendant is correct that *Garretson* required

2  apportionment of both defendant's profits and "the patentee's damages."

3        While apportionment in the reasonable royalty context has been the topic of much recent

4  discussion, *see, e.g., LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir.

5  2012), *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011), its application to

6  the lost profits theory of recovery is less familiar.  Defendant cites to *Ferguson*

7  *Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega systems, LLC*, 350 F.3d 1327, 1346

8  (Fed. Cir. 2003) as establishing that the apportionment requirement applies with equal force in

9  the lost profits context.

10       In *Ferguson*, the plaintiff claimed that the infringement cost it sales of two different

11  devices.  *Id*. at 1345-46.  The first embodied two patents ('376 and '991), while the second only

12  embodied one of the two ('376).  *Id*.  The patentee only proved that the defendant infringed one

13  of the patents, but obtained an award of lost profits for both of its devices.  *Id*. at 1346.  Because

14  "the district court based its lost profits award on evidence of sales of a device embodying

15  features in addition to those present in the infringed '376 patent, namely, those features

16  attributable to the '991 patent," the Federal Circuit held that "[t]he district court therefore failed

17  to distinguish the allocation of profits that would have been made 'but for' the infringement of

18  the '376 patent with the profits that could fairly be allocated to customer demand related to the

19  features embodying the '991 patent."  *Id*.

20       *Ferguson* supports Defendant's argument to some extent.  But it does not specifically

21  discuss the entire market value rule, and a powerful counterpoint is found in the frequently-cited

22  case of *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1544 (Fed. Cir. 1995) (en banc).  *Rite-Hite*

23  contains an extensive historical analysis of "but for" lost profits damages under the current

24  statutory regime, noting that the Supreme Court framed the analysis as asking "had the Infringer

25  not infringed, what would the Patentee Holder-Licensee have made?"  *Id*. at 1580 (quoting *Aro*

26  *Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964)).  *Rite-Hite* treats this

27  as a simple but-for test, albeit limited by principles of proximity and foreseeability: for example,

28

40

1   an inventor's heart attack is too remote.  *Id*. at 1545-46.  Summing up its examination of the law,

2   *Rite-Hite* held that

3       under § 284 of the patent statute, the balance between full compensation, which is

4       the meaning that the Supreme Court has attributed to the statute, and the

5       reasonable limits of liability encompassed by general principles of law can best be

6       viewed in terms of reasonable, objective foreseeability. If a particular injury was or

7       should have been reasonably foreseeable by an infringing competitor in the

8       relevant market, broadly defined, that injury is generally compensable absent a

9       persuasive reason to the contrary.

10  *Id*. at 1546.

11      *Rite-Hite* then applied these principles to two categories of products that had been

12  included in the damages calculation.  First, it addressed the plaintiff's lost sales of a product that

13  did not itself embody the patent, but which directly competed with the infringing product.  *Id*.  It

14  held that because such lost sales are "surely foreseeable," they "constitute the full compensation

15  set forth by Congress, as interpreted by the Supreme Court, while staying well within the

16  traditional meaning of proximate cause," and are therefore "clearly" compensable.  *Id*.  The

17  second *Panduit* lost profits factor is absence of acceptable non-infringing substitutes.  *Panduit*

18  *Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978).  In *Rite-Hite*, the

19  patentee's own unpatented product was substitutable with the infringing product, raising the

20  possibility that the chain of causation for lost profits had been broken.  But *Rite-Hite* held that

21  the *Panduit* factors are not the exclusive way of proving but-for causation, and that in any event,

22  a patentee's **own** non-infringing products do not count under *Panduit* Factor 2.  56 F.3d at 1548.

23      Second, *Rite-Hite* addressed the plaintiff's lost sales of dock levelers that it would have

24  sold with the patented and unpatented restraints.  *Id*. at 1549.  The district court had included

25  those follow-along sales under the entire market value rule.  *Id*.  The court explained that the

26  "entire market value rule has typically been applied to include in the compensation base

27  unpatented components of a device when the unpatented and patented components are physically

28  part of the same machine," or together constituted a functional unit.  *Id*. at 1549-1550.  *Rite-Hite*

1  concluded that the entire market value rule did not apply because the products did not function

2  together to achieve one result and could have been used independently.  *Id*. at 1551.

3         Despite the increased scrutiny courts have recently applied to patent damages awards,

4  *Rite-Hite* is still good law.  *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1263-64

5  (Fed. Cir. 2013) *cert. denied*, 134 S. Ct. 1013 (2014).  To be sure, there is a distinction between

6  the mechanical devices at issue in *Rite-Hite* and "electronic devices, which may include dozens

7  of distinct components, many of which may be separately patented, the patents often being

8  owned by different entities" and that "to assess how much value each patented and non-patented

9  component individually contributes to the overall end product—*e.g.*, a personal computer—can

10  be an exceedingly difficult and error-prone task."  *LaserDynamics, Inc. v. Quanta Computer,*

11  *Inc.*, 694 F.3d 51, 66 (Fed. Cir. 2012).

12         A fair corollary to *LaserDynamics* is that trying to prove but-for lost profits in a case

13  involving devices that may include dozens of distinct and possibly separately patented products

14  can also be "an exceedingly difficult" task, fraught with the risk of total failure.  And a failure to

15  apportion between asserted patents bears its own risks in those circumstances.  Defendant

16  certainly argues that, given the relative importance of the many components and features of the

17  accused products, Plaintiff will fail.  (Mot. at 34-36.)  Plaintiff responds that the bid

18  requirements of the major customers for whose business the parties compete, and Defendant's

19  marketing during that competition, show that the infringement was the but-for cause of the lost

20  sales.  (Opp'n 35-37.)

21         While Defendant argues based on *Garretson* that Plaintiff must show apportionment

22  because the patents at issue are "improvement" patents (Reply 14), Plaintiff's but-for theory

23  here, if borne out by the facts, would explain why apportionment is not necessary in these

24  particular market conditions.  While *Ferguson* could be read to support Defendant's argument, it

25  did not discuss the entire market value rule, nor involve the market conditions asserted to be

26  present here.  Ultimately, *Ferguson* may best be understood here as reinforcing the idea that

27  Defendant may attack Plaintiff's but-for causation proof by demonstrating that factors other than

28  the asserted patents were the but-for cause of the lost sales.

There is no real dispute in this case that a remote control is the smallest patent-practicing unit, and Plaintiff submitted evidence that licenses and sales in the industry use a remote control as the unit of sale.  (Opp'n 29-33.)  Defendant's argument that Plaintiff inappropriately applies the entire market value is therefore not a search for a smaller physical unit or a request to exclude a follow-on sale, but a demand that Plaintiff show how much of its profit results from the patented features.  Plaintiff has elected not to make that general showing, but instead seeks to convince the jury that in this particular commercial context, it would have made the sale but for the infringement.  While the jury might not agree, Plaintiff has provided enough evidence in support of that theory to avoid summary judgment.

### 6.2   Conclusion

As to issue 6, application of the entire market value rule, the Motion is DENIED.

## 7.   PATENT MARKING

### 7.1   Legal Standard

Patentees who make or sell products in the United States may notify the public that the product is patented by marking the product with the patent number.  35 U.S.C. § 287.  If a patentee does not do so, the damages period does not start running until the patentee notifies the infringer of the infringement.  *Id*.  Compliance with the marking requirement is a question of fact, on which the patentee bears the burden of proof.  *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996).  The patentee must show that "substantially all of [the patented product] being distributed were marked, and that once marking was begun, the marking was substantially consistent and continuous."  *Nike*, 138 F.3d at 1446.

### 7.2     Analysis

Defendant argues that because Plaintiff failed to properly mark substantially all of its products, no damages are available for the period before Plaintiff provided notice of the alleged infringement.  (Mot. 37-38.)  Defendant argues that the four categories of documents Plaintiff produced to show compliance with the marking statute are insufficient.  (Mot. 39.)  Those documents are (1) product specifications, (2) documented corporate policies and procedures, (3) QA Product Approval Submission Checklists and QA Specification Review Checklists, and (4) Product Design Verification Documents, which show the results of quality assurance inspections.  (Mot. 39.)  Defendant argues that "evidence of current company policy and practice, without any other evidence of compliance with the marking requirement during the relevant time period, is insufficient to overcome a motion for summary judgment."  (Mot. 39-40 (quoting *Von Holdt v. A-1 Tool Corp.*, 714 F. Supp. 2d 863, 871 (N.D. Ill. 2010)).)  Plaintiff responds that *Von Holdt* itself acknowledges that specific evidence of products actually marked or affidavits are sufficient evidence to survive summary judgment, and that such evidence is present here.  (Opp'n 41.)

Plaintiff argues that Defendant's 30(b)(6) witness on marking, Hayes, who had been Plaintiff's former Vice-President of Intellectual Property, and who had Plaintiff's four types of company documents, testified that he could not say whether any of the remotes that practiced the patents-in-suit were appropriately marked, because one would need to undertake a multi-step examination of the documents and the remote controls themselves, and Hayes had not done that analysis.  (Mot. 40 (citing Oct. 31, 2013 Hayes Dep., Rowland Decl., Ex. 80), Reply 19.)  Hayes testified that to be able to tell whether any of Plaintiff's products were marked, he would need to either see the product itself or refer to "the quality assurance records and the product specifications, the manufacturing documents that would show whether the markings were placed in the tool or placed on the sticker or placed on the label or silkscreened onto the product."  (Hayes Dep. 642:5-24.)  Hayes was presented with certain of Plaintiff's remote controls that he would expect to include the features claimed by the '426 and '067 Patents, but were not marked

1  with those patent numbers.  (Hayes Dep. 662:5-663:28.)  Hayes testified that it was impossible

2  to see the patent numbers in a number of photographs and schematics that Plaintiff had

3  produced.  (Hayes Dep. 674:23-675:17, 681:13-683:3.)  That lead to the following exchange:

4  > MR. BROOKEY [Defendant's counsel]: And I'd ask your counsel if it's possible

5  > to get an actual legible version of this that has evidence of marking. It is very hard

6  > to make out, even with the magnifying glass, all right? Can we get one? Chris,

7  > Laura?

8  > MR. LANEY [Plaintiff's counsel]: I'll take it under advisement.

9  > MR. BROOKEY: It's your evidence. If you don't want anyone to be able to read

10  > your evidence, then don't produce it.

11  (Hayes Dep. 683:13-25.)  Defendant's counsel's remarks accurately captured the fact that

12  Plaintiff bears the burden on this issue, and had by that point in the deposition not satisfied it.

13  Hayes then testified that the simplest way to see whether a remote was marked would be

14  to look at the remote, but that Plaintiff does not "maintain a library of sample units ex-

15  production," so [t]here is no point that you can go to to get samples of these [remotes on lists

16  showing which products practiced which patents].  Most of these probably do not exist

17  anymore."  (Hayes Dep. 736:5-25.)  Given the absence of a library of samples for inspection and

18  no way to look at photographs that match up to the lists, Hayes reaffirmed that marking could be

19  demonstrated by looking at all the product development documents, but had "no idea" how long

20  that would take, and had not undertaken it for any of Plaintiff's products that Plaintiff asserts

21  practice the patents-in-suit.  (Hayes Dep. 739:21-740:21.)

22

23  ### 7.2.1   '426 Patent Marking

24

25  It appears that while the Plaintiff's Atlas family of remotes constituted over 90% of the

26  remotes covered by the '426 Patent in the relevant period, Plaintiff did not mark them with the

27  '426 Patent.  (Mot. 41 (citing Atlas photos, Rowland Decl. Exs. 54 and 58, Atlas specifications

28  and design verification documents, Rowland Decl. Ex. 57).)  Plaintiff's first line of response to

1  this evidence, that certain of its products' technical specifications list the '426 Patent, is not

2  directly responsive.  (Opp'n 41.)  That evidence does not show that those products were actually

3  marked, and Plaintiff does not show the percentage of '426 Patent-covered products that those

4  specifications cover.  Plaintiff argues, without citation to any evidence, that "less than ½ of 1%

5  of UEI's quality assurance inspections detected patent marking issues with respect to the

6  patents-in-suit."  (Opp'n 41.)  But Plaintiff does not show that the inspections were accurate or

7  that they were even looking for the '426 Patent number on substantially all of the product lines,

8  let alone products, covered by the '426 Patent.  Plaintiff also focuses on the fact that a particular

9  "Crystalis NV-10 remote" was marked (Opp'n 41), again without showing what percentage of

10  '426-covered sales were accounted for by that remote.

    Plaintiff shows that the technical specifications for two Super Atlas remotes require
11
12  marking, and that the Product Design Verification document for the Super Atlas remote

13  identifies no patent marking quality problems.  (Opp'n 42.)  But a review of the Product Design

14  Verification document shows that it is simply not probative as to patent marking.  It appears to

15  have been completed by two electrical engineers and provides the following "Test Results":

16  "Results of Evaluation: • Pass[.]  Quality Issues?: None." (Haan Decl. Ex. 46.)  The "Test

17  Comments" are: "[t]he non-compliant issues noted by the factory are acceptable."  (Haan Decl.

18  Ex. 46.)  There is no indication whatsoever that the test included checking that the correct patent

19  markings were present, or whether incorrect marking would have been an "acceptable" non-

20  compliance.

    The most direct approach Plaintiff makes to demonstrating that substantially all of the
21
22  '426-covered remotes were appropriately marked was to attack Defendant's identification of the

23  Atlas remotes as products that were in fact covered by the '426 Patent.  Plaintiff argues that none

24  of the 6 model numbers in the Atlas remote photographs submitted by Defendant in support of

25  the Motion appear on Plaintiff's covered product sales summaries.  (Opp'n 42, Haan Decl. Ex.

26  47 ¶ 6-7.)  But Defendant responds that at his deposition, Hayes identified the 1055 and 1056

27  prefixes, which do appear on Plaintiff's covered product sales summarires as identifying the

28  Atlas remotes.  (Reply 19, Rowland Decl. Ex. 130 at 664:4-668:15.)

1      Plaintiff misapprehends its burden here.  "On an issue for which the moving party does

2  not have the burden of proof at trial, the moving party may meet its initial burden on the motion

3  either by providing evidence that negates an essential element of the opposing party's case, or by

4  showing that the evidence on file (such as pleadings, depositions, and admissions) establishes no

5  material issue of fact and that the opposer will not be able to prove an essential element of its

6  case."  *Vivid Techs, Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 807 (Fed. Cir. 1999).  While

7  the non-moving party's evidence is to be believed, Defendant here only needed to show that not

8  "substantially all" of Plaintiff's '426-covered products were marked to shift the burden to

9  Plaintiff to show otherwise.  Defendant went further, and showed that around 90% of the '426-

10  covered products were not marked.  Instead of coming forth with rebuttal evidence showing that

11  substantially all of its '426-covered products were marked, Plaintiff tried to poke holes around

12  the edges of Defendant's evidence, and succeeded only in showing that some '426-covered

13  products were marked.  That is insufficient to raise a genuine issue of material fact concerning

14  whether substantially all of the covered products were marked.

15

16           *7.2.2   '067 Patent Marking*

17

18      Defendant argues that Plaintiff has taken the position that almost every product Plaintiff

19  sold from 2003-2007 (the life of the '067 Patent) was covered by the '067 Patent.  (Mot. 42

20  (citing Oct. 31, 2013 Hayes Dep. 638:22-640:4).)  Defendant points to the lack of evidence of

21  marking on four categories of remotes which collectively accounted for between 50-60% of

22  covered remotes in 2006 and 2007.  (Mot. 42-43.)   Those remotes were the Atlas remotes, the

23  DirecTV remotes, the Motorola DRC800 remotes, and a group of Radio Shack remotes.  (Mot.

24  42-43.)  The Atlas remotes did not include the Millennium 4 product, but that was difficult to

25  ascertain from the Motion, because it was stated only in a declaration submitted as Rowland

26  Exhibit 91, which in turn was only cited on page 41, in the argument about the '426-covered

27  remotes, and not in the following pages specifically addressing the '067-covered remotes.

28

In any event, Plaintiff's response again begins not by addressing the specific evidence Defendant presented, but instead offering evidence of various remotes marked with the '067 Patent, with general citations to various product specifications, the lack of many findings of marking problems in quality inspections, and various manufacturing drawings.  (Opp'n 42.) Plaintiff does present evidence that the DirecTV remotes were marked (*see* Opp'n 43), and despite Defendant's attack on that evidence (Reply 20), it would suffice to create a genuine issue for the jury to decide.  But Plaintiff fails to offer evidence creating a genuine issue of fact as to the other remotes.  Its Atlas evidence addresses only the Millennium 4 product (Haan Decl. Ex. 45 586, 589) that did not form part of the basis for the Motion.  It offers no evidence concerning the Motorola DRC800 remotes.  It offers no evidence that the Radio Shack remotes addressed in the Motion were marked, instead providing evidence that other Radio Shack remotes—the 8-in1 and GamerPro models—were marked (Haan Decl. Ex. 43), and that other Radio Shack specifications state that the "owner's manual" should be marked. (Haan Decl. Ex. 51 792.)  As Defendant points out (Reply 20), marking the owner's manual is insufficient where the product itself is capable of being marked, as is the case here.  *See Metrologic Instruments, Inc. v. PSC, Inc.*, Civ. A. No. 99-4876 (JBS), 2004 U.S. Dist. LEXIS 24949, *55, *60 (D.N.J. Dec. 13, 2004) (holding insufficient listing the patent numbers of its products in the related instruction manuals).

Subtracting out the genuinely disputed DirecTV remotes shows that Plaintiff has failed to establish a genuine dispute concerning the fact that it failed to mark approximately 23% of the '067-covered remotes in 2006 and 22% of the '067-covered remotes in 2007.  Those figures fail the "substantially all" requirement by a wide measure.  *See Hazeltine Corp. v. Radio Corp. of Am.*, 20 F. Supp. 668, 673 (S.D.N.Y. 1937) (holding that a failure to mark 13% of products is "certainly not adequate marking.").

*7.2.4   The Date When Plaintiff Provided Actual Notice of Infringement*

As Defendant notes (Mot. 43), "Section 287(a) provides that absent marking, a patentee may not recover damages without proof that 'the infringer was notified of the infringement.'" *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 186 (Fed. Cir. 1994).  "For purposes of section 287(a), notice must be of 'the infringement,' not merely notice of the patent's existence or ownership. Actual notice requires the affirmative communication of a specific charge of infringement by a specific accused product or device."  *Id.* at 187.

Plaintiff's Complaint in this case alleged that it sent Defendant written notice of infringement of the '426 Patent on March 1, 2010.  (Dkt. No. 1 ¶ 11.)  Defendant accepts that date for purposes of the Motion, and Plaintiff does not dispute it.  Therefore, Plaintiff's damages for infringement of the '426 Patent are limited to those accruing on or after March 1, 2010.

Defendant argues that Plaintiff's first notification of infringement of the '067 Patent was the Complaint in this case on March 2, 2012, and that because the '067 Patent expired in 2007, Plaintiff is not entitled to any damages for the '067 Patent.  (Mot. 44.)  Plaintiff does not dispute those dates in its Opposition, and thus has waived any objection to such a finding.

Despite that, the Court discusses those potential notice dates in the interest of completeness.  The Motion acknowledges that the Complaint alleges that Plaintiff provided notice of the patent on either December 16, 2004, by listing the '067 Patent in the license agreement that settled the 2000 litigation, or in a letter dated May 27, 2011.  (Mot. 44 (citing Compl., Dkt. No. 1 ¶¶ 46-47).)  As to the 2004 date, the Complaint only alleges that the license agreement provided notice of the '067 Patent, not that it provided notice of infringement.  (Dkt. No. 1 ¶ 46.)  Had the 2004 license agreement alleged infringement, that would likely create laches and equitable estoppel problems, and would be in conflict with the positions taken by Plaintiff in opposing summary judgment on those issues.  As to the May 27, 2011 letter, it merely stated, after discussing particular infringement of a number of patents by a number of remotes, that "[i]n addition, in the past certain URC products may have infringed upon now-expired UEI patents, including . . . [the '067 Patent] as previously communicated to you."  That

was not an "affirmative communication of a specific charge of infringement by a specific accused product or device."  *Amsted*, 24 F.3d at 186.

Plaintiff's inability to recover for any infringement of the '067 Patent is a result not only of its failure to mark, but of its lack of diligence in asserting infringement.  The accused infringement of the '067 Patent relates to what are apparently common features of both parties' remotes.  Not only are the parties the two largest competitors in the market, they were in direct competition for the Time Warner account since 2006, which competition lead to the bulk of Plaintiff's damages claim in this case.  (Decl. of Frank Bernatowicz ("Bernatowicz Decl."), Tab. A. ¶¶ 51-94, Ex. 16.)  While the undisputed facts are not sufficient to grant summary judgment of laches, Plaintiff's assertion of its patent rights was not a model of diligence.

### 7.3    Conclusion

As to issue 7, patent marking, the Motion is GRANTED.

//

//

**DISPOSITION**

The Court rules on Defendant's Motion for Summary Judgment as follows:

Issue 1: Laches, Estoppel, and Implied License.  DENIED.

Issue 2: Invalidity of the '426 Patent.  DENIED.

Issue 3: Non-Infringement of the '426 Patent.  GRANTED.

Issue 4: Non-Infringement of the '906 Patent.  DENIED.

Issue 5: Non-Infringement of the '067 Patent.  DENIED.

Issue 6: Entire Market Value Rule.  DENIED.

Issue 7: Patent Marking.  GRANTED.

IT IS SO ORDERED.

DATED: March 24, 2014

_____

Andrew J. Guilford
United States District Judge